# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DIMENSIONAL EMERGING MARKETS
VALUE FUND, DFA INVESTMENT
DIMENSIONS GROUP INC. on behalf of its
series EMERGING MARKETS CORE EQUITY
PORTFOLIO, EMERGING MARKETS
SOCIAL CORE EQUITY PORTFOLIO and
T.A. WORLD EX U.S. CORE EQUITY
PORTFOLIO, THE DFA INVESTMENT
TRUST COMPANY on behalf of its series THE
EMERGING MARKETS SERIES, DFA
AUSTRALIA LIMITED solely in its capacity as
responsible entity for the DIMENSIONAL
EMERGING MARKETS TRUST, DFA
INTERNATIONAL CORE EQUITY FUND and
DFA INTERNATIONAL VECTOR EQUITY
FUND by DIMENSIONAL FUND ADVISORS
CANADA ULC solely in its capacity as Trustee,
DIMENSIONAL FUNDS PLC on behalf of its
sub-fund EMERGING MARKETS VALUE
FUND, and DIMENSIONAL FUNDS ICVC on
behalf of its sub-fund EMERGING MARKETS
CORE EQUITY FUND,

                                        Plaintiffs,

v.

PETROLEO BRASILEIRO S.A. –
PETROBRAS,

                                        Defendant.

Civil Case No.  15 CV 02165

**COMPLAINT**



RECEIVED
MAR 23 2015
U.S.D.C. S.D. N.Y.
CASHIERS

**TABLE OF CONTENTS**

<u>Page</u>

I.    NATURE OF THE ACTION ............................................................................................. 2

    A.    Overview of the Case ............................................................................................ 2

    B.    The Claims Asserted in this Complaint ................................................................ 9

II.   JURISDICTION AND VENUE .................................................................................... 10

III.  PARTIES ....................................................................................................................... 12

    A.    Plaintiffs .............................................................................................................. 12

    B.    Petrobras ............................................................................................................. 13

    C.    Relevant Non-Parties ......................................................................................... 14

IV.   FACTUAL BACKGROUND ....................................................................................... 16

    A.    History and Structure of Petrobras ...................................................................... 16

    B.    Petrobras Required Extraordinary Amounts of Capital to Exploit
          Brazil's Oil and Gas Resources ........................................................................... 19

    C.    Petrobras Focused on the United States Capital Markets .................................... 21

    D.    Petrobras Was Legally Required to Engage in Open and Honest
          Bidding With Outside Contractors ....................................................................... 22

    E.    Petrobras Trumpets Its Transparency in Response to a 2009
          Investigation into Pricing Irregularities ............................................................... 24

V.    PETROBRAS'S FRAUDULENT SCHEME DURING THE RELEVANT PERIOD .... 27

    A.    Petrobras Touts New Capital Projects as Critical to Its Future and
          Emphatically Denies Allegations of Pricing Irregularities .................................. 28

        1.    The Pasadena, Texas Refinery .................................................................. 28

        2.    The Abreu Refinery .................................................................................. 29

        3.    The Comperj Refinery ............................................................................... 31

        4.    SBM Offshore Projects ............................................................................. 33

i

     5.      Transpetro Subsidiary ...................................................................... 33

B.    Unbeknownst to Investors, Petrobras's Contract Costs, Asset Values and Net Income Were Grossly Inflated by Cartelization and Graft .................................................................. 34

     1.      Petrobras and Its Contractors Engaged in Bid-Rigging .............................................................................................. 36

          (a)     Petrobras's Contractors Dictated Which Companies Would Bid on Petrobras Projects ............................... 36

          (b)     Bid-Rigging by the Cartel Inflated Petrobras's Project Costs .............................................................. 39

     2.      Petrobras Executives Demanded that All Contracts Include an Additional "Bribe Fee" .......................................... 41

     3.      The Company's Senior Officers Orchestrated and Covered Up the Scheme ................................................................. 49

          (a)     Foster and the Executive Directorate Silenced Velosa and Closed Their Eyes to Evidence of Fraud ......................................................... 50

          (b)     Gabrielli and Duque Retaliated Against Fernando After Fernando Warned of Fraud at Abreu ........................................................................... 54

          (c)     Petrobras Removed an Independent Director From the Audit Committee After He Raised Concerns About the Company's Financial Statements ...................................................................... 56

     4.      The Kickback Scheme Had an Enormous Impact on Petrobras's Financial Statements Throughout the Relevant Period ................................................................... 58

          (a)     Petrobras's Accounting for the Bribes and Overpayments on Contracts Violated GAAP and IFRS .......................................................................... 58

          (b)     Petrobras Has Admitted It Must Record a Massive Writedown to PP&E to Account For Improperly Capitalized Expenses ........................................... 61

5.      "Operation Car Wash" Has Provided Extensive Testimony and Documentary Evidence Demonstrating the Mechanisms of the Scheme ........................................ 64

        (a)    Bribery in the International Division ............................................. 66

        (b)    Abreu and Comperj Refineries: Hundreds of Millions in Bribes and Overpayments .......................................... 68

        (c)    Bribery by SBM .......................................................................... 72

        (d)    Bribery at Transpetro ................................................................... 73

C.    Following the Commencement of Operation Car Wash, Petrobras Continued to Mislead Investors by Forcefully Denying the Existence of Corruption ......................................................................... 75

VI.    THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES ................................................................................................ 78

VII.    RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE COMPANY ...................................................................................................... 92

VIII.    MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE EXCHANGE ACT CLAIMS ........................................................................... 95

A.    Petrobras's Materially False and Misleading Statements Concerning Its Financial Condition and Compliance with GAAP and IFRS ......................................................................................................... 95

B.    Petrobras's Materially Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects ...................... 105

        1.    Pasadena, Texas Refinery ..................................................... 105

        2.    Abreu Refinery ....................................................................... 107

        3.    Comperj Refinery ................................................................... 110

        4.    SBM Contracts ....................................................................... 112

        5.    Transpetro Contracts .............................................................. 114

        6.    Repar Refinery ........................................................................ 115

C.    Petrobras's Materially False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption ........................... 116

D.     Petrobras's Materially False and Misleading Statements About Competitive Bidding ........................................................................ 121

E.     Petrobras's Materially False and Misleading Denials of Fraud, Bribery and Corruption as Investigations Commence ......................................... 124

F.     Petrobras's Materially False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls .......................................................................... 127

IX.     SUMMARY OF SCIENTER ALLEGATIONS ............................................. 129

A.     Petrobras's Scienter Is Established Through the Admissions of Senior Officers ..................................................................................... 132

     1.     Costa ............................................................................... 133

     2.     Barusco ............................................................................ 137

B.     Foster Knew About or Recklessly Disregarded the Bid-Rigging and Kickback Scheme Prior to and During the Relevant Period ...................... 139

C.     Additional Members of the Executive Directorate Have Been Implicated in the Fraudulent Scheme ............................................... 143

     1.     Gabrielli ............................................................................ 144

     2.     Duque ............................................................................... 145

     3.     Cerveró ............................................................................ 146

D.     Additional Evidence of Scienter ...................................................... 147

     1.     The Magnitude and Scope of the Scheme ............................ 147

     2.     Petrobras's Retaliatory Efforts ........................................... 149

     3.     Resignations and Terminations of Petrobras Executives ...................................................................... 150

X.     THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES ........................... 150

XI.     THE STATUTORY SAFE HARBOR IS INAPPLICABLE ........................... 151

XII.     CAUSES OF ACTION ............................................................................. 152

XIII.     PRAYER FOR RELIEF ........................................................................... 155

Plaintiffs, Dimensional Emerging Markets Value Fund; DFA Investment Dimensions Group Inc. on behalf of its series Emerging Markets Core Equity Portfolio, Emerging Markets Social Core Equity Portfolio and T.A. World ex U.S. Core Equity Portfolio; The DFA Investment Trust Company on behalf of its series The Emerging Markets Series; DFA Australia Limited solely in its capacity as responsible entity for the Dimensional Emerging Markets Trust; DFA International Core Equity Fund and DFA International Vector Equity Fund by Dimensional Fund Advisors Canada ULC solely in its capacity as Trustee; Dimensional Funds plc on behalf of its sub-fund Emerging Markets Value Fund; and Dimensional Funds ICVC on behalf of its sub-fund Emerging Markets Core Equity Fund (collectively, "Plaintiffs" or "Dimensional"), by and through their undersigned counsel, bring this action against Defendant Petróleo Brasileiro S.A.—Petrobras ("Petrobras" or the "Company") to recover damages for losses Plaintiffs have suffered on certain securities issued by Petrobras and purchased or acquired by Plaintiffs between March 24, 2010 and January 27, 2015, inclusive (the "Relevant Period").  Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of:  (i) documents filed by Petrobras with the U.S. Securities and Exchange Commission ("SEC") and the Comissão de Valores Mobiliários ("CVM"); (ii) securities analysts' reports about Petrobras; (iii) transcripts of Petrobras conference calls; (iv) Petrobras press releases; (v) media reports published in the United States and Brazil concerning Petrobras and Operation "Car Wash," including online news sources; and (vi) documents, deposition testimony, plea bargain proffers, criminal complaints and other evidence submitted by Brazilian prosecutors and other Brazilian governmental authorities in Brazilian federal court proceedings.

1

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after Plaintiffs have had a reasonable opportunity to conduct discovery.

## I.   NATURE OF THE ACTION

### A.   Overview of the Case

1.   This securities action arises from a massive scheme to funnel billions of dollars in kickbacks to executives at Petrobras, an oil and gas company that stood as a central pillar of Brazil's economy.   As several of the Company's senior executives have now testified, Petrobras's and its executives' participation in this long-running scheme caused the Company to overstate by billions of dollars the value of its refineries, oil rigs, and other assets.   Rather than accounting for these bribes and overstated costs as expenses in its financial statements, which would have decreased the Company's reported assets and net income, Petrobras fraudulently capitalized the bribes as assets to mask the kickback scheme, in violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").   Petrobras's January 27, 2015 earnings release indicates that, as a result of this scheme, its assets will have to be written down by a staggering amount, ranging from *$1.5 billion to $34 billion*.[1]   This admitted fraud—which pervaded virtually every aspect of Petrobras's business and caused the Company to issue admittedly false financial statements—has caused billions of dollars in losses to Petrobras's investors on the New York Stock Exchange ("NYSE").

_____   _____

[1] All currency amount are expressed in United States dollars, except where indicated as "R$." Wherever possible, Plaintiffs' Counsel have provided the approximate U.S. dollar amount from the contemporaneous exchange rate, as provided by Brazil's Central Bank: http://www4.bcb.gov.br/pec/taxas/ingl/ptaxnpesq.asp?id=quotations.   Unless otherwise noted, all emphasis is added.   Many of the sources quoted herein were originally published in Portuguese. Plaintiffs have made good faith and reasonable efforts to translate these sources into English.

2.      Throughout the Relevant Period, Petrobras and its senior officers, including former Chief Executive Officer ("CEO") Maria das Graças Silva Foster ("Foster"), insisted that Petrobras was a global leader in corporate governance and transparency.  For example, the Company stated that it "*reject[ed] any corruption practices and use[d] strict management methods* to assure the protection of its shareholders' interests."  Then, as the costs of Petrobras's massive capital projects inexplicably doubled, and then tripled, and then quadrupled, the Company repeatedly stated that "there is *no overbilling, overpricing, or any other irregularity*" in Petrobras's contracts.  For the avoidance of any doubt, Foster announced in 2012 that "*[o]ur results are absolutely true and legitimate*."

3.      These statements—and the dozens of other similar statements during the Relevant Period—were false.  In reality, since no later than 2004, Petrobras executives colluded with dozens of the world's largest engineering and construction firms to overbill and inflate the costs of their contracts with Petrobras and funnel billions of dollars in bribes directly into the hands of Petrobras executives and Brazilian government officials.

4.      These facts began to emerge in late 2014 when former Chief Downstream Officer (also referred to as the Director of Supply), Paulo Roberto Costa ("Costa"), a former C-level executive who served on the Company's "Executive Directorate," confessed to criminally conspiring with other Petrobras senior executives to operate a longstanding bribery and bid-rigging scheme.  Specifically, Costa stated in sworn testimony that he colluded with Renato Duque ("Duque"), former Chief Services Officer and Executive Directorate member; Pedro Barusco ("Barusco"), Duque's right-hand man and former Executive Manager of Engineering; Nestor Cerveró ("Cerveró"), former Chief International Officer and Executive Directorate member; and Sergio Machado ("Machado"), former CEO of Petrobras's subsidiary Petrobras

Transporte S.A. ("Transpetro"); along with some of Brazil's top politicians, a "cartel" of engineering and construction companies, and criminal money launderers to use the Company as a giant slush fund. All of these individuals and entities collaborated to rig Petrobras's bids for outside contractors and to inflate contract costs by up to 20%. In exchange, Petrobras officials demanded a standard 3% bribe for themselves and the Brazilian political parties that sponsored their appointment to the Company's Executive Directorate.

5.      All told, Petrobras paid billions of dollars in illegal bribes and inflated contracts pursuant to this scheme, and went to great lengths to conceal these payments from investors. Indeed, as Petrobras would later reveal, it improperly recorded these inflated contract amounts *as assets* in the Company's financial statements. Petrobras then used these misstated financial statements to raise billions of dollars from investors through the U.S. capital markets.

6.      As revealed by Costa's and Barusco's sworn testimony, the "cartelization" and bribery scheme was "endemic" and "institutionalized" at Petrobras. Barusco testified and provided documentation demonstrating that the scheme, which dates back to at least 2004, actively continued well into 2014.

7.      In concealing this criminal activity, the Company misled investors concerning the nature of Petrobras's contracts and overstated the value of its assets. These overstated values include, among others:

- The value of Petrobras's refinery in Pasadena, Texas. In 2006, Petrobras agreed to purchase—at Cerveró's instigation—a 50% stake in the Pasadena refinery from Astra Oil for $370 million, a price that eventually ballooned to $1.18 billion. Only years later did investors learn from Costa's confession that Astra Oil paid millions of dollars to Petrobras's Executive Directorate to "not hinder" this white elephant of a deal.

- Petrobras's flagship modern oil refinery, Abreu e Lima ("Abreu"). Abreu was originally budgeted in 2007 to cost $2.5 billion, and by the time of its completion in 2014, supposedly cost an astounding $18.5 billion. Costa and Barusco (among

4

others) provided detailed testimony regarding the multiple specific large-scale Abreu projects whose costs were wildly inflated by the Cartel (defined below) bid-rigging and bribery of Petrobras executives.

- The reported $20 billion value of oil platforms that were the subject of lease agreements with Dutch company SBM Offshore. Barusco testified in detail that he personally accepted $22 million in bribes in connection with SBM contracts and that Duque received even more. The exposure of the SBM bribes may result in a ban on contracts with SBM, potentially reducing Petrobras's profits by $15 billion over the next several years.

8.      Petrobras's senior executives, including Foster and her predecessor as CEO, Jose Sergio Gabrielli de Azevedo ("Gabrielli"), carried on a long-running cover-up of this bribery scheme that had become Petrobras's standard operating procedure.  For example, a former senior Petrobras executive, Venina Velosa da Fonseca ("Velosa"), who reported directly to Costa and worked closely with Foster before Foster's elevation to CEO in 2012, has recently revealed that she repeatedly, and noisily, objected to Petrobras's improper practices.  Velosa informed both Gabrielli and Foster about problems with bidding relating to the construction of the Abreu refinery, including payments for services that were never rendered, overbilled contracts, and violations of the Company's ethical code.  Velosa stated that she made her concerns widely known within the Company, including to Foster and Gabrielli:

> [I]n 2008, as an executive manager, I informed . . . the director at the time, Paulo Roberto Costa. I informed other directors, like Graças Foster. And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time.  I informed director Cosenza, in his position as director, since he was my peer, and as executive manager.  I informed president Gabrielli.

9.      After months of raising objections and seeking to change the Company's practices, Velosa began to receive anonymous personal threats to herself and her daughters. Then, in 2011, Petrobras summarily removed Velosa from her position and transferred her to the Company's office in Singapore, where she was instructed to spend her time in a "training

course." Velosa conveyed her outrage at the Company's practices and her exile directly to

Foster, with whom she was "close," through an October 7, 2011 email that has recently become

public. Velosa informed Foster that, as result of the widespread improper practices at Petrobras,

and because of "the immense pride that I had for my company, I started to feel ashamed." In the

email, Velosa told Foster that she was considering what she should do and explicitly noted that

part of the incriminating documentation that she had about irregularities was already in Foster's

possession: "There are alternatives I'm evaluating despite fears of risking myself and my

daughters. *I would like to present to you part of the documentation that I already have. Part*

*of it, I know you are already aware of.* I would like to hear from you before taking the next

step." Foster never responded.

10.     Petrobras eventually terminated Velosa's employment without explanation in late

2014, at which point she again emailed Foster:

> Since 2008 my life has become a hell, I came across an initial scheme of
> embezzlement within the Communications of Downstream [unit]. By fighting it,
> I was threatened and harassed. I even had a gun pointed to my head and received
> threats against my daughters.

*       *       *

> I have with me all the documentation of the case, which I never offered to the
> press out of respect for Petrobras, despite all the journalists' attempts of
> contacting. I presented the matter to the company's competent authorities,
> including the Legal and Audit [departments], *which was in vain*.

11.     Despite these and other efforts to cover-up the institutionalized culture of bribery

at Petrobras, the Company's scheme began to unravel in March 2014. On March 20, 2014, Costa

was swept up in a Brazilian sting operation concerning money laundering and embezzlement,

which was code-named "Operation Car Wash" (or Operation "Lava Jato"—the Brazilian slang

for "car wash"). After news of Costa's arrest emerged, both Petrobras and Costa strenuously

denied any connection between Costa's arrest and his Petrobras activities.  Indeed, for months following Costa's arrest, Petrobras officials, including Foster, denied any accusations of "irregularities" at Petrobras and claimed that others were using Petrobras as a "political weapon" in an election year.

12.     However, in August 2014, Costa accepted a plea bargain whereby he agreed to turn state's evidence.  In his plea agreement and confidential video testimony, which were later made public, Costa explained the broad outlines of the Cartel's operations and the payments of bribes to himself and to significant Brazilian politicians.  In an attempt at damage control, Petrobras immediately responded that, if any misconduct did in fact occur, *the Company* was the victim.

13.     Faced with overwhelming evidence of misconduct, the Company finally admitted that Petrobras executives were part of the money laundering and bribery scheme, and that this corruption had directly impacted the Company.  On November 13, 2014, after the market closed, Petrobras issued a press release acknowledging, for the first time, that if the evidence provided by Costa was true, it would "potentially impact the Company's financial statements."  Petrobras reported that it would delay filing its third-quarter 2014 financial statements in light of the investigation.

14.     On Friday, November 14, 2014, the scandal intensified with the arrest of another former Company executive, Duque, and 22 other people in connection with Operation Car Wash.  The next business day (November 17), before the market opened, the Company held its earnings conference call with investors during which CEO Foster and Chief Financial Officer ("CFO"), Almir Guilherme Barbassa ("Barbassa"), discussed the delayed earnings and tried to maintain control over the deepening crisis.  During three hours of questioning, first from analysts, and

then from journalists, the CEO and other top executives could not explain how Petrobras would recover or account for the billions of dollars in inflated contract payments. However, Foster admitted that "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, *could potentially affect the Company's financial statements*." In particular, Barbassa further admitted that the allegations, if true, would require the Company to record a substantial writedown to its Property, Plant and Equipment ("PP&E"), its largest and most valuable asset. In response to this news, Petrobras American Depositary Shares ("ADSs") fell dramatically in value.

15.    Then, on December 15, 2014, Brazilian criminal authorities announced the formal indictment of Cerveró for acts of corruption and money laundering. Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his facilitation of Petrobras's acquisition of the Pasadena, Texas refinery. As former Chief of Petrobras's International Division, Cerveró's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope. In response to the news of Cerveró's indictment, the Company's ADSs fell approximately 12% in a single day.

16.    Finally, after the markets closed on January 27, 2015, and after a two-month delay, Petrobras released wholly incomplete and unaudited third-quarter 2014 financial statements. Notably, these financial results did not contain the expected writedowns because *the scope of the fraud was too vast for the Company or its auditors to estimate*. Petrobras disclosed that the corruption scheme impacted at least "1/3 of the company's total fixed assets," and provided a range of potential asset writedowns on these assets from *R$4 billion (US$1.5 billion) to R$88.6 billion (US$34 billion)*. Petrobras further admitted that it had improperly accounted

8

for overpayments and bribes as assets during the Relevant Period, leading to "errors" in its published financial statements.  In a letter to shareholders accompanying Petrobras's financial results, Foster acknowledged the commission of "unlawful acts" by former Petrobras employees and stated that the "payments to . . . suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."  However, because Petrobras and its auditors allegedly could not agree upon the amount of the adjustment, the Company's financial statements did not contain any writedowns.

17.     The scope of the potential writedowns revealed by this disclosure, coupled with Petrobras's admissions concerning the falsity of its financial statements, stunned investors and immediately caused the price of the Company's ADSs to plunge 11.9%.  On January 29, Moody's downgraded Petrobras to the lowest level of investment grade, citing as a main reason for the downgrade the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the liquidity pressures that follow as investors are left in the dark.

18.     The impact of the fraud continues to reverberate through the Company.  On February 4, Foster and CFO Barbassa—along with the rest of the Executive Directorate—left the Company due to the corruption scandal.  In addition to the ongoing criminal prosecutions in Brazil, the SEC and DOJ have also launched investigations into the Petrobras kickback scheme and potential violations of the U.S. Federal Corrupt Practices Act ("FCPA").

**B.     The Claims Asserted in this Complaint**

19.     Plaintiffs assert securities fraud claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with their purchases of Petrobras securities on the NYSE during the Relevant Period.  Plaintiffs' Section 10(b) claims allege that Petrobras engaged in a fraudulent scheme to artificially inflate the price of Petrobras securities.

20.     Plaintiffs' claims arise from a series of materially false and misleading statements and omissions made by Petrobras in the Company's SEC filings and other public statements issued by Petrobras throughout the Relevant Period concerning, *inter alia*, (i) the value of Petrobras's PP&E; (ii) the amount of Petrobras's expenses and net income; (iii) the Company's compliance with GAAP and IFRS; (iv) the adequacy of the Company's internal controls over financial reporting; (v) the Company's failure to disclose the fact that certain of Petrobras's contracts were overstated by billions of dollars that were paid out in bribes to Petrobras employees and government officials; and (vi) the Company's affirmative representations that Petrobras's contracts were not overpriced and that the Company was not involved in the payment of bribes during the Relevant Period.  The truth about Petrobras was revealed through a series of disclosures, which caused a precipitous decline in the market value of Petrobras common and preferred ADSs and caused significant damages to Plaintiffs.

II.     **JURISDICTION AND VENUE**

21.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

23.     Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on the NYSE, engaged in the public offering of ADSs that are listed on the NYSE, and certain of the acts that constitute the violations of law complained of herein, such as the dissemination of materially false and misleading information to the investing public, including in Petrobras's filings with the SEC, occurred in and/or were issued from this District.

24.     Plaintiffs' claims are premised upon their purchases of Petrobras common and preferred ADSs on the NYSE.

25.     In a Deposit Agreement governing Petrobras's common and preferred ADSs, filed with the SEC on Form F-6 on December 7, 2011, Petrobras stated that it "consents and submits to the jurisdiction of any state or federal court in the State of New York in which any such suit or proceeding may be instituted."   Furthermore, in that same Deposit Agreement, the Company agreed that: "This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York[.]"

26.     Likewise, in the prospectus supplement filed on September 28, 2010 pursuant to which the Company issued ADSs on the NYSE, Petrobras stated:  "Each deposit agreement and the [ADSs] issued thereunder shall be governed by and construed in accordance with the laws of the State of New York.  In each deposit agreement, we have submitted to the jurisdiction of the courts of the State of New York and appointed an agent for service of process on our behalf."

27.     The underwriting agreements entered into by Petrobras and certain underwriters, in connection with the public offerings of securities that occurred during the Relevant Period, stated that the parties to the agreement "agree that any suit, action or proceeding against them, arising out of or based upon this Underwriting Agreement or the transactions contemplated hereby, may be instituted in any State or federal court in the Borough of Manhattan, City of New York, New York."   The underwriter agreements further state that the parties "waive any objection which they may now or hereafter have to the laying of venue of any such proceeding and any right to which any of them may be entitled on account of places of residence or domicile, and irrevocably submit to the jurisdiction of such courts in any suit, action or

proceeding." The underwriting agreement that Petrobras filed with the SEC on Form 6-K on September 29, 2010 in connection with its September 2010 offering of ADSs contained identical statements and waivers. Plaintiffs allege, among other things, that Petrobras's denials of fraud and corruption contained in these underwriting agreements were false and misleading, as set forth in Section VIII.C *infra*.

28.     The Company conducted the registered public offerings of the ADSs at issue in this Action in this District.

29.     In connection with the acts alleged in this complaint, Petrobras, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

30.     As reflected in Appendix A attached hereto, the following Dimensional entities purchased Petrobras ADSs on the NYSE during the Relevant Period:

31.     Plaintiff Dimensional Emerging Markets Value Fund, a Delaware statutory trust, purchased Petrobras ADSs on the NYSE during the Relevant Period and suffered substantial losses as a result of the conduct complained of herein.

32.     Plaintiff DFA Investment Dimensions Group Inc., a Maryland corporation, purchased Petrobras ADSs on the NYSE during the Relevant Period on behalf of its series Plaintiffs Emerging Markets Core Equity Portfolio, Emerging Markets Social Core Equity Portfolio and T.A. World ex U.S. Core Equity Portfolio, which suffered substantial losses as a result of the conduct complained of herein.

33.     Plaintiff The DFA Investment Trust Company, a Delaware statutory trust, purchased Petrobras ADSs on the NYSE during the Relevant Period on behalf of its series Plaintiff The Emerging Market Series, which suffered substantial losses as a result of the conduct complained of herein.

34.     Plaintiff Dimensional Emerging Markets Trust, by Plaintiff DFA Australia Limited, an Australian corporation, solely in its capacity as responsible entity, purchased Petrobras ADSs on the NYSE during the Relevant Period, and suffered substantial losses as a result of the conduct complained of herein.

35.     Plaintiffs DFA International Core Equity Fund and DFA International Vector Equity Fund, by Plaintiff Dimensional Fund Advisors Canada ULC, an unlimited company organized under the laws of Nova Scotia, solely in its capacity as Trustee, purchased Petrobras ADSs on the NYSE during the Relevant Period, and suffered substantial losses as a result of the conduct complained of herein.

36.     Plaintiff Dimensional Funds plc, an Irish Variable Capital Public Limited Company, purchased Petrobras ADSs on the NYSE during the Relevant Period on behalf of its sub-fund Plaintiff Emerging Markets Value Fund, which suffered substantial losses as a result of the conduct complained of herein.

37.     Plaintiff Dimensional Funds ICVC, a United Kingdom Open Ended Investment Company, purchased Petrobras ADSs on the NYSE during the Relevant Period on behalf of its sub-fund Plaintiff Emerging Markets Core Equity Fund, which suffered substantial losses as a result of the conduct complained of herein.

**B.     Petrobras**

38.     Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor,

20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022. The Company also maintains a trading and procurement office in Houston, Texas. The Company employs more than 400 people in its U.S. operations. The Company's common and preferred shares are listed on the São Paulo Stock Exchange, the BM&FBOVESPA ("Bovespa"), trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2000, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.

**C.**   **Relevant Non-Parties**

39.     Foster served as CEO and President of Petrobras from February 13, 2012 until February 2015. During this time, Foster was also a member of Petrobras's Executive Directorate and a member of the Company's Board of Directors (the "Board of Directors"). Previously, Foster served as the Company's Director of Gas and Energy. Foster signed Petrobras's 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F reporting the Company's financial results and other misstated information about the Company and its business. Foster also made a series of false and misleading statements in investor conference calls, press releases and other communications during the Relevant Period. On February 4, 2015, Foster was forced to resign as a result of her role in the misconduct alleged herein.

40.     Barbassa served as CFO of Petrobras from 2005 to February 2015 and was a member of the Executive Directorate. Barbassa signed each of Petrobras's Relevant Period Forms 20-F and each of Petrobras's Relevant Period Forms 6-K reporting the Company's financial results and other misstated information about the Company and its business. On February 4, 2015, Barbassa purportedly resigned as a result of the misconduct alleged herein.

14

41.     Gabrielli served as CEO and member of the Executive Directorate for Petrobras until February 13, 2012.  Gabrielli signed Petrobras's 2009 Form 20-F and 2010 Form 20-F reporting the Company's financial results and other misstated information about the Company and its business.  On December 16, 2014, prosecutors in Brazil announced that they were planning to indict Gabrielli on fraud charges and sought an order freezing Gabrielli's assets.  On January 29, 2015, a Brazilian court granted that request, froze Gabrielli's assets and granted access to Gabrielli's and other suspects' bank records.

42.     Costa served as Petrobras's Chief Downstream Officer from May 14, 2004 to around April 27, 2012 and was a member of the Executive Directorate during that time.  Costa also served as the chairman of the boards of directors of the Alberto Pasqualini Refinery (REFAP), the Abreu Refinery (RNEST) and the Complexo Petroquimico do Rio de Janeiro ("Comperj").  Costa was also a member of the board of directors of Petrobras Transportes ("Transpetro").

43.     Duque served as Petrobras's Chief Services Officer (also referred to as Chief Engineering, Technology and Procurement Officer and Services Director) from January 31, 2003 to around April 29, 2012.  Duque also served as Chairman of Petrobras's Services Board and was a member of Petrobras's Executive Directorate and of the board of directors of Petrobras Gas S.A. (Gas Petro).

44.     Barusco served as Executive Manager of Engineering, reporting directly to Duque, from approximately 2003 until March of 2011.  Thereafter, Barusco was appointed by Gabrielli to the position of Head of Operations at Sete Brasil, a company founded in 2010 to lease oil rigs and deepwater drilling platforms to Petrobras, where he stayed until his resignation in 2013.

45.     Cerveró served as a director of Petrobras's International Division from 2003 to 2008, and was a member of the Executive Directorate during that time.   Cerveró then served as CFO of Petrobras's fuel distribution subsidiary, BR Distribuidora, until March 2014.

46.     Machado served as CEO and President of Petrobras's transport unit, Transpetro, from June 2003 to February 5, 2015.

IV.     **FACTUAL BACKGROUND**

A.     **History and Structure of Petrobras**

47.     Petrobras was incorporated in 1954 in order to carry out crude oil and natural gas production and refining activities on behalf of the Brazilian federal government.   At the beginning of the Relevant Period, Petrobras was the largest corporation in Brazil (and in the Southern Hemisphere) by market capitalization, and one of the largest integrated oil and gas conglomerates in the world.   Petrobras also operates in 22 other countries, including in the United States, where the Company focuses on deepwater oil exploration in the Gulf of Mexico.

48.     While investors in the Company's NYSE-traded ADSs hold the equivalent of approximately 25% of the Company preferred stock and 21% of the Company's common shares, Brazilian law requires that the Brazilian federal government own a majority of Petrobras's voting stock.   As a result of this arrangement, the Brazilian federal government has the power to elect a majority of the Company's Board of Directors and, through them, the "Executive Directorate," which was selected by and reported directly to the Board of Directors.   The Executive Directorate (also known as the "Executive Board") was composed of the Company's CEO and six senior-most officers and was responsible for the Company's day-to-day management. These executives included, among others, Gabrielli and Foster, in their capacities as Company CEOs and, for Foster, in her previous capacity as Chief of Gas and Energy; Barbassa, as Company

CFO; Costa as Chief Downstream Officer; Duque as Chief Services Officer; and Cerveró, as Chief International Officer.

49.     For over a decade, the ruling party in Brazil has been the Workers Party (known by its Portuguese acronym "PT").  The PT and its coalition allies thus have the power to appoint a majority of Petrobras's Board of Directors and to select members of Petrobras's Executive Directorate.  Indeed, Brazil's current President, Dilma Rousseff, was Chairwoman of Petrobras's Board of Directors from 2003 until she was elected President of Brazil in 2010.  During her time as Chairwoman, Rousseff acted as cabinet minister to former president Luis Inácio Lula da Silva. In 2012, after she was elected President, Rousseff nominated Foster for the position of Petrobras's CEO.

50.     During the Relevant Period, Petrobras's revenue was derived from five separate business segments:

a.     *Exploration and Production* ("E&P" or "Upstream"): The Upstream Division included all of Petrobras's oil and gas exploration, development, and production in Brazil.  The E&P Division searched for potential underground or underwater crude oil and natural gas fields, drilled exploratory wells, and subsequently drilled and operated the wells that recovered and brought the crude oil and/or raw natural gas to the surface.

b.     *Refining, Transportation and Marketing* ("Downstream" or "Supply"): The Downstream Division included all of Petrobras's refining, logistics, transportation, oil products and crude oil exports and imports and petrochemicals that took place in Brazil.  Costa was the Director of this Division until he departed in April 2012.

c.     *Gas and Energy*: The Gas and Energy Division handled Petrobras's gas transportation and distribution, fertilizer production, and electric power generation using natural gas and renewable energy sources.  Foster was Director of this Division before she was promoted to CEO in February 2012.

d.     *Distribution*: The Distribution Division distributed Petrobras's oil products to wholesalers and through the Company's "BR" retail network in Brazil.  Cerveró was CFO of this Division prior to being terminated in December 2014.

17

     e.    *International*: The International Division included all of Petrobras's revenue-generating activities (including exploration and production, refining, transportation and marketing, distribution and gas and energy operations) in the 22 countries in which Petrobras operated outside of Brazil, including the United States. Cerveró was Director of this Division prior to 2008.

51.    In addition, as discussed further below, the Company had other non-revenue generating divisions, including the "Engineering, Technology and Materials" (or "Services") Division. This Division was responsible for designing and overseeing the construction and development of Petrobras's large-scale capital projects, including the building of new refineries. Duque was Director of this Division from 2003 until his departure in 2012.

52.    Petrobras's Divisions were organized within the Company as follows:



53.     The Company also operated several subsidiaries, including its fully owned subsidiary, Transpetro.  Transpetro is the largest oil and gas transportation company in Brazil. Transpetro's financial results are rolled up into the Company's consolidated financial results. Machado served as CEO of Transpetro throughout the Relevant Period.

54.     As the Company reported in its Forms 20-F filed with the SEC: "Our most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other transportation assets, and power plants."  Petrobras reported the value of these tangible assets as PP&E on its balance sheet, which constituted by far the majority of the Company's assets during the Relevant Period.

|  | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| PP&E | $218,567 | $182,465 | $204,901 | $227,901 |
| Total Assets | $308,683 | $319,410 | $331,645 | $321,423 |
| PP&E as % of Total Assets | 70.80% | 57.12% | 61.78% | 70.90% |
| *All dollar amounts in $ millions* | | | | |

**B.    Petrobras Required Extraordinary Amounts of Capital
        to Exploit Brazil's Oil and Gas Resources**

55.     Petrobras's business activities were extremely capital-intensive.  In order for the Company to exploit Brazil's oil reserves, the Company first had to invest billions of dollars in exploratory drilling, oil rigs, and infrastructure.  In the Company's Downstream operations, oil refineries cost billions to build, including the real estate, construction costs, pipelines, roads and other infrastructure.

56.     Petrobras's need for outside capital exploded beginning in 2006 with the discovery of several mega oil fields buried miles off Brazil's coastline.  These "pre-salt" fields—so-called because they lie under a two-kilometer thick layer of sodium chloride—were the biggest oil discoveries in the Americas in decades and promised to elevate Brazil to one of the

top oil-producing countries in the world.  Indeed, the discovery of the pre-salt fields doubled Brazil's known oil resources and placed Brazil second only to the Middle East in oil reserves.

57.     When the pre-salt fields were discovered, the Brazilian government immediately suspended all new development while it re-wrote the laws to grant Petrobras a larger stake in pre-salt development.  Before 2010, Petrobras was required to compete on a level playing field with other companies for exploration and production agreements with the government. However, in December 2010, the Brazilian government passed regulations aimed at reducing competition against Petrobras and increasing government control over the new pre-salt fields. Specifically, the government passed regulations that allowed Petrobras to be the sole operator of oil fields where licenses had not yet been auctioned, and granted Petrobras a minimum 30 percent stake in joint ventures to bid for exploration licenses.  As Costa stated at the time, the new legislation "represent[ed] a strong position of the state to keep this wealth."

58.     However, the exploration and development of oil in the pre-salt layers was technologically challenging and expensive.  Indeed, at the time, analysts were concerned that the Company could risk being "overwhelmed" with projects, given the complicated financing and project management required of these sprawling developments.  Some of the main difficulties included the fact that the pre-salt fields were located 300 kilometers from Brazil's coastline, in ultra-deep water (greater than 2,000 meters), laying below a thick salt layer (more than 2,000 meters), with often severe oceanic conditions.  Analysts estimated that a single pre-salt well would cost $100 to $150 million to develop, and one significant pre-salt field alone could require up to 200 wells and $600 billion over the life of the wells.  Petrobras was then required to build or lease enormous floating production, storage and offloading vessels ("FPSOs"), each of which cost hundreds of millions of dollars. As one analyst put it: "What Petrobras is planning to do this

decade in the deepwater has never been attempted by any single company anywhere, ever. It really is on a different scale."

59.     As Petrobras was embarking upon these expensive new pre-salt developments, it announced plans to build Brazil's first new oil refineries since 1980, in an effort to become less dependent on foreign oil imports.  Gabrielli claimed in 2008 that Petrobras's major refinery projects—specifically, "Abreu" and "Comperj"—would transform Brazil's economy by enabling the country to reach "self-sufficiency in oil refining by 2015."

60.     In 2008, the Company announced an enormous capital investment program in which the Company intended to spend *$175 billion* from 2009-2013.  Similarly, in 2012, the Company announced a plan to spend an additional *$236 billion* between 2013 and 2016.

61.     During the each year within the Relevant Period, the Company reported billions of dollars in annual capital expenditures and investments.

**C.    Petrobras Focused on the United States Capital Markets**

62.     The Company relied heavily on its access to U.S. securities markets to fuel these massive capital expenditures.   For instance, in September 2010, Petrobras conducted an enormous offering of common and preferred ADSs on the NYSE, concurrent with an offering of common and preferred shares in Brazil.  In the U.S. offering, the Company sold at least 235 million common and preferred ADSs for proceeds of $7.7 billion.  Upon the conclusion of the ADS offering and the concurrent offering in Brazil, Petrobras immediately became the fourth-largest company in the world measured by market capitalization.

63.     Evidencing the importance of the NYSE to Petrobras's capital-raising efforts, Petrobras based its Global Investor Relations department out of its New York office, which was headed by Executive Manager and Global Head of Investor Relations, Theodore Helms ("Helms").  Since 1999, Petrobras's New York office (under Helms) has "actively participated in

Petrobras's efforts to access the international debt and equity capital markets, including working with the ratings agencies to obtain an investment grade rating for Petrobras."

64.     In order to fund these investments through the U.S. capital markets, the Company had to convince investors and ratings agencies that its financial statements were accurate, and that it would adhere to the strict disclosure requirements of public companies that are listed on U.S. exchanges.   The Company repeatedly claimed that it "met the requirements of" the Sarbanes-Oxley Act ("SOX") and was subject to "oversight by the Securities and Exchange Commission in the US (SEC), and to all the rules of governance and disclosure of relevant information to the market."

65.     Indeed, the Company's emphasis on its compliance with U.S. disclosure obligations was critical to its access to U.S. capital markets, which, in turn, was foundational to the Company's growth.   In fact, Petrobras's initial public offering of its ADSs on the NYSE in 2000 was, at the time, one of the largest such offerings in U.S. history.   At the time, analysts observed that Petrobras's listing on the NYSE would have a transformational effect on the Company's ability to raise capital.   For example, an August 7, 2000 article in *Oil & Gas Journal* observed that "[t]he much-anticipated Petrobras global offering and its listing on the NYSE will make its shares more attractive to foreign investors, many of whom have been reluctant to buy the OTC-traded instruments.   In addition, *an NYSE listing will make the company's accounting standards more transparent*, similar to other large US companies, analysts said."

**D.    Petrobras Was Legally Required to Engage in Open
      and Honest Bidding With Outside Contractors**

66.     As described in detail below, several former Petrobras executives and business associates have admitted that it was Company practice to avoid open bidding and to accept gross overpricing in contracts with a large cartel of contractors in exchange for hundreds of millions of

dollars in kickbacks and bribes. These practices were in direct violation of Petrobras's stated legal obligation to engage in open and honest bidding with its contractors.

67.     As is typical of oil and gas companies, Petrobras worked with numerous outside contractors that supplied goods and/or services to the Company's different segments in order to complete all of these resource-intensive projects, including the construction of new refineries. Given the critical role of outside contractors to Brazil's state-owned enterprises—particularly Petrobras—the Brazilian government issued special procurement rules to govern bidding practices. In 1997, the government of Brazil amended its Constitution in order to approve by Presidential Decree Petrobras's Simplified Bidding Procedure Regulations. In anticipation of the 2014 World Cup and the 2016 Olympic Games, in 2011, Brazil introduced legislation called the Differential Public Procurement Regime to streamline procurement bids and contracts at Brazilian companies, including Petrobras.

68.     During the Relevant Period, procurement processes at Petrobras were internally governed by the Simplified Bidding Procedure Regulations and the Petrobras Procurement Manual. The process was supposedly "underpinned by legal, technical, quality and cost criteria, and formally oblige[d] suppliers to carry out their activities based on ethics and also social and environmental responsibility." In addition to these governmental regulations, according to Petrobras, "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it. We also established limits of authority, updated and approved periodically by the Executive [Directorate], for the signing of contracts."

69.     Petrobras's procurement processes were largely conducted under the auspices of Petrobras's Engineering & Services Division (defined above as the "Services Division"). As

Costa later explained to Brazilian federal prosecutors, the Downstream/Supply, Gas & Energy, and Exploration & Production Divisions were "business areas," whereas the Services Division offered support to the business areas. When the business areas commissioned new projects for their divisions, they "hired" the Services Division to create the basic design, conduct the bidding process, select the outside contractor(s) to execute the project, and oversee the construction of the project. Upon completion, the business areas took over the project. Duque was the Director of the Services Division from 2003 to 2012, and his "right hand man" was Barusco, Executive Manager of Engineering. As discussed below, Costa, Duque and Barusco were central figures in executing the massive bribery and bid-rigging scheme at Petrobras.

### E. Petrobras Trumpets Its Transparency in Response to a 2009 Investigation into Pricing Irregularities

70.     In 2009, before the beginning of the Relevant Period, concerns arose regarding the size of Petrobras's construction contracts. At the time, Rousseff was the Chairwoman of the Company's Board of Directors and Brazilian President Lula's chosen successor. In what was widely perceived to be a political attack, the opposition party initiated a Parliamentary Commission of Inquiry, known by its Portuguese-language acronym "CPI," to investigate, *inter alia*, findings of "irregularities" in Petrobras's construction contracts by the Brazilian federal government's public auditor (Tribunal de Contas da União, or the "TCU"). The TCU was responsible for auditing procurement processes financed by the Brazilian federal government and had oversight over every Petrobras capital investment and contract.

71.     The Company firmly refuted all allegations of overpricing, reporting that there were "[n]o problems with Petrobras contracts. ***There [was] no overpricing***."

72.     In further response to the CPI's investigation, the Company launched a massive investor relations campaign to promote and enhance the Company's transparency. Among other

measures, the Company created an official website linked directly to its corporate webpage titled "*Fados e Dados*," or "*Facts and Data*" in English, which was designed to allow the Company "to achieve maximum possible transparency in the relationship with its stakeholders." The Company repeatedly made it clear that *Facts and Data* was its official channel of communications with investors, press, and other stakeholders. In a June 10, 2009 post, the Company stated that "Petrobras reaffirms that the blog *Facts and Data* has been launched to disseminate information from Petrobras, the [Company's] position on issues relating to CPI and also guarantees full disclosure of [the] responses sent to the press." Similarly, in a June 7, 2009 *Facts and Data* post the Company stated that:

> [T]he goal of Petrobras [is] to achieve maximum possible transparency in the relationship with its stakeholders.

*       *       *

> The initiative to create the blog *Facts and Data* is, in the opinion of Petrobras, a milestone in the building of new bridges of communication with the public that has a relationship with the company, in a new era of digital information in real time. The so-called blogosphere allows a direct relationship between the disclosing source of information and readers, without filters, so that the decision about what is in fact of interest to the recipient is selected thereby, so that the recipient has full access to the questions and answers.

73.    Throughout 2009, both on *Facts and Data* and through traditional news media, Petrobras emphasized to investors that it was a model corporate citizen. For example, Rousseff, as Chairwoman of the Board, insisted in a press interview in 2009 that: "Petrobras has **one of the most accurate accounting standards in the world** . . . . If it wasn't the case, investors would not be seeking out the company as one of the great investment targets." In June 2009, the Company wrote on *Facts and Data* that:

> Petrobras has **a strict code of ethics, widely reported for its workforce, and that governs relations with its suppliers**, whether small or large companies. **There is no political or partisan interference in their decisions.** We emphasize that the company – systematically subjected to internal and external audits, with shares

25

traded on the stock exchanges of São Paulo, New York, Madrid and Buenos Aires
-- is considered a **benchmark in transparency and corporate governance in Brazil and abroad**.

74.     In a June 20, 2009 posting on *Facts and Data*, Petrobras quoted an interview that Gabrielli gave to *Época* Magazine elaborating on the Company's transparency and ethics. During this interview, Gabrielli emphasized the Company's transparency and its robust internal controls, stating: "We are very transparent, more than most private and public companies" and "we have a code of ethics, formal procedures and audit and control systems.  If we identify failures and deviations in these processes, we will investigate."

75.     After a five-month congressional investigation, the CPI (led by the PT, which had an overwhelming electoral majority at the time) finished its work without identifying any irregularities in Petrobras's contracts.  Indeed, the CPI's final report (filed in December 2009) found that "[t]he set of signs of irregularities pointed out by the TCU in the works of Abreu Refinery, after the analysis undertaken by the CPI, was shown to be inconsistent.  In view of this finding, we consider it unnecessary to adopt additional measures concerning this investigation." Given these conclusions, investors were assured that Petrobras had been exonerated.  Indeed, in a November 10, 2009 *Bloomberg* article discussing the CPI committee's expected conclusions, a Banco do Brasil SA analyst observed that, because the CPI probe had not turned up anything problematic for the Company, "***Petrobras became the biggest winner out of this debate***."

76.     Significantly, years later when the contract-fixing and kickback scheme at Petrobras began to be revealed, investors learned that a key member of this 2009 CPI committee was paid a $10 million bribe in order to whitewash the investigation of Petrobras.

## V.   PETROBRAS'S FRAUDULENT SCHEME DURING THE RELEVANT PERIOD

77.     In the wake of the CPI's 2009 investigation into Petrobras's potential overbilling and subsequent public exoneration of the Company, Petrobras and its executives boosted their efforts to publicize Petrobras's purported "strong ethical principles" and its commitment to "carrying out its business with transparency and integrity."   Indeed, throughout the Relevant Period, Petrobras repeatedly touted the Company's purported anti-corruption practices.   For example, in SEC filings and conference calls with investors, Petrobras consistently emphasized the Company's "Code of Ethics," which stated that the Company was purportedly committed to "select[ing] and hir[ing] suppliers and service providers based on criteria strictly legal and technical of quality, cost and timeliness" and "[r]efusing any corruption and bribery and bribery practices and keeping formal control and disciplinary procedures for any possible violation of this principle."

78.     The Company continued to firmly contend that there were no "irregularities," overbilling, or corruption associated with its massive capital spending projects.   Given the Company's high debt-earnings ratio, the Company's capital spending was of significant interest to analysts and investors.   As UBS wrote in a February 10, 2010 report, "[w]e are once again referring to *capital discipline* as a key theme for PETROBRAS."   Throughout the Relevant Period, therefore, investors and the media continued to seek assurances from the Company that Petrobras was spending the billions of dollars in investor capital appropriately and cost-effectively.   Petrobras provided these assurances at every turn, insisting that there was "no overbilling" in its capital projects and no "irregularities" in its relationships with outside contractors.

79.     However, as at least two former Petrobras executives have now admitted in guilty pleas and the Company has acknowledged, every one of these assurances was false when made.

Indeed, as has now been revealed, Petrobras's capital costs were dramatically inflated due to a decade-long scheme of kickbacks and graft. This scheme caused the Company—and its investors—to grossly overpay outside contractors in exchange for direct cash bribes to top Company executives and government officials.

### A.    Petrobras Touts New Capital Projects as Critical to Its Future and Emphatically Denies Allegations of Pricing Irregularities

80.    Throughout the Relevant Period, Petrobras and its executives repeatedly assured investors that there were no irregularities at any of its major construction projects. However, as discussed below in Section V.B, most, if not all, of these projects were riddled with fraud and bribery, which inflated the costs of each projects. The following key projects are just significant examples of the widespread corruption at the Company.

### 1.    The Pasadena, Texas Refinery

81.    During the Relevant Time Period, the market was concerned over potential overpricing at a massive oil refinery that Petrobras acquired in Pasadena, Texas (the "Pasadena Refinery"). In response to these concerns, Petrobras and its executives adamantly denied that the huge costs of the Pasadena Refinery were the result of any form of corruption or fraud.

82.    In 2006, the Company decided to significantly expand its operations in the United States by signing a joint venture agreement with Transcor Astra Group SA ("Astra") in which Petrobras paid $360 million for a 50% stake in the Pasadena Refinery. This amount alone was stunning, because Astra had purchased the entire refinery for only $42.5 million just a year before. Interest payments and legal fees brought the price tag for Petrobras's stake in the refinery to $820.5 million. Ultimately, following a protracted litigation over Astra's exercise of a put option requiring Petrobras to buy the remaining 50% stake, Petrobras paid a total of *$1.18 billion* for Pasadena.

83.     As the costs for the Pasadena Refinery escalated, the Company forcefully denied any claims that the decision to invest in the refinery at such a high price was the result of fraud or corruption.   For example, in August 2013, Gabrielli appeared before a Brazilian Senate committee to defend Petrobras's purchase.   As set forth in an August 7, 2013 post on *Facts and Data*, Gabrielli insisted that: "According to our Former Chairman, the acquisition [of the Pasadena Refinery] was a ***normal operation, based on market conditions*.*"   The Company further insisted in a May 23, 2014 statement on *Facts and Data*:

> *We have strict legal procedures for payments, including for the purchase of Pasadena.*
>
> The payments made for any reason and in any country follow strict and clear procedures and relevant legislation. Additionally, we have a structured Internal Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made.

(Emphasis in original).

84.     Later, in 2014, Brazil's Attorney General raised concerns about the exorbitant cost of Pasadena, but exonerated Petrobras's Board of Directors.   However, as Costa eventually admitted, the Pasadena acquisition was the direct result of the Company's "institutionalized" bribery scheme.   In reality, the Company's International Director, Cerveró, was incentivized to push through this unfavorable transaction in order to reap $20 to $30 million in bribes from Astra.

## 2.     The Abreu Refinery

85.     In 2005, Petrobras approved plans to build Abreu, one of Brazil's first new oil refinery projects in over 20 years.   Costa, as Director of the Downstream Division, was primarily responsible for Abreu, including negotiating with contractors to work on the project.

86. Investors began raising concerns over increasing costs and delays at the refinery soon after development began. Initially budgeted at a total cost of $2.4 billion in 2006, the anticipated cost of the Abreu tripled to $12 billion in just three years.

87. Petrobras countered media and investor inquiries into the project's ballooning costs with an aggressive public relations campaign. In response to reports in the Brazilian press regarding cost overruns at Abreu, Petrobras emphatically stated in a January 28, 2010 *Facts and Data* post: "Petrobras reiterates *that there are no irregularities in contracts for the construction of the Abreu[] Refinery*." The next day, on January 29, 2010, Petrobras stated on *Facts and Data* that the Company "reaffirms that there was no 'overbilling' or 'overpricing' in the construction works of the Abreu [] refinery."

88. Petrobras's representations had their intended effect of reassuring analysts and investors over the growing costs of the Abreu refinery. For example, following a meeting with Costa and Barbassa on November 19, 2010, Morgan Stanley analysts "walked out of the presentation . . . *convinced that the concerns surrounding the construction of the refineries are overstated*" and explained that Costa "made a thorough presentation touching on every single controversy raised by the market over the past 18 months and justifying every decision made by the company based on economics," including those related to Abreu. Based on Costa's representations, Morgan Stanley estimated a "capex reduction of up to 35% due to fiscal benefits and the *competitive bidding process potentially escalating returns to double-digit levels*" and stated that "Petrobras is not investing in refineries for political reasons," reiterating its "overweight" rating (or "most positive" buy recommendation).

89. UBS analysts were similarly impressed, noting in a November 22, 2010 report that their three-hour in-person meeting with Costa and Barbassa, in which "the high costs of

Abreu" were discussed, had positively influenced their assessment of the Company.   UBS analysts stated that they "came out of the meeting slightly more positive on improved transparency," and credited Costa and Barbassa's comments that it was "not fair" to compare Abreu's costs with other worldwide refineries because its costs were attributable to the "extra infrastructure costs . . . plus its peculiar design."   Deutsche Bank was similarly reassured by "initiatives being taken in order to reduce the new refineries' construction costs."

90.     Petrobras continued to defend its expenditures on Abreu even as they continued to climb.   For example, on January 7, 2013, in response to questions posed by the *Jornal Nacional* (Brazil's leading primetime television news program), including questions regarding the project delays and the fact that the budget was expanded more than eight times and was expected to cost more than ***R$41 billion*** (US$20.2 billion), Petrobras again professed that there were "no irregularities in the construction of the Abreu[] Refinery."

91.     Abreu finally began operations in November 2014—approximately four years behind schedule—at a cost-to-date of $18.6 billion, or over five times its original budget, making it one of the most expensive refineries ever built.   While the refinery was expected to process 230,000 barrels of crude oil per day, it will likely not reach that level until the second half of 2015.   As detailed below, Costa and others have now confessed that Abreu served as a slush fund for hundreds of millions of dollars in kickbacks to Petrobras executives and Brazil's governing political parties.

### 3.     The Comperj Refinery

92.     Like Abreu, Petrobras represented that its Petrochemical Complex of Rio de Janeiro, or Comperj, was key to the Company's future profitability.   According to Costa in a 2009 interview with *Petrobras Magazine*, the Comperj refinery alone would generate "annual savings of around US$2 billion" for Petrobras by reducing its dependence on more expensive

31

imported petrochemical products.  Originally conceived in 2004, Comperj was initially expected to be operational by 2011 and to cost approximately $6.1 billion.  By 2006, the expected cost rose to $8.4 billion, with an operation start date pushed back until 2012.

93.     As costs associated with Comperj grew and its opening was delayed, Petrobras again executed a public relations campaign to counteract market concerns.  For example, when the TCU raised concerns regarding certain Comperj contracts in October 2010, Petrobras denied any "irregularities."  Among other things, the TCU highlighted an R$53 million (US$31.5 million) contract for a water treatment unit that was being constructed in Rio de Janeiro by the same contractor for a third of that amount.  In an October 8, 2010 *Facts and Data* post, Petrobras responded that there was "***no overpricing***" at Comperj, and that it had "strictly observe[d]" competitive bidding mandates governing the Company's business.

94.     When the media raised further questions, Petrobras again denied any wrongdoing.  Responding to reports from both *Globo TV* and *Jornal Nacional* on January 6 and 7, 2013, respectively, Petrobras reaffirmed that there were "***no irregularities***" at Comperj.  According to Petrobras, the increase in costs was attributable to changes in the scope of the project, as the "initial project has undergone several modifications" since it was first conceived more than seven years earlier.

95.     Notwithstanding the Company's assurances, Comperj's costs continued to spiral out of control.  By January 2015, the Comperj refinery was still not complete, and faced a new set of delays after at least 23 contractors responsible for Comperj projects were implicated in the criminal proceedings examining the bribery scheme at Petrobras.  According to news reports, Petrobras is now expected to delay the start of the Comperj refinery complex until 2018.  The current cost for Comperj now stands at $21.6 billion.

### 4.   SBM Offshore Projects

96.   Petrobras also partnered with multiple international corporations as outside contractors.  As discussed above, Petrobras relied upon enormous FPSOs to process and store the oil or gas extracted from the Company's pre-salt fields.  One of Petrobras's most significant FPSO lessors was SBM Offshore N.V. ("SBM"), a Dutch engineering company that owned and operated the world's largest fleet of FPSOs.

97.   On February 13, 2014, following media reports of suspected bribes being paid by SBM to Petrobras executives, Petrobras purported to initiate an internal investigation.  On March 31, 2014, the Company announced the "Completion Of Internal Verification," stating:

> Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBM Offshore, concluded that, based on work performed and limited to its regulatory scope, *no facts or documents were found that prove the payment of bribes to employees of Petrobras*.

98.   As late as June 11, 2014, Foster testified to the CPI that "no irregularities were discovered" between SBM and Petrobras.

### 5.   Transpetro Subsidiary

99.   In addition to extracting and refining oil and gas, Petrobras also operates a vast transportation network to transport those oil and gas products from the sea and to bring them to market through its wholly owned subsidiary, Transpetro.

100.   The Company touted Transpetro throughout the Relevant Period as a critical component of the Company's "integrated" business plan to generate returns through the Company's pre-salt discoveries and revitalize Brazil's shipping industry through the Company's Fleet Modernization and Expansion Program, or "PROMEF."  The Company repeatedly claimed

that it strictly adhered to a competitive bidding process, which ensured the money spent to develop its transportation infrastructure was prudent and in the best interests of investors.

101.    When investors and analysts began raising concerns over the large amounts Transpetro was expending in connection with PROMEF, the Company vehemently defended its bidding process and expenditures.   For example, in response to *O Globo* articles detailing specific contractual terms in a February 27, 2011 report, Petrobras stated that complaints of "alleged overbilling against the administration of Transpetro . . . are unfounded."  According to Petrobras, Transpetro's "management is transparent, always focused on the public interest and continuously monitored by supervisory bodies and other competent authorities."

102.    As investors began to learn late in 2014, Transpetro's CEO, Sergio Machado, was engaged in the bribery scheme, and was directly implicated by Costa, who claimed that Machado paid him a $500,000 bribe in exchange for his approval for a shipping contract.  Machado was subsequently forced out of Transpetro after Petrobras's internal auditors refused to certify any financial statements while he remained CEO.

**B.     Unbeknownst to Investors, Petrobras's Contract Costs, Asset Values and Net Income Were Grossly Inflated by Cartelization and Graft**

103.    Contrary to Petrobras's repeated reassurances concerning the Company's commitment to "transparency," its "strict" compliance with laws governing competitive bidding, the legitimacy of its financial results, and the absence of "any irregularities" or "overpricing," Petrobras's senior-most executives were secretly engaged in a massive kickback scheme that grossly inflated the value of Petrobras's construction and services contracts, along with the financial results that Petrobras reported to the SEC throughout the Relevant Period.

104.    This scheme, and its impact on the Company's financial condition, has been admitted in sworn testimony provided by, among others, Costa—one of the senior-most

executives at the Company during the Relevant Period—who explained that, prior to and during the Relevant Period, the Company operated as part of a criminal enterprise together with a select group of suppliers consisting of up to 16 of Brazil's largest construction companies called the "Cartel." With Petrobras's knowledge, the members of the Cartel routinely inflated the terms of purportedly competitive bids for Petrobras construction projects by up to 20%.

105.    This inflation did not just benefit the Cartel members. The inflated contract prices also included a 3% kickback that was divided among Petrobras executives, Brazilian politicians, and money launderers who helped conceal the illegal transfers. Petrobras's senior-most executives, including Costa, Duque and Cerveró, were instrumental in the scheme and received hundreds of millions of dollars in kickbacks.

106.    To date, multiple Petrobras executives, Cartel members, and other participants in the scheme have pled guilty to corruption and bribery and have provided sworn testimony and documents describing the scheme to Brazilian investigators. These individuals include:

- Costa, who was one of the senior-most executives at Petrobras during his tenure as Director of the Downstream Division Supply. Along with Duque, Petrobras's Director of Services, Costa was responsible for all contracts with outside contractors in the Downstream Division. As set forth in an October 21, 2014 *Bloomberg* article, during his tenure at the Company, Costa was the "charismatic face" of Petrobras. Costa was arrested in 2014 and has since admitted to his role in the bribery scheme and his personal receipt of millions of dollars in bribes.

- Barusco, a former Petrobras executive who was the "right hand man" to Duque in the Services Division. Barusco has admitted to the scheme and agreed to return over *$100 million* that he personally reaped from these illegal bribes, an amount that places Barusco among the largest known bribery recipients in Brazil's history, and represents the largest amount ever turned over to Brazil from a single person. In his plea deal, Barusco admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the company Petróleo Brasileiro S/A."

- Youssef, a convicted black market money launderer, who has admitted to personally delivering cash payments to Petrobras executives and Brazilian politicians.

- Augusto Ribeiro de Mendonça Neto ("Mendonça Neto"), who served as a director of Toyo Setal.  Toyo Setal was an engineering, procurement and construction ("EPC") contractor in Brazil, an affiliate of Japanese engineering firm Toyo Engineering Corporation, and a member of the Cartel.

107.   In addition to the sworn written and oral testimony from these key players, the Brazilian investigation has made public thousands of pages of documents, account statements, handwritten and other recorded minutes and spreadsheets documenting the bribery payments, and other evidence of the scheme.  Former Petrobras employees have also voluntarily stepped forward to confirm that there were noisy objections to these practices within the Company.  This includes, as discussed below, at least one former senior executive, Velosa, who identified numerous irregularities in Petrobras's bidding and contract processes and repeatedly brought concerns about these irregularities to Foster herself.  After Velosa raised these concerns, the Company sent her to Singapore where she was relieved of her duties, and her family was threatened.

       1.      **Petrobras and Its Contractors Engaged in Bid-Rigging**

       (a)      **Petrobras's Contractors Dictated Which Companies Would Bid on Petrobras Projects**

108.   In stark contrast to the Company's repeated statements touting Petrobras's transparency, as Costa testified in 2014, "[i]n reality, what was happening within Petrobras, primarily from 2006 onward, was a process of 'cartelization.'"  According to Costa, the Cartel, which consisted of the largest construction companies in Brazil—including Odebrecht, Camargo Correa, Andrade Gutierrez, Iesa, Engevix, Mendes Junior, UTC, OAS, and Queiroz Galvão— coordinated the bids they submitted for Petrobras contracts.

109.   Barusco corroborated Costa's statements in his sworn testimony offered in connection with his plea bargain.  Specifically, in Annex No. 5 to his plea bargain with the Brazilian Federal Police, Barusco testified:

THAT the cartel's action at Petrobras had been going on for a long time, but was made easier from 2006 until 2011, due to the high volume of big constructions, where the technical criteria to select the companies at Petrobras would always indicate the same companies of the cartel and others that were "supporters," which allowed for the actions *of the cartel in the sense of* dividing the works among themselves;

THAT the companies that made up a sort of "hard core" of the cartel were around 14 (fourteen), namely CAMARGO CORREA, ANDRADE GUTIERREZ, ODEBRECHT, SETAL/SOG ÓLEO E GÁS, OAS, UTC, SKANSKA, PROMON ENGENHARIA, TECHINT, QUEIROZ GALVÃO, ENGEVIX, MENDES JÚNIOR, SCHAIN and MPE;

THAT those were the companies that received most of the invitations, the ones that did most of the work inside of PETROBRAS;

THAT there were also supporting companies that accepted to "discuss with the cartel" above mentioned and eventually took part in bids, acting together with the companies from the "hard core," namely CARIOCA, TOMÉ ENGENHARIA, TKK, ENGESA, JARAGUÁ, ALUSA, GDK, among others.

110.    Mendonça Neto confirmed Costa's and Barusco's testimony regarding the history of the Cartel:

That was an initiative that started in the late nineties, but it wasn't very effective because there were only a few companies in on it, because they were nine companies in a broader market, so those companies didn't have… they only had the protection system running between them, and it became more effective around maybe, the end of 2003/2004, when these things started to be set up with Petrobras' Directors. So that the companies that were invited were the ones that might be participating in the activities of, or in that group. After that, it became more effective. Contracting began to work out. And after 2006, late 2006, some other companies were included, by imposition of the market, or even Petrobras. Initially they were nine, seven more got in, and they were sixteen, all operating in the same way.

111.    As Mendonça Neto testified to Brazilian federal authorities, Petrobras and the Cartel members adhered to a set, formalized procedure. *First*, the members of the Cartel held meetings where they exchanged information concerning upcoming procurement invitations from Petrobras. The Cartel meetings were attended by high-level executives with "decision powers . . . so that the meetings would be secret and safe in the first place, and, second, that everything that

was agreed upon would be followed by the company[.]"  Indeed, Costa testified that his personal contacts were "always at the level of president and director of the [contractor] companies, I had no contact with the people from operation, execution."

112.    *Second*, once the list of upcoming projects was finalized, Youssef testified that the Cartel determined which Cartel member would receive which contract, considering, among other things, the number of contracts that member had already amassed.

113.    *Third*, the Cartel finalized the list of companies that would be invited to bid on a particular project.  The agreed-upon list was sent to Duque and Costa, "who ultimately had the power to grant final approval for the companies that would be invited to each procedure." Youssef also corroborated, in sworn testimony to the Brazilian judge, that bidding for Petrobras projects was never competitive, and that contractors determined the winner of each tender before it was conducted.  As Youssef explained, the Cartel would "previously define the winner" of the Petrobras bids.  Youssef confirmed during his testimony:

> **JUDGE:** Do you know of this . . . if there were, regarding Petrobras, for those companies to obtain those contracts, any frauds in the bidding, or any arrangements between the companies? Do you have any knowledge of that?

> **ALBERTO YOUSSEF:** What I am aware of is that there was an arrangement between the companies, not in the matter of bidding, but when there was a package of projects at Petrobras, the [Cartel] companies, ***they, among themselves, would connect and arrange who would be the winner of that project***.

114.    As Mendonça Neto explained, the Cartel members memorialized the "rules" that would govern their bid-rigging operation.  In 2010, certain Cartel members voiced complaints that they were not receiving as many contracts as other members of the Cartel.  In a document titled the "Sports Championship," which was handed out at Cartel meetings, the Cartel members agreed on procedures concerning the bidding for projects relating to Comperj.  According to Mendonça Neto, the document reflected the Cartel's new agreement that past contracts would

not be taken into account when assigning winners to new contracts, and that in effect, "what's done is done, we will not be arguing who got more contracts and who didn't, up to now."  In other words, "[a]ll the teams"—i.e., the Cartel members, "will have their times, records, etc. back to zero" and "we are playing the game from now on."

115.    In addition, as *Valor International* revealed in February 2015, Petrobras employees and executives actively assisted the members of the Cartel in ensuring that their bids were accepted by the Company.  Indeed, Petrobras held meetings with Cartel members during the Relevant Period at the Company's offices in Rio de Janeiro to discuss the process of submitting bids to Petrobras.  As reflected in the minutes of such meetings, Petrobras employees "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal" by the Company.

116.    Contracts with Cartel members accounted for a vast amount of Petrobras's reported fixed assets during the Relevant Period.  Indeed, in January 2015, Petrobras confirmed that over *R$188 billion (US$73 billion)* in assets—"or 1/3 of the [C]ompany's total fixed assets"—relate to contracts entered into with Cartel members between 2004 and April 2012 alone.

### (b)    Bid-Rigging by the Cartel Inflated Petrobras's Project Costs

117.    Unsurprisingly, this illegal coordination among Cartel members removed all competition from Petrobras bids, causing bids to skyrocket.  As Costa explained, the coordination of bids and the pre-selection by the Cartel of the winning bidder "obviously result[ed] in an excessive delta price"—or overcharge—to Petrobras.

118.    The bids Cartel members submitted to Petrobras during the Relevant Period consistently met or exceeded the maximum amounts that were internally budgeted by the Company.  Costa testified that Petrobras calculated the expected cost of supplies and labor (the

budget), and had a general prohibition on accepting bids that came in higher than 20% over budget. Initially, Cartel members would bid at prices high above Petrobras's 20% limitation. At that point, Petrobras would contact the bidders and would request a "rebid." The winning Cartel member would then "arbitrate its price close to the additional 20%, as a rule, and the others with amounts a little higher." In other words, as a matter of practice, contracts bid on by Cartel members were inflated to the greatest extent that Petrobras and its executives could conceivably permit without drawing obvious attention to the scam.

119. Barusco's plea agreement similarly stated that Petrobras entered into inflated contracts with Cartel members for projects at Abreu and that the Cartel wanted to impose contract prices that were "way above budget." Barusco's plea agreement also confirmed that "in the case of [Abreu] there was a clear overbilling."

120. According to Barusco, Petrobras's contracts with Cartel members were always "signed near the maximum amount for the internal budget of Petrobras."

121. As detailed in a December 11, 2014 complaint filed by the Brazilian federal public prosecutors' office against Costa and eight others (the "December 11 Prosecutor's Complaint"):

> [The participants in the scheme] managed to frustrate the competitive nature of bidding for large works conducted by **PETROBRAS**, attaining consistent advantages by imposing higher prices compared to a freely competitive environment, ensuring contracts of a given volume of works and choosing the works most convenient according to region or technical know-how, among other advantages.

122. The December 11 Prosecutor's Complaint included a chart, derived from material provided by Petrobras and excerpted below, with examples of massive projects where the Cartel members submitted winning bids for Abreu and another refinery, Repar, that were at or near the internal "maximum" bid:

| AGREEMENT | ESTIMATED AMOUNT | MAXIMUM CONTRACT LIMIT (ESTIMATED AMOUNT + 20%) | AGREEMENT AMOUNT / AGREEMENT AMOUNT IS X% HIGHER THAN ESTIMATED AMOUNT | WINNER BID PERCENTAGE RELATIVE TO MAXIMUM CONTRACT LIMIT |
|---|---|---|---|---|
| REPAR – [IERP] 111 | R$2,076,398,713 (~US$1,292,660,000) | R$2,491,678,455 (~US$1,551,190,000) | R$2,252,710,536 (~US$1,402,420,000) | 90.44 % |
| REPAR – [IERP] 112 | R$2,093,988,284 (~US$1,303,610,000) | R$2,512,785,941 (~US$1,564,330,000) | R$2,488,315,505 (~US$1,549,100,000) | 99.08 % |
| ABREU – | R$2,892,667,038 (~US$1,667,950,000) | R$3,216,200,446 (~US$1,854,500,000) | R$3,190,646,503 (~US$1,839,760,000) | 99.80 % |

## 2. Petrobras Executives Demanded that All Contracts Include an Additional "Bribe Fee"

123.   Petrobras executives not only knew about the Cartel's overpricing and bid-rigging activities during the Relevant Period—they personally profited from them.  Indeed, Petrobras executives, including Costa, Duque and Barusco, required that Cartel members' inflated bids include an extra "bribe fee" that was set aside for kickbacks to Petrobras executives and bribes for government officials.  Specifically, "every" Petrobras contract with Cartel members included a surcharge of up to 3% that would be "allocated to political agents," and Petrobras executives. This "bribe fee," which was incorporated into the bid price submitted by Petrobras's contractors, further inflated Petrobras's project costs.

124.   According to Costa, in connection with Cartel contracts, 2% was allocated to the Services Division.  Of the remaining 1%, "60% went to the [Progressive Party], 20% was for expenses . . . and the remaining 20% was allocated—70% to me and 30% either to [José] Janene or Alberto Youssef."  Thus, for every $100 million contract entered into by Petrobras and a member of the Cartel over which Costa had an interest, the co-conspirators typically allocated the accompanying bribe as follows:

41

| Bribes for Every $100 Million Contract | | |
|---|---|---|
| % Allocation | Amount Allocated | Recipient |
| 2% | $2,000,000 | PT (Workers' Party) –Services Division |
| .8% | $800,000 | PP (Progressive Party) and expenses |
| .14% | $140,000 | Costa |
| .06% | $60,000 | Youssef or other money launderer |

125.    Mendonça Neto corroborated that approximately 3% of all contract amounts were paid to Petrobras executives and politicians as bribes.  According to Mendonça Neto, the Cartel members knew that the payment of bribes to Petrobras senior executives, including Duque and Costa, was the only way to secure the contracts, and the Cartel members were not in a position to object:

> **Public Prosecutor:** At the meetings, besides the division of the construction projects, the cartel deals, was payment of undue advantages to Petrobras' Directors ever discussed, if it would be convenient to uphold those promises of payment or not, regarding the cartel's activities?
>
> **Mr. Augusto:** Basically, the division of the construction projects was discussed. And as for the payment of commissions to Petrobras' directors, maybe that didn't even merit a discussion, because *everyone was aware that it would be very much mandatory*.

126.    For Toyo Setal's part, Mendonça Neto admitted in court testimony that Toyo Setal had paid bribes to Costa for at least one contract related to Petrobras's Repar refinery and at least two contracts relating to Petrobras's Replan refinery.

127.    Other Cartel members have continued to come forward and have provided additional evidence detailing the bribery scheme.  For example, Julio Camargo, another Toyo-Setal executive, testified that he paid R$12 million (approx. US$5.1 million) in bribes to Costa and Duque to build a major component, known as a coking unit, at the Repar refinery. According to Camargo, the bribes were a "*rule of the game*, which means that if there was no

bribe for the supply department and for the engineering department, the negotiations wouldn't be successful."

128.     Similarly, according to press reports, Erton Medeiros Fonseca ("Fonseca"), the CEO of leading Brazilian construction company Galvão Engenharia, provided receipts to Brazilian prosecutors evidencing bribes paid to Duque.   According to Fonseca, Galvão was extorted by Costa, and Fonseca explained through his attorney that "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by [José] Janene," a black market money launderer who facilitated Cartel bribes to Petrobras executives.   At a meeting at Fonseca's house in 2010, Janene informed Fonseca "in a very truculent way . . . that *to be able to win contracts, he would have to pay.*"   Once Fonseca started paying the bribes, Galvão Enginharia's bids "started getting approved."   According to Fonseca's testimony, the contracts that Galvão Engenharia won from Petrobras after the alleged bribe payments included projects as large as R$2 billion to R$3 billion (approx. US$1.1 billion to US$1.7 billion), such as construction contracts at Abreu.

129.     This "rule of the game" applied to non-Cartel members as well, who were also forced to include a 3% "bribe fee" in their contracts with Petrobras.   Indeed, as multiple witnesses have since testified, these bribes were standard operating procedure for Petrobras and were a "mandatory" part of nearly every Petrobras contract executed before and during the Relevant Period.   As Youssef testified:

> **JUDGE:** Can you enlighten me, you yourself mentioned that you were a part of some of those meetings to define those . . . this percentage. What was the . . . ? How was that negotiation? What was the company's gain? How would they gain, making that payment of 1%, for instance?
>
> **ALBERTO YOUSSEF:** The truth of it is, they would win the work. If they didn't pay, . . . *they wouldn't get the work if they didn't pay.*

130.    The payment of these massive bribes was well-organized.    Mendonça Neto explained that with respect to Cartel members, once a Cartel member was chosen for a project, the Cartel member would arrange for the payment of bribes through Youssef, explaining that "[a]fter we agreed on an amount, dates of payment, [Youssef] would arrange things and he would intervene if there were any problems, delays, things like that" for bribes funneled to Costa.   According to Mendonça Neto, bribes paid to Duque were discussed directly with Costa, the Director of Supply, and the "payments were made either as deposits in an account abroad or in cash here in Brazil."

131.    In addition, Barusco maintained a spreadsheet that detailed the payment of bribes in connection with some of Petrobras's key refinery projects, including Abreu and Comperj. As explained above, the conspirators would allocate a specific percentage of each contract among: (i) the "house," or "casa," which referred to Petrobras executives and included Duque, who Barusco nicknamed "MW" or *"My Way"* (after the Frank Sinatra song); and (ii) the political parties—such as PR and/or PART—that participated in the scheme.[2]  As reflected in Barusco's spreadsheet (excerpts of which are reproduced below), which featured a column delineating the percentage to be paid as a bribe (the "%" column), the scheme impacted billions of dollars in Abreu contracts alone:

---

[2]      Plaintiffs' counsel has replicated this chart exactly except to translate terms and to provide the approximate U.S. dollar equivalent.

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| Alusa | C | CAFOR da Abreu e Lima | 29/8/08 | R$966,103,305.78 US$591,395,266 | 2 | 1PR 0,5 PART 0,5casa (0,6MW 0,4Sab) | Luiz Eduardo Barbosa | Cesar Godoi Mario | 29/8/08 |
| Alusa Barbosa Mello | C | Pacotel-Carteira Enxofre Abreu Lima | 3/12/10 | R$651,760,449.82 US$385,451,801 | 2 | 1PR 1Part | | | |
| Camargo CNEC | C | UCR da Abreu e Lima Tipico + 17% | 10/9/09 | R$3,411,000,000.00 US$1,868,733,907 | | | | | 10/9/09 |
| Camargo/ Galvao /Odebrecht/ Queiroz Galv5o | | Terraplanagem Abreu e Lima | 10/7/07 | R$429,207,776 US$226,626,420 | 2 | 1PR, 1PART | 10/07/2007 | Eduardo Leite Erton Fonseca Rogerio Araujo Idelfonso Colares | 31/07/07 |
| Engevix EIT Engeform | C | Edificagoes Abreu e Lima | 10/2/09 | R$591,324,228.09 US$262,577,366 | 2 | 1PR 0,5PART 0,5casa | Milton Pascovicth Shinko Nakandakari | Gerson Almada Marco Pinto Rola | 10/2/09 |
| Odebrecht OAS | C | Consorcio RNEST CONEST Abreu e Lima | 26/8/09 | R$1,485,103,583.21 US$795,790,153 | | | Rogerio Araujo e Agenor Medeiros | Rogerio Araujo e Agenor Medeiros | 26/8/09 |
| Odebrecht OAS | C | Consorcio CONEST/ UHDT Abreu e Lima | 20/8/09 | R$3,190,646,503.15 US$1,731,600,186 | | | Rogerio Araujo e Agenor Medeiros | Rogerio Araujo e Agenor Medeiros | 20/8/09 |
| Queiroz IESA | C | Interligacoes da ABREU e LIMA (15%) | 13/1/10 | R$2,694,950,143.93 US$1,545,801,390 | 2 | 1PR, 0,5Part, 0,5casa | Idelfonso Colares | Idelfonso Colares | 13/1/10 |
| | | | TOTAL | R$13,420,095,989.98 US$7,407,976,489 | | | | | |

132.    The spreadsheet also reflects the payment of bribes to Sete Brasil chairman Joao Ferraz, who was referred to as "Mars," or "Marshall," and Barusco, who used the name "SAB," a reference to his girlfriend Sabrina.

133.    Barusco provided another spreadsheet to authorities reflecting that payments from the Jurong Shipyard, totaled millions of dollars per month and continued until *at least* 2014. Indeed, in a February 21, 2015 article in Brazilian publication *Veja*, Ricardo Pessoa, the jailed president of construction company and accused Cartel participant UTC, explained that UTC had illegally funneled R$30 million (approx. US$10.5 billion) as part of the Petrobras bribery scheme to Rousseff's re-election campaign in 2014 alone.

134.    According to Costa, the Cartel was able to operate in secret for so long because of the tremendous power that the "political agents" had over the fate of Petrobras's suppliers.  As Costa explained, there was "never, never" an instance where a Cartel member refused to pay the illegal bribes because:

[If the Cartel member] did not contribute to a certain political party at that time, this would be reflected in other works at the government level, and the political parties would not look kindly to this . . . . If you create a problem on one side, it can create a problem on the other. So in my time there, I do not remember any company that failed to pay. There was, there were some delays, by cartel companies, *but they never failed to pay*.

135.   The bulk of the illicit bribes paid by Petrobras's outside contractors were directed to the coffers of the political patrons of Petrobras executives.   As noted above, each of the members of the Executive Directorate was hand-picked by Brazil's ruling political parties. In exchange for this appointment, according to the testimony of Costa and others, Petrobras's Directors and outside contractors were supposed to direct substantial contributions to those political parties in connection with each contract.

136.   As Costa explained, Petrobras's senior managers—including Costa, Duque, Foster, and Gabrielli—owed their jobs to the politicians and political parties that had appointed them to those posts.   Costa stated:

Other departments such as gas and energy and exploration and production, were also PT [Workers Party], so there was PT in the exploration department, PT in the gas and energy department and PT in the service department. So the comment in the company is that in this case the 3 percent went direct to the PT, PP [Progressive Party] did not participate in that because they were departments nominated for both execution of services and for business, PP with PT. So what happened within the company was that the total amount would be fully for PT.

137.   Highlighting the role of different political patrons for different divisions, Costa further testified:

The international department senior management was appointed by the Democratic Movement Party of Brazil (PMDB), so they also had funds which were passed on to the PMDB. In the international department.

138.   Costa also testified that it was crystal clear to all parties involved that enormous bribes were being directed specifically to fund politicians and political campaigns:

**YOUSSEF'S DEFENSE LAWYER:** The companies knew that these monies, this money that was being paid, was also going to a public agent?

**PAULO ROBERTO:** Yes.

**YOUSSEF'S DEFENSE LAWYER:** They knew for sure that the money was going to finance politicians and political campaigns.

**PAULO ROBERTO:** Of course. Yes, the answer is yes.

**YOUSSEF'S DEFENSE LAWYER:** That is, this scheme (please forgive me for using this word but it has been used here) of bribery was also used to finance Brazilian politicians and the politicians' campaign scheme.

**PAULO ROBERTO:** The answer is yes.

139.    As Barusco testified, "the payment of bribes and their amounts intensified with the increase of the billing of Petrobras, the increase of prices that were charged by the companies and the high demand of the company."  For example, in 2003 (when Barusco was hired as the Technology Manager in Petrobras's Board of Exploration and Production) the Services Division managed and made around US$3 billion per year.  By 2011 (when Barusco was Executive Manager of Engineering reporting to Duque) the Services Division was earning that amount *per month*, leading to a "proportional" and "mathematical" increase in the size of bribes he and other Petrobras executives received.

140.    In fact, Barusco testified that he and Duque received bribes "between US$40 to US$50 million dollars" in connection with "*90 (ninety)* PETROBRAS contracts" between 2003 and 2013.  These contracts included the $3.9 billion in contracts for the UHDT Hydrotreatment Unit for Abreu, in which Cartel members Odebrecht and OAS participated.  As Barusco explained, because Duque was "disorganized" and "worried that he might be caught," Duque assigned Barusco to act as an "accountant" charged with "manag[ing]" the amounts "owed" by the "hard core" construction companies that made up the Cartel.  According to Barusco, Duque required Barusco to deliver R$50,000 (approx. US$21,500) in cash to his home every two

weeks—amounts that were deducted from the bribes Barusco received while he was at the Company.

141.   As confirmed in testimony provided by former Petrobras executives and other Cartel members, the bribery scheme continued throughout the Relevant Period, and bribes were paid to Petrobras executives even after they left the Company.  For example, Barusco detailed how he continued to receive bribes after he left the Company in 2011 to become Chief Operating Officer ("COO") of Sete Brasil, a company formed to provide leasing services to Petrobras. Barusco worked with his replacement at Petrobras, Roberto Gonçalves, to continue the bribery scheme.  Barusco testified that as COO of Sete Brasil, he helped Sete Brasil obtain 28 contracts with Petrobras for the service and construction of drilling rigs in six Brazil shipyards.  As in his role at Petrobras, Barusco was also charged with facilitating the payments of bribes to politicians and Petrobras executives under these 28 contracts, which had a total value of approximately $22 billion.  As Barusco testified, while certain amounts varied, approximately 1% of the value of these contracts was to be paid as bribes, with (i) two-thirds of the 1% amount going to the treasurer of the Workers Party, João Vaccari Neto, and (ii) one-third divided between recipients in "House 1"—which consisted of Duque and Barusco's successor at Petrobras, Roberto Gonçalves—and those in "House 2," which consisted of Barusco and other Sete Brasil executives.

142.   According to Costa and other witnesses, numerous directors throughout the Company received kickbacks as a result of the scheme, and "everyone" at the Company knew this was the case.

> **JUDGE:**  This, let's say, this cartelization and this payment of 3% also existed in the other boards?
> **PAULO ROBERTO:** Yes. Correct.

**JUDGE:** Do you know whether other directors, like you, also received amounts?

**PAULO ROBERTO:** Yes, within the service area there was the director Duque, who was appointed at the time by the Minister of Civil Affairs, José Dirceu, right? And he had this connection with João Vaccari within PT [Partido Trabalhista (Worker's Party)] process. Within the International Board of Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the PMDB [Partido do Movimento Democrático Brasileiro (Brazilian Democratic Movement Party)].

**JUDGE:** But do you know, for example, whether Mr. Nestor Cerveró and Mr. Renato Duque also personally received amounts?

**PAULO ROBERTO:** *Well, this was talked about within the company and it was clear that yes they did. Yes, the answer is yes.*

143.   Barusco echoed these sentiments, stating that bribery and corruption were "*endemic*" and "*institutionalized*" at Petrobras.

144.   In all, the "bribe fee[s]" kicked back to Petrobras executives and government officials, up to 3% of Petrobras's contracts, totaled billions of dollars.   Indeed, Petrobras's January 27, 2015 earnings release, discussed below, indicates that, for Cartel contracts signed between 2004 and April 2012,  this figure amounts to at least *$1.5 billion* (R$4.0 billion).

### 3.   The Company's Senior Officers Orchestrated and Covered Up the Scheme

145.   This massive and elaborate scheme was perpetrated through the extensive efforts of Petrobras's Executive Directorate to conceal the existence of the bid-rigging and bribes.  The cover-up goes back for years.  As discussed above, one of the principal reasons that the 2009 CPI investigation collapsed and failed to expose the true reasons for Petrobras's massive cost overruns in connection with Abreu was because one of the key members of the CPI committee was illicitly paid $10 million to keep quiet.

146.   Indeed, several members of the Executive Directorate were personally involved in and profited from the kickback scheme, including Costa, Cerveró, and Duque.  In addition,

Foster, Gabrielli, and Barbassa, who served side-by-side with these Directors, each collaborated in the conspiracy to cover up Petrobras's longstanding fraud.

(a)    **Foster and the Executive Directorate Silenced Velosa and Closed Their Eyes to Evidence of Fraud**

147.    Members of Petrobras's Executive Directorate, including Foster, Gabrielli, Costa and Barbassa, were intimately involved in the fraud alleged herein, and silenced employees who threatened to disclose it, including Velosa, a Petrobras executive from 1990 to 2014 who reported directly to Foster and Costa during the Relevant Period.

148.    On December 12, 2014, Velosa appeared on a Brazilian weekly TV news show (*Fantástico*).    That same day, Brazil's premier business newspaper, *Valor*, published an extensive interview citing to "hundreds of internal documents" Velosa provided to the newspaper.    In those interviews, Velosa described in detail her discovery of significant "irregularities" at Petrobras and how she reported these red flags to Foster, Gabrielli, Costa, Duque and others in 2008 and 2009 before being silenced.    Velosa's warnings describing telltale signs of fraud and asset misappropriation are documented in contemporaneous emails and other documents that have been provided to Brazilian federal prosecutors.

149.    Velosa had held various positions at Petrobras from 1990 until November 2014, most recently as the managing director of subsidiary Petrobras Singapore since 2010.    However, in 2008 and 2009, Velosa was an executive manager under Costa, where her Division was responsible for budgeting and evaluating the economic viability of Downstream projects.    Velosa also interacted regularly with Foster.    Specifically, Velosa stated to *Fantástico*, "we always had a lot of access.    I knew Graças [Foster] when she was manager of technology, in the gas sector; I was manager of the contract management sector.    We were close."

150.   As reported in *Valor,* in 2008, Velosa led an internal audit of the Downstream Division's communications section and discovered extensive fraudulent billing practices. Velosa provided significant information to Gabrielli and Foster detailing the impact of the overbilling practices and made clear that the overcharges could only have been the result of fraud. These numerous problems included suspected misappropriations for small services billed at R$133 million (approx. US$59 million) between January and November 17 of 2008—a number that well exceeded the R$39 million (approx. US$17.4 million) planned for that year. Velosa's audit also revealed that R$58 million (approx. US$26 million) was paid in communication contracts for services that were never even rendered, including R$38 million (approx. US$17 million) in payments made by Geovane de Morais, the director of the communications sector. Velosa believed that Morais should be fired from the Company immediately and submitted a legal opinion supporting this assertion from senior Petrobras counsel, Fernando de Castro Sá ("Fernando"). However, Mr. Morais was kept on the Company's payroll until 2013.

151.   Further, Velosa informed both Gabrielli and Foster about problems with bidding relating to the construction of the Abreu refinery, including payments for services that were never rendered. Velosa testified to the Brazilian Federal Police that her team performed a comparative study examining the cost increases at Abreu to projects in the rest of the world, which revealed "prices for equipment that were four times higher than for the same equipment abroad." Similarly, Velosa's team discovered that work on an earthmoving contract that was supposedly complete had not in fact been done. As Velosa explained, "there were always gaping holes." According to *Valor*, a Petrobras internal document shows that Velosa made 107 "Project Change Requests," which would have saved R$947.7 million (approx. US$436.3 million) in the works of the Abreu refinery alone—none of these requests were implemented.

152.   Most significantly, Velosa criticized Petrobras's procurement model, which allowed for significant projects to be contracted out without a bidding process.   According to Velosa, this model often benefited members of the Cartel.

153.   Velosa testified that she reported these and other problems to Duque and Costa (including via emails), but no actions were ever taken.   Usually, Velosa was simply told to proceed as instructed, even when a project would generate a loss for the Company, as with the Abreu refinery.   In one instance, as Velosa told *Fantástico*, Costa confronted her after she raised her concerns.   Costa "pointed towards Gabrielli's [office] and asked:  'Do you want to bring down everybody?'"   According to Velosa, she responded:  "Look, I have two daughters.   I need to put my head onto [my] pillow and be able to sleep.   And the next morning, I have to look them in the eye without feeling embarrassed."

154.   Velosa also told *Fantástico* that she personally met with Foster to discuss these issues and other identified irregularities:

> [I]n 2008, as an executive manager, *I informed . . . the director at the time, Paulo Roberto Costa.   I informed other directors, like Graças Foster*.   And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time.   I informed director Cosenza, in his position as director, since he was my peer, and as executive manager.   *I informed president Gabrielli*.

155.   In April 2009, Velosa prepared a memorandum outlining the details of the misappropriation of funds that her team had uncovered in its audit of various projects, which she intended to circulate to senior management.   On April 3, 2009, Velosa asked Foster to review the memorandum.   At the time, Foster was Petrobras's Director of Gas and Energy.   Velosa's email asked: "I would like to have your opinion on a final text that I need to forward.   Can I leave it for you to read?   You know about the matter.   Feel free if you feel better not reading it.   *I await your response to leave or not the material with your secretary*."   Foster did not reply.

156.    Hearing nothing from Foster, Velosa circulated her "Internal Document of the Petrobras System," which concluded that "administrative irregularities" existed in the communications unit of the Downstream Division, to the Board of Directors.

157.    Velosa also made recommendations for improving Petrobras's governance practices going forward.  For example, Velosa testified that she explained to her superiors that there was a need for a responsibility matrix and fixed milestones.  These ideas were presented to Gabrielli, Duque, Costa, Foster and other members of the Executive Directorate. The proposed model was never adopted.  According to Velosa, no reasons were provided for not adopting her recommendations.

158.    In October 2009, after reporting the above irregularities and making these recommendations, Velosa was transferred to Petrobras's Singapore office.  No reason was provided to her for transfer and, when she arrived, she was asked not to work and advised to take a training course.

159.    Velosa reiterate her concerns about the Downstream Division in an October 7, 2011 email to Foster, stating: "*From the immense pride that I had for my company, I started to feel ashamed*."  She continued, "what happened in the [] (the Downstream department) in the area of communications and projects was absolute nonsense."  In the email, Velosa explicitly noted that part of the documentation showing the irregularities was already in Foster's possession: "*There are alternatives I'm evaluating despite fears of risking myself and my daughters.  I would like to present to you part of the documentation that I already have.  Part of it, I know you are already aware of.  I would like to hear from you before taking the next step.*"

160.   While in Singapore, Velosa continued to report irregularities to her superiors, including significant issues with the Company's purchases of fuel abroad.  Velosa reported these additional irregularities to Foster in an email.

161.   Finally, as *Valor* put it, on November 19, 2014, "after making hundreds of warnings and recommendations on money misappropriations in the company, [Velosa] was ousted by the current management without being informed the reason, along with several employees suspected of being involved in Operation Car Wash."

162.   As *O Estado de Sao Paulo* reported in a December 17, 2014 article, a day after her dismissal, Velosa wrote Foster one last time:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit].  By fighting it, I was threatened and harassed. ***I even had a gun pointed to my head and received threats against my daughters.***"  [Velosa] did not detail in the email to Ms. Foster what happened, but she had a gun pointed to her, in the neighborhood of Catete, in Rio de Janeiro.  They did not take a penny, but there was a recommendation that she should be quiet.

163.   Velosa's email concluded, "I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting. ***I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain***."

### (b)   Gabrielli and Duque Retaliated Against Fernando After Fernando Warned of Fraud at Abreu

164.   Velosa was not the only Petrobras employee who objected to the Company's improper practices and was dismissed or demoted for her efforts.  On January 7, 2015, Brazilian Federal Prosecutors deposed Fernando de Castro Sá (defined above as "Fernando"), a lawyer who worked in Petrobras's Supply Division and regularly interacted with Duque and Gabrielli during the Relevant Period.  During the interview, Fernando, who holds a master's degree from

the University of California in international trade law, described in detail his discovery of significant "irregularities" at Petrobras and how he reported them to Gabrielli, Costa, Duque and others in 2008 and 2009 before being silenced.

165.   Fernando drafted a legal opinion in early April 2009 concluding that Geovane de Morais should be terminated following Velosa's internal inquiry, which determined that Morais was responsible for improper payments in the Communications Department of the Downstream Division. Later that month, Fernando's superior, Nilton Maia, informed Fernando that he had received a call at home from Duque and Gabrielli regarding the Geovane opinion. Nilton stated that Gabrielli was very angry about the opinion. According to Fernando's testimony, Petrobras's senior management determined that "the legal department [would] give an opinion revising the previous opinions" concerning the findings of improper payments.

166.   Fernando also testified that in early 2008, as a result of the comparative study conducted by Velosa's team regarding Abreu's expanding costs (discussed above), he spearheaded an effort to convince the Board of Directors to adopt a systematic procurement model similar to the international benchmark, or Engineering-Procurement-Construction model. The EPC model contained certain key elements that would help address the deficiencies identified in Velosa's study, such as a "single point of responsibility" clause and non-extendable milestones. Although the Board of Directors approved the adoption of the EPC model promoted by Fernando on March 8, 2008, the Services Division, which was responsible for overseeing procurement contracts, continued to use the previous procurement model over Fernando's objection.

167.   When Fernando complained about the Services Division's refusal to follow the Board-approved policy, Gabrielli and other senior Petrobras managers retaliated against him and

destroyed the evidence of improper practices he uncovered.  Fernando testified that when he

questioned contract terms for Abreu, the Petrobras committee responsible for approving them

pointed to guidelines established by ABEMI, a lobby group for the Brazilian industrial

engineering industry that included multiple significant Cartel members.  After being repeatedly

told that numerous unfavorable contract terms would not be changed despite his objections,

Fernando complained to his superiors that ABEMI was in fact dictating the contracts.    Even

though Fernando was "very frightened by . . . what [he] was discovering," he received approval

from Nilton to draft up a report to document his concerns.  On July 8, 2009, Fernando met with

Nilton to discuss his findings, who told him:  "This is the deal, I do not want to see [the report].

You are already out of here. And it won't help to talk to anyone because I already talked to the

president [Gabrielli] . . . I have spoken with the director [Costa] and director Duque."

168.    Soon after, Fernando was transferred to a small, isolated office in the International

legal department, with no computer and without any work to do, his salary was decreased, and

his former colleagues were instructed not to speak with him.  Most importantly, Fernando's new

role did not involve any interaction with outside contractors.  When asked during his deposition

who was responsible, Fernando replied, "I was told that Gabrielli wanted my resignation, Duque

too."  According to his testimony, on September 2, 2009, Fernando was informed by a Petrobras

executive that a committee set up to investigate his complaints regarding ABEMI "had not

established anything, that [the executive] was erasing all documents in the system relating

thereto and that he would keep the physical documents."

### (c)    Petrobras Removed an Independent Director From the Audit Committee After He Raised Concerns About the Company's Financial Statements

169.    Petrobras also took steps to remove the Company's critics from positions of

power where they could uncover the truth about Petrobras's practices.  For example, Mauro

Cunha is one of the three independent members of the Company's Board of Directors. He has represented minority investors on Petrobras's Board since 2013 and is a vocal critic of the pro-government policies of the Company. In early 2014, Cunha was on the Petrobras Audit Committee investigating the Company's actions in acquiring the Pasadena refinery and constructing the Abreu and Comperj refineries. According to a March 18, 2014 *Dow Jones* article titled "Board Member of Brazil's Petrobras Voted Against 2013 Financial Report," during a February 25, 2014 meeting of the Board, Cunha rejected the Company's 2013 earnings reports because "he didn't have enough time to analyze the firm's finances and [] there was insufficient information and 'apparently inadequate' accounting of the firm's investments in refineries." According to a February 6, 2015 *Bloomberg* article, Cunha complained about Petrobras's conduct to the CVM, Brazil's securities regulatory agency. Cunha sent a letter to the Brazilian regulator following the February 25, 2014 meeting, stating: "They [Abreu and Comperj] are among the world's most expensive refineries . . . . I'm not comfortable with the absence of impairment."

170.    During an April 25, 2014 meeting of the Board of Directors, the Board removed Cunha from the Audit Committee without any explanation. According to an October 20, 2014 *Bloomberg* article titled "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," Cunha has lodged a complaint with the CVM questioning his removal and the independence of the Petrobras Audit Committee. In response, Petrobras filed a complaint with the CVM against Cunha regarding statements Cunha made in his capacity as Head of the Brazilian Association of Capital Markets incriminating Petrobras's management team.

4.      **The Kickback Scheme Had an Enormous Impact on Petrobras's Financial Statements Throughout the Relevant Period**

(a)     **Petrobras's Accounting for the Bribes and Overpayments on Contracts Violated GAAP and IFRS**

171.    Petrobras's kickback scheme pervaded the entire Company and inflated the price of contracts in all of the Company's primary business lines.  Both Costa and Barusco testified that every significant Petrobras division—Downstream/Supply, Services, Exploration & Production, Transportation, and Gas and Energy—operated pursuant to the 3% kickback scheme that inflated the Company's contracts.  These facts have been corroborated by Cartel members. As discussed above, the only significant difference between the divisions was which political party received a cut of the bribes.

172.    In an effort to conceal this widespread kickback scheme from Petrobras's investors, Petrobras improperly recorded the billions of dollars in bribes and overpayments paid throughout the Relevant Period as *assets* on the Company's balance sheet.  Specifically, as Petrobras has since admitted, the bribes and inflated contract amounts that Petrobras paid out on a particular project were included in the value of the asset that Petrobras recorded on its balance sheet.  As a result, the amount of Property, Plant, and Equipment (defined above as "PP&E") that Petrobras reported to the SEC on a quarterly basis throughout the Relevant Period included billions of dollars in unlawful bribes and overpayments.

173.    Both Generally Accepted Accounting Principles (defined above as "GAAP") (which the company was required to comply with prior to January 1, 2011) and International Financial Reporting Standards (defined above as "IFRS") (which the Company was required to comply with throughout the remainder of the Relevant Period) prohibited Petrobras's capitalization of bribes and inflated costs as assets in the Company's financial statements.  IFRS provision International Accounting Standard ("IAS") 16 states that "[a]n item of property, plant

and equipment that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction." Similarly, under GAAP, Accounting Standards Codification ("ASC") 360 allows companies to record the "historical cost" of PP&E, which includes *only* "the costs necessarily incurred to bring it to the condition and location necessary for its intended use." The cash received by Petrobras executives and Brazilian politicians as bribes and the additional costs incurred due to illegal (but Petrobras-sanctioned) bid-rigging were not cash "given to acquire an asset at the time of its acquisition or construction" under IAS 16, nor were these amounts costs "necessarily incurred to bring [the asset] to the condition and location necessary for its intended use" under ASC 360, and therefore could not be recorded as assets in the PP&E.

174.    Petrobras publicly represented to investors during the Relevant Period that it was valuing its PP&E in accordance with these accounting requirements. For instance, in its 2012 and 2013 Forms 20-F, Petrobras adopted the language of ASC 360 in representing that:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

175.    These representations were demonstrably false, and Petrobras's accounting for the bribes and overpayments violated GAAP and IFRS. By capitalizing amounts paid out in bribes and inflated contract prices as PP&E, Petrobras reported materially overstated amounts for PP&E and total assets throughout the entirety of the Relevant Period. This material overstatement also had the effect of inflating Petrobras's reported shareholder equity.

176.    Rather than capitalizing these bribes and inflated costs, IFRS and GAAP both required Petrobras to recognize these costs as expenses on Petrobras's income statement during the reporting period in which they were incurred.  IFRS states that "[a]n *expense is recognised immediately in the income statement when an expenditure produces no future economic benefits* or when, and to the extent that, future economic benefits do not qualify, or cease to qualify, for recognition in the balance sheet as an asset."  IFRS CF 4.52.  Similarly, under GAAP, "expenses and losses are generally recognized when an entity's economic benefits are used up," meaning that expenses that result in no future economic benefit to a company must be recognized immediately.   FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶85.  There can be no dispute that these bribes and inflated costs produced no "future economic benefits" to the Company throughout the Relevant Period. Accordingly, putting aside that the bribes were illegal and should never have been paid, accounting rules required Petrobras to immediately disclose and record the bribes as expenses.

177.    In addition, Petrobras misreported net income in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the Company's PP&E and total assets.  Moreover, Petrobras misreported net income in each of those periods during which a bribe was paid and improperly capitalized instead of having been expensed immediately.

178.    In sum, as alleged below in ¶¶ 281-84, by wrongfully recognizing as assets the cash paid out as bribes and overpayments on contracts, Petrobras materially overstated the amount of PP&E, total assets and net income in each of its quarterly and annual financial statements filed with the SEC during the Relevant Period.

**(b)     Petrobras Has Admitted It Must Record a Massive Writedown to PP&E to Account For Improperly Capitalized Expenses**

179.    Petrobras has since *admitted* that the Company improperly recorded these inflated sums as assets during the Relevant Period, and that the capitalization of such costs during the Relevant Period (i) amounts to a violation of GAAP and IFRS; and (ii) necessitates a massive writedown.  On November 14, 2014, the Company disclosed that it would be unable to meet its deadline to file third quarter 2014 results accompanied by a review report by its outside auditor, Pricewaterhouse Coopers ("PwC").  Specifically, the Company stated:

> [A]s a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) *make any adjustments to the financial statements based on the accusations and investigations related to [Operation Car Wash]* and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.

180.    During the Company's November 17, 2014 conference call, Foster stated that "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, could potentially affect the Company's financial statements."  In particular, Barbassa stated that "PP&E . . . should not include values which are not a fair value for that good or service," and further acknowledged that Petrobras would be required to "deduct from [PP&E] any amount that could be linked to bribery of any sort."  Barbassa also stated that overpayments and bribes "should be removed from the PP&E line item."  Foster likewise admitted during the November 17, 2014 conference call that the existence of overpricing and bribery would require Petrobras to record a writedown to its PP&E:  "You have an obligation to write off from the asset a cost related to corruption . . . [I]f there is a cost relating to corruption in the value of [a] net asset . . . you have an obligation to write off that cost.  You have to discount that cost."

181.    In addition, in connection with "contracts entered into between January 1, 2004 and April 30, 2012," Petrobras admitted in its January 27, 2015 unaudited financial report for the

third quarter of 2014 that amounts paid as bribes and other inflated costs "*were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount*." Petrobras further admitted that "*those costs should not have been capitalized*." As a consequence, the Company stated that "it is necessary to correct the amounts related to the misconduct that were capitalized," and, in particular, to "deduct from [PP&E] any amount that could be linked to bribery of any sort." Accordingly, Petrobras conceded that its financial statements contained "errors in the carrying amount of [PP&E]." Similarly, in her letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that the "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were *improperly recognized* as part of the cost of our fixed assets."

182.    Petrobras further conceded on January 27, 2015 that, due to its capitalization of bribes and other inflated charges during the Relevant Period, its financial statements do not fairly present the Company's financial position and do not comply with applicable accounting regulations. In particular, the Company stated:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of the current date, *except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of issue of these financial statements, as set out in note 3.*

> These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), *except for the errors mentioned above and further discussed in note 3.*

183.     The Company stated that it is unable to quantify the size of the required asset writedown.  On January 27, 2015, Petrobras admitted that it could not file third quarter 2014 financial statements that contained a reasonable estimate of the necessary write downs to the Company's assets.  According to Petrobras, the fraud—which affected at least R$188.4 billion (US$73 billion) in assets—was so pervasive that the Company still could not quantify the full extent of the misstatements on its financial statements.  Instead, the Company indicated that its assets could be overvalued by anywhere from *US$1.5 billion (R$4.06 billion) to US$34 billion (R$88.6 billion)*.

184.     The $1.5 billion figure Petrobras provided grossly understates the size of the required writedown.  In its January 27, 2015 earnings release, the Company explained that this figure was derived by writing down the total value of contracts entered into with Cartel members by (i) an average percentage of 3%, which was an "estimation of the magnitude of the error using the average percentage mentioned in [Costa's] deposition," and (ii) "specific amounts of improper payments" mentioned in Costa's and others' depositions.  However, as discussed above, (i) the bribery was not limited to the Cartel companies, (ii) the improper contract inflation was not limited to the 3% in bribes, but instead included additional amounts of up to 20%, and (iii) the bribery scheme did not end in April 2012, but instead continued until 2014.  Recognizing this, the Company acknowledged in the earnings release that even this $1.5 billion writedown figure could understate the true impact of the bribery on its financial statements, because the Brazilian Federal Police investigation was still ongoing and further wrongdoing could emerge.

185.     In any event, the Board of Directors had in fact quantified the writedown, but was prevented from releasing that figure at the last moment due to political pressures.  Just prior to the release of the third-quarter results, Foster and most of Petrobras's Board had agreed, on

January 23, to take a net writedown of R$61.4 billion (US$22 billion) in the third quarter, but President Rousseff, through government-appointed board members, vetoed this proposal, saying it was too large.  The writedown was then rejected by the full Board on January 27, 2015.

### 5. "Operation Car Wash" Has Provided Extensive Testimony and Documentary Evidence Demonstrating the Mechanisms of the Scheme

186.    In addition to the Company's admissions concerning the falsity of its financial statements, multiple Petrobras executives and Cartel members have pled guilty to corruption and provided extensive testimony explaining how the kickback scheme worked.

187.    Brazilian prosecutors uncovered the scheme almost by accident.  According to the prosecutors, their initial focus was on investigating money laundering by Youssef, a convicted career criminal who was known as the Brazilian black market's "central banker." Operation Car Wash got its name from the fact most of the stolen money was laundered through a network of gas stations and car washes.

188.    According to press reports, Petrobras's scheme was only uncovered when investigators discovered Costa's name in the thousands of documents authorities had compiled through their investigation.  Specifically, investigators noticed that the name of Paulo Roberto Costa—the "public face" of Petrobras during his tenure—appeared together with the name of career criminal Youssef on a proof of address form submitted in connection the purchase of a R$250,000 (approx. US$110,000) Range Rover Evoque.  As explained by the *Financial Times*, that discovery led to Costa's arrest on March 20, 2014, when Brazilian federal authorities raided Costa's home and seized assets from the former Supply Director, including 6 million Brazilian reais in cash, 25 luxury cars, and the Evoque.  According to court records, when the Brazilian Federal Police conducted the raid on Costa's home, a security camera video caught Costa's two

daughters and their husbands stuffing suitcases and bags with cash, incriminating documents, and a laptop, all of which they hoped to hide from the police.

189.    Although Costa initially denied the charges—claiming in a June 2014 appearance before a Parliamentary Commission of Inquiry that he "vehemently den[ied] that there was a criminal organization in Petrobras"—he ultimately struck a plea deal with prosecutors.  As part of the deal, Costa provided 42 hours of sworn video testimony in which he described how he and numerous Petrobras senior executives pocketed hundreds of millions of dollars through the decade-long criminal kickback scheme.  Arrests and plea bargains by other culpable individuals quickly followed.

190.    Following Costa's testimony, the Brazilian Federal Public Prosecutor's Office filed a complaint against Costa and nine others on December 11, 2014.  The December 11 Prosecutor's Complaint summarized the course of Operation Car Wash as follows:

> During the operation "BIDONE" investigations, it was found that the criminal organization led by ALBERTO YOUSSEF was also active in offences against the civil service within and against **PETROBRAS**. Thus, the criminal lawsuit [] was proposed through which it was charged against **PAULO ROBERTO COSTA**, former supply director at **PETROBRAS**, for money laundering crimes against the Civil Service and participating in the criminal organization led by **ALBERTO YOUSSEF**, *based on evidence of overpricing at the Delayed Coking Unit at the Abreu e Lima Refinery in Pernambuco*, charged to the CONSORCIO NACIONAL CAMARGO CORREA, led by contractor CAMARGO CORREA S/A.
>
> *            *            *
>
> The existence of a **large criminal scheme** was revealed including crimes against the economy, corruption and money laundering, and the establishment of a large and powerful cartel with participating companies OAS, ODEBRECTH, UTC, CAMARGO CORREA, TECHINT, ANDRADE GUTIERREZ, MENDES JUNIOR, PROMON, MPE, SKANSKA, QUEIROZ GALVÃO, IESA, ENGEVIX, SETAL, GDK and GALVÃO ENGENHARIA. This scheme enabled rigging the competitive bidding processes regarding the major works contracted

by **PETROBRAS** between 2004 and 2014, largely increasing the profits of these companies in hundreds of million [reais].

(Emphasis in original).

191.   The December 11 Prosecutor's Complaint further summarized the "large criminal organization," which operated "from 2006 until at least November 14, 2014," as follows:

- The "first nucleus" consisted of executives at Petrobras's outside contractors, which was "was geared to commit cartel and bid rigging crimes against **PETROBRAS**, to corrupt its officers and launder assets received as a result of these crimes."

- The "second nucleus" consisted of Costa and Duque and "other top level PETROBRAS employees," who "assist[ed]" the "first nucleus" in "conduct[ing] the offences of cartel and bid rigging."

- The "third nucleus" consisted of Youssef and "other operators, who enabled the payment of undue advantages to the members of the second nucleus, as well as asset laundering that were the result of crimes committed by the entire criminal organization."

192.   Documents and testimony made public as part of Operation Car Wash contain copious details regarding the fraud.  Indeed, the contracts that Costa, Barusco, Mendonça Neto and Camargo testified were used to funnel bribes to Petrobras executives—including those involving contracts at Pasadena, Comperj, Abreu, and SBM—are the same projects that Petrobras repeatedly claimed were awarded based on a bidding process that "strictly" complied with the law, were free of any "irregularities," and were accurately reflected in the Company's financial statements at values that were "absolutely true and legitimate."

(a)   **Bribery in the International Division**

193.   The corruption scandal at Petrobras included the Company's International Division, which was headed by Cerveró from 2003 to 2008.  Documents and testimony revealed through Operation Car Wash have demonstrated that, while the International Division grossly

overpaid for certain foreign assets (the value of which the Company overstated throughout the Relevant Period), the principal executives in that Division were accepting enormous bribes.

194.     For example, Costa revealed during his sworn testimony that the International Division, and Cerveró in particular, perpetrated the same kickback scheme where 3% of the value of a contract would be diverted to management as a bribe.  When asked if the "cartelization and this payment of 3% also existed in the other boards?" and if he knew "whether other directors, like you, also received amounts?"  Costa stated: "Yes . . . [w]ithin the International Board of Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the [Brazilian Democratic Movement Party]."

195.     Costa also told investigators that he had received $1.5 million from a lobbyist to assist in the purchase of the Pasadena Refinery.  Costa stated that he received a visit from Fernando Soares, a lobbyist with ties to one of Brazil's biggest political parties.  Costa had a longstanding relationship with Soares, and introduced him to other key members of the bribery scheme, including Barusco, at an Offshore Technology Conference in Houston, Texas.  Soares offered Costa the bribe, which Costa accepted, in exchange for not hindering the negotiations as Cerveró proposed the project for approval. Costa stated that he believed the money came from Astra Oil, the owner of the refinery.  Moreover, Costa stated that he understood a group headed by Cerveró had received between $20-30 million in bribes for the transaction.

196.     In December 2014, Brazilian federal prosecutors filed charges against Cerveró and three others in connection with $53 million in bribes allegedly paid by Samsung Heavy Industries as part of a deal to supply offshore drilling vessels.  According to the charges filed, prosecutors say the bribes from Samsung Heavy Industries were solicited and received by Cerveró and other suspects "in order to make feasible" the contracting, by Petrobras, of two

drilling vessels.  The ships cost $586 million and $616 million, respectively, and were destined for offshore oil fields in Africa and the Gulf of Mexico.  Cerveró allegedly shared $40 million of the bribe payments with Soares.  Prosecutors say Soares requested the payments from Júlio Camargo, an executive of a Brazilian engineering firm who was acting as a broker for Samsung.

197.   Soares, like Cerveró, was charged with two counts of "passive" corruption and 64 counts of money laundering.  Camargo, who allegedly received $13 million in bribes, was charged with "active" corruption, money laundering and financial crimes.  The prosecutors specifically noted in their indictment that "[a]lthough it was Fernando Soares who made the deals with Júlio Camargo, there is no doubt that Fernando Soares passed along part of this amount to the former International Director, Cerveró, whose participation was fundamental for the deal between Samsung and Petrobras."

198.   On February 24, 2015, prosecutors filed new charges against Cerveró for "using the influence of his office to obtain contracts by payment of bribes (unfair advantage) under PETROBRAS" through the use of offshore companies located in Uruguay and Switzerland.

### (b)   Abreu and Comperj Refineries: Hundreds of Millions in Bribes and Overpayments

199.   The evidence demonstrating the impact of Petrobras's bribery and corruption scheme on the financial performance of the Company's Downstream (or Supply) Division—the business unit overseen by Costa—is overwhelming.  The Downstream Division was responsible for over $70 billion in capital expenditures during the Relevant Period and, as numerous witnesses have now confirmed, a staggering percentage of this amount was paid out as bribes to Petrobras officials, and as overpayments to contractors for services that should have been performed for billions of dollars less.

200.     In fact, Costa has admitted that, contrary to Petrobras's repeated public representations during the Relevant Period, there *was* "overpricing" in all contracts for Abreu involving Cartel members like Camargo Correa, and that virtually every contract involving Costa's Division was inflated by the Cartel's bid-rigging, as well the 3% bribe that was paid to Costa and politicians.

201.     Other Petrobras executives have corroborated the scope of the fraud in the Company's Downstream Division and admitted the Division's most important and capital intensive projects, including Abreu and Comperj, were specifically targeted by Cartel members and Petrobras executives.  For example, in his November 24, 2014 plea agreement statement (No. 5), Barusco admitted that "in the case of [Abreu], *there was a clear overbilling*."  In fact, according to Barusco, the Cartel's coordination of bids for 12 Abreu projects—including four of the largest packages of works related to Abreu—resulted in "contracts at prices at the top echelon of the Petrobras budget."  Further, even after the Abreu projects went through a re-bidding process, Barusco explained, the Cartel and Petrobras agreed to inflated contract terms that were just under Petrobras's internal 20% threshold.

202.     In other words, at the same time Petrobras was telling investors that it had "rigorously" complied with the bidding and that there were no "irregularities" or "overbilling" at Abreu, Petrobras's senior executives were in truth awarding inflated contracts in order to secure millions of dollars in bribes.  Indeed, Barusco confirmed that "*the main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the Abreu e Lima Refinery-RNEST and the Petrochemical Complex of Rio de Janeiro-COMPERJ*, in addition to large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and REPAR."

203.    Barusco provided detailed information to the Brazilian Federal Police concerning specific projects performed in connection with the Abreu refinery totaling over *R$13 billion* (approx. US$7.5 billion), which were used to divert bribes to Petrobras executives and public officials.  These contracts included, for example, a nearly R$1 billion (approx. US$635 million) contract for the construction of a powerhouse, compressed air unit, input substation, and related structures (the "CAFOR da Abreu e Lima" project) awarded to Cartel member Alusa; a R$3.2 billion (approx. US$1.8 billion) for the UHDT hydrotreatment unit project awarded to Odebrecht and OAS; and a R$3.4 billion (approx. US$2 billion) contract for a Delayed Coking Unit awarded to Camargo and CENC.

204.    As noted and illustrated above (at ¶ 131), the detailed spreadsheet maintained by Barusco memorializes that the bribery scheme impacted billions of dollars in Abreu contracts.

205.    In addition, Costa explained that, after he left the Company in April 2012, he set up a "consulting" company, "Costa Global," in order to facilitate the payment of bribes relating to Abreu and other contracts.  For example, Costa admitted that Costa Global entered into an arrangement with Construtora Comércio Camargo Corrêa—which performed significant work at Abreu throughout the Relevant Period—through which Costa received R$100,000 per month for 30 months (or approximately US$1 million) through 2013.

206.    Barusco confirmed that the same "tactics" used by Petrobras and the Cartel to bid up prices and pay bribes for Abreu were used at the Comperj refinery as well.  In his plea bargain, Barusco identified numerous instances of Comperj projects that were subject to bid-rigging and bribery. In fact, Barusco admitted that information compiled from his Company computer demonstrated that a new project relating to the Downstream Division would be tendered practically *every month*, and that each such project would be used to funnel bribes to

Petrobras executives—clear evidence of the massive scope of the fraud and its impact on the Company's financial results.

207.    Barusco specifically identified three Comperj projects valued at over R$4.2 billion (approx. US$2.4 billion) that were used to funnel bribes to Petrobras executives— including a R$1.5 billion (approx. US$838 million) project awarded to Alusa to build a Catalytic Hydrocracking Unit (HCC), a nearly R$2 billion (approx. US$1.15 billion) project awarded to Andrade Guiterrez Techint to build a Coking Unit, and another R$820 million (approx. US$484 million) "earthworks" project, as set forth in Barusco's spreadsheet (excerpts of which are reproduced below):

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| ALUSA | C | HCC do COMPERJ | 19/2/10 | R$1,460,859,527.26 US$806,748,137 | 2 | 1PR,0,5Part,0,5casa | Luiz Eduardo Barbosa | Cesar Godoi | 19/2/10 |
| Andrade Gutierrez Techint | C | Coque do Comperj Tipico Cartel 15% | 5/3/10 | R$1,938,191,350.00 US$1,087,893,663 | 2 | 1PR,0,5Part,0,5casa | | | 5/3/10 |
| Andrade Odebrecht Queiroz | C | Terraplanagem Comperj | 28/3/08 | R$819,800,000.00 US$469,853,278 | 2 | 1PR 1Part | | | 07/03/08 |

208.    On January 29, 2015, *Valor* reported that the Company's Board of Directors had received an appraisal report prepared by accountants that Petrobras hired to assess the impact of the bribery scheme on the Company's assets, including the Abreu and Comperj refineries. According to *Valor*, the report showed that, while the Company had spent over $18.5 billion on projects relating to Abreu, the refinery was in fact worth just $7 billion, or ***$11.5 billion*** less than its cost, after accounting for the impact of the fraud and overpricing. That same report showed that the entire value of Comperj, which has been built at a cost of $13.5 billion and is still not scheduled to open for at least another year, ***should be written down to zero***.

71

### (c)    Bribery by SBM

209.    Directly contrary to Petrobras's claims (discussed above at ¶¶ 97-98) that there were no "irregularities" in its relationship with SBM Offshore, documents and testimony revealed through Operation Car Wash demonstrate that SBM actually paid millions in bribes to Petrobras executives.  As part of Barusco's plea deal, he agreed to repay $100 million in illicit bribes he received in his role as a senior procurement executive.  Barusco made it clear that *$22 million* of those bribes were paid by SBM.

210.    Specifically, as part of Barusco's plea agreement statement (No. 03) with the Brazilian Federal Police, Barusco acknowledged that he began to accept bribes from SBM in "1997 or 1998," which continued until at least October 2010.  Barusco provided the following sworn testimony:

> [T]hat he [Barusco] started to receive bribes from the Dutch company SBM in 1997 or 1998, while he held the position of Manager of Facilities Technology, within the Board of Exploration and Production, from two FPSO contracts signed due to the technical and "essential" participation of the informant, since he was the coordinator of the technical department;

> [T]hat at the time [Barusco] was in charge of formalizing the first freighted FPSO contract and he became an essential piece in the following FPSO contracts signed with SBM, and [Barusco] also started to receive bribes from them;

> [T]hat due to a very close relationship that [Barusco] had developed with the SBM representative, JULIO FAERMAN, both [Barusco] requested and JULIO offered the payment of the bribe, being an initiative that came from both sides and became systematic after the second FPSO contract signed between SBM and PETROBRAS in the year 2000, if I'm not mistaken;

> [T]hat these were long term contracts and, as such, the payment of bribes also lasted for many years while [Barusco] held the position of Manager of Facilities Technology between 1995 and 2003;

> *            *            *

> [T]hat, in the year 2007, a contract was signed between SBM and PETROBRAS for the supply of a FPSO named P57, whose contract value was worth R$

1,258,548,071.75, during the time when [Barusco] already held the position of Executive Manager of Engineering, and received 1% over the contract's amount as a bribe, paid by JULIO FAERMAN between 2007 and until October 2010;

[T]hat this way the informant received, between 1997 or 1998 until October 2010, as a result of contract signed between PETROBRAS and SBM, the approximate amount of US$22 million dollars[.]

211.   Barusco's detailed spreadsheet, excerpted below, sets forth bribes (the "%" column) that SBM (among many others) paid Barusco (via Faerman) in connection with at least three separate contracts, set forth in relevant part below:

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| SBM | C | Monoboias PRA-1 | 13/3/06 | US$ 61,705,300 | | US$ 200mil fixo SAB/MW | Julio Faerman | Julio Faerman | 13/3/06 |
| SBM | C | P-57 | 19/12/07 | US$1,258,548,071 | 1 | Sab 300mil US part | Julio Faerman | Julio Faerman | 19/12/07 |
| SBM | C | Turret da P-53 | 1/5/05 | US$81,000,000,00 | 1 | Casa 0,6MW 0,4Sab | Julio Faerman | Julio Faerman | 24/4/08 |

212.   On November 12, 2014, SBM announced a settlement with the Dutch Public Prosecutors Office of US$240 million in connection with the Dutch officials' investigation in SBM's international bribery scandal.   According to SBM in a November 26, 2014 statement, the Dutch Public Prosecutor was able to establish that "payments were made from the accounts of the Company's agent to government officials in Brazil" "using means not available to [SBM]." With this admission and Barusco's plea agreement, the Company finally admitted on November 17, 2014 that there was "overwhelming evidence" that SBM had bribed Petrobras officials.   As a result, SBM is now barred from entering into contracts with Petrobras until the allegations are proven, at which point SBM will be further suspended for an additional six months to two years.

**(d)   Bribery at Transpetro**

213.   The corruption at Petrobras also extended to the Company's transportation subsidiary, Transpetro.   Barusco's testimony establishes that at least 28 contracts totaling $22

billion involving shipyards operated by Transpetro were used to funnel bribes to Petrobras executives and affiliated politicians.  According to Barusco, the very PROMEF projects that Transpetro's CEO, Machado, touted as based on a "competitive" bidding process were in fact arranged by an agreement among the Cartel's members.  The costs of those contracts were artificially inflated by up to 20% as a result, and also included hidden bribes that were made to Petrobras executives and Brazilian politicians.  In fact, Costa testified that he himself received a bribe from Machado, who personally delivered a R$500,000 bribe to Costa at Machado's apartment in Rio de Janeiro:

> **FEDERAL JUDGE:** Did this also happen with companies linked to Petrobras, subsidiaries?
>
> **PAULO ROBERTO:**  Well, linked to Petrobras, . . . there's Transpetro, Transpetro has some cases of passing funds on to politicians, yes.  Transpetro.
>
> **FEDERAL JUDGE:**  You, for example, regarding Transpetro, which you said you had more knowledge of, did you ever receive any advantage or bribe through these Transpetro contacts?
>
> **PAULO ROBERTO:**  Yes, I did. I received a payment from Transpetro.
>
> **FEDERAL JUDGE:**  Can you be more specific?
>
> **PAULO ROBERTO:**  If I'm not mistaken, I received 500,000 Reais.
>
> **FEDERAL JUDGE:**  Who paid you?
>
> **PAULO ROBERTO:**  The president of Transpetro, Mr. Sérgio Machado.
>
> **FEDERAL JUDGE:**  When approximately was that?
>
> **PAULO ROBERTO:**  Perhaps I have some difficulty in remembering the dates here, because there were many dates if I'm not mistaken, maybe around 2009, 2010. Around that time, I think.
>
> **FEDERAL JUDGE:**  But did you receive that on a single occasion?
>
> **PAULO ROBERTO:**  From Transpetro, yes. A single occasion.
>
> **FEDERAL JUDGE:**  And can you tell me the reason why that sum was paid?

**PAULO ROBERTO**: I can, it was due to the contracting of some ships, and that had to go through the supply director. So it was due to the contracting of ships by Transpetro.

**FEDERAL JUDGE**: And was the amount delivered directly by Mr. Sérgio Machado?

**PAULO ROBERTO**: It was delivered directly by him, at his apartment in Rio de Janeiro.

214. In light of this testimony, as well as the other evidence produced by Costa and Barusco concerning the contract inflation and bribes impacting Transpetro's financial results, PwC has refused to sign off on Transpetro's financial statements for the third quarter of 2014. According to news reports, PwC refused to approve the results given Machado's involvement in preparing them and demanded that Machado be fired—a proposition that was apparently met with resistance by some members of Petrobras's Board of Directors who were concerned that his firing would cause friction with President Rousseff's ruling coalition. On November 3, 2014, however, Petrobras placed Machado on unpaid leave. Machado was eventually fired from Transpetro on February 5, 2015.

C.   **Following the Commencement of Operation Car Wash,
     Petrobras Continued to Mislead Investors by Forcefully
     Denying the Existence of Corruption**

215. By the start of 2014, Petrobras had assuaged any lingering concerns over costs and pricing in connection with its refineries and contracts. Beginning in early 2014, however, several investigations commenced that once again raised the specter of "irregularities" in Petrobras's business dealings, including Costa's arrest. In each instance, Petrobras and its executives strongly condemned these allegations and vehemently denied the existence of any irregularities or corruption at the Company.

216.     For instance, Petrobras and its executives denied any wrongdoing in response to a newly convened CPI to investigate possible improprieties in connection with Petrobras's purchase of Pasadena.   On April 15, 2014, Foster told reporters she "believed one thousand times" in the Company's fundamentals, and later testified before the CPI in defense of Petrobras's performance, stating that the Pasadena deal was simply based on "incomplete data" and nothing untoward.   Foster further testified that the Company "found no wrongdoing by Petrobras employees in the purchase" of Pasadena.

217.     Similarly, on April 1, 2014, Petrobras announced in a press release that the Company's investigation into the accusation of bribes between SBM and Petrobras "concluded that there are *no facts or documents that evidence the payment of bribes to Petrobras employees*."

218.     In May 2014, following his initial release from prison, Costa gave an exclusive interview to Brazilian newspaper *Folha* during which he strenuously defended himself and Petrobras against charges of bribery and fraud.   Costa denied any knowledge of Youssef's role as a money launderer and denied having any relationship with him involving bribes.   Costa stated that he provided advice to Youssef in 2013, and his payment for that advice was the Range Rover Evoque seized by the Federal Police in March 2014.   Costa stated affirmatively that *"[m]y involvement in money laundering and remittance abroad is zero."*

219.     Further, on May 10, 2014, the day after Brazilian newspaper *O Estado de São Paulo* reported that SBM's Brazilian representative Jacques Levy purportedly "said members of Petrobras knew of the bribery payments" since 2012, Petrobras issued a "forceful" denial of these allegations.   Specifically, the Company stated on *Facts and Data* that it "belie[d], forcefully" the article "and reaffirm[ed] that it became aware of accusations of alleged bribery

payments to employees of the Company, involving the company SBM Offshore" for the first time from a February 2014 article.

220. Two days later, on May 12, 2014, during a conference call held to discuss the Company's first quarter 2014 earnings ("First Quarter 2014 Investor Call"), Foster allayed investors' concerns by reaffirming that Petrobras was not involved in any wrongdoing:

> We have our own internal investigation committee. They conducted investigations during 45 days. And regarding Petrobras action, regarding our operations, ***there are no facts or documents that would document the payment of bribery to any employees of Petrobras***.

221. Petrobras's and its executives' denials of wrongdoing continued throughout the spring and fall of 2014. On June 10, 2014, Costa vigorously defended his and Petrobras's innocence before the CPI, stating:

> I want to state here, first hand, that ***I firmly reject the allegation that Petrobras is a criminal organization, that there was, let's put it that way, someone else that was doing money laundering***.

222. Costa further testified: "I totally repudiate the []truth of this accusation made by the Federal Attorney's Office"; "Petrobras is an extremely serious company"; "***you will not find anything illegal at Petrobras, because there is nothing illegal about Petrobras***"; "[t]here is no criminal organization"; and "[t]here is no laundering of Petrobras money by Alberto Youssef. I do not know how they came up with this story."

223. At the same time, the Company continued to deny the allegations on the *Facts and Data* site, "reaffirm[ing]" on July 12, 2014 that Petrobras "has not found any facts or documents evidencing the payment of bribes to employees of Petrobras." Likewise, on July 14, 2014, Petrobras repeated its mantra that "there is no indication of irregularities" and "there is no overpricing or overbilling in the project of the Abreu [ ] refinery."

224.   Over the weekend of September 6-7, 2014, Brazilian magazine *Veja* leaked information and recordings from the confidential testimony provided by Costa as part of his plea bargain.   In this testimony, Costa stopped protesting his and his accomplices' innocence and for the first time admitted to paying and receiving bribes during his tenure at Petrobras.   Costa also reportedly implicated three state governors, six senators and 25 congressmen from three parties in the governing coalition.   These individuals included the president of the Senate and the speaker of the lower chamber and the treasurer of the Workers' Party.   *The Economist* reported on September 8, 2014 that the beneficiaries of the illegal kickback scheme "are alleged to have pocketed 3% of the value of the contracts signed with Petrobras in return for supporting the government in congressional votes."

225.   In a statement to the *Wall Street Journal*, Petrobras responded that it was cooperating with the investigators but refused to acknowledge its role in the scheme, stating that it was the ***victim***, not the perpetrator, of the fraud: "Petrobras would also like to emphasize that the company is considered by those authorities to be the victim in this investigation process."

226.   In sum, as the accusations of corruption began to mount in 2014, Petrobras executives flatly denied all wrongdoing while the Company maintained that it was the victim of the fraud, thereby perpetuating the fraud on investors.   Notwithstanding these denials, Petrobras and its executives knew that the jig might be up.   Foster immediately transferred her significant real estate assets to her son and daughter.   Similarly, Cerveró donated significant assets to his heirs before his assets were frozen by the Brazilian authorities.

## VI.   THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES

227.   After months of repeatedly and vehemently denying the existence of the bribery and corruption scheme, on October 27, 2014, Petrobras issued a formal statement filed in a Form

6-K with the SEC regarding Operation Car Wash.  In this statement, Petrobras acknowledged for the first time that the facts revealed by the police investigation could have a significant negative impact on its business.  The Company also outlined the steps the Company was taking in response to the testimony and the investigation.  Petrobras announced that it had had hired two "independent specialized investigation companies," later revealed to be two law firms—Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP—to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business."

228.   However, Petrobras reinforced that "the relevant government authorities have officially acknowledged the Company as a victim in this investigative procedure."

229.   Petrobras's admission that Costa's claims of bribery and graft were legitimate and could have serious financial consequences for the Company's current financial condition stunned the market.  In response to its October 27 statement, the Company's ADSs fell nearly 14% in a single day on extraordinarily high volume.  Specifically, the common ADSs dropped 15.86%, falling from a close of $12.93 per share on October 24, 2014 to a close of $11.16 per share on October 27, 2014.  Likewise, the preferred ADSs dropped 17.15%, falling from a close of $13.46 per share on October 24, 2014 to a close of $11.49 per share on October 27, 2014.

230.   On November 13, 2014, after the market closed, Petrobras issued a press release, which it filed with the SEC on Form 6-K.  The press release revealed for the first time that the allegations of bribery and corruption at Petrobras could potentially impact the Company's financial statements, but it did not specify how.  The Company stated that it would be unable to publish its audited third-quarter 2014 financial statements by the SEC's deadline of November

14, because it required additional time to quantify the impact of the corruption allegations on its financial condition. The Company further stated that it would release unaudited accounting information concerning its third quarter results by December 12, 2014.

231.   On November 14, 2014, Petrobras was rocked by more bad news when the Brazilian Federal Police arrested Duque. Duque's arrest revealed to the market that Costa's bribery and graft admissions were not the actions of a rogue employee, but instead spread throughout the Company. That same day, the Brazilian Federal Police arrested 26 other likely Cartel members in connection with the investigation of Petrobras, including senior executives and contractors who had contracts with Petrobras worth approximately $59 billion. The Federal Police also served dozens of search warrants and raided the offices of 11 companies that they suspected of participation in the scam. The *Financial Times* and other publications reported that the offices of Petrobras were among the offices that were raided.

232.   Also on November 14, Brazil's Comptroller General's office announced that it was investigating allegations that Petrobras officials accepted bribes to award contracts to SBM Offshore. Petrobras executives admitted that SBM, one of the world's largest companies, was now formally barred from future bid rounds.

233.   In response to the November 13 and 14 disclosures, the Company's ADS price declined significantly. Specifically, the common ADSs dropped 2.5%, falling from a close of $10.20 per share on Thursday, November 13, 2014 to a close of $9.95 per share on Friday, November 14, 2014. Likewise, the preferred ADSs dropped 2.8%, falling from a close of $10.52 per share on November 13, 2014 to a close of $10.23 per share on November 14, 2014. By Friday morning alone, shares of Petrobras ADSs had hit a 52-week low in reaction to these disclosures that "intensified" the "corruption scandal," according to *The Street.com*.

234.    In response to these revelations, Bank of America downgraded Petrobras from a "buy" to a "neutral" rating on November 14.  *O Globo* quoted a Professor of Accounting and Finance who "classified [Petrobras's actions] as 'extremely unusual and atypical' and signifying a reduction of the Company's 'trustworthiness.'"

235.    On Monday, November 17, 2014, before the market opened, the Company held its previously-scheduled earnings conference call with investors.  During the call, Foster admitted that while the Company had not yet determined the extent of the corruption scheme, "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, could potentially affect the Company's financial statements."   In fact, after one analyst demanded that the Company disclose "what kind of accounting adjustments could be necessary," Barbassa identified the specific line items on Petrobras's balance sheet and income statement that were impacted by the fraud, stating that "if the accusations are proven to be true . . . payment above what would be a fair value for a good [or] service . . . should be removed from the PP&E line item . . . and should be taken to the result."   Barbassa went on to state that Petrobras's PP&E "should not include values which are not a fair value for that good or service"—i.e., bribes—and that the Company "would deduct from it any amount that could be linked to bribery of any sort; any excessive price that would have been charged."   Likewise, in response to an analyst's inquiry into why the alleged corruption would necessitate an asset writedown if proven true, Foster stated:  "***You have an obligation to write off from the asset a cost related to corruption . . . if there is a cost relating to corruption in the value of [a] net asset, even if the asset can pay off that cost, you have an obligation to write off that cost***."

236.    In response to this news, Petrobras ADSs fell dramatically in value.  Specifically, the price of the common ADSs dropped over 6%, falling from a close of $9.95 per share on

November 14, 2014 to a close of $9.33 per share on November 17, 2014.  Likewise, the preferred

ADSs dropped nearly 6%, falling from a close of $10.23 per share on November 14, 2014 to a

close of $9.64 per share on November 17, 2014.  Petrobras bonds trading on the NYSE also fell

on this news.

237.    As the *Washington Post* noted in a November 17 article titled "'Operation

Carwash' in Brazil causes normally staid business meeting to go off script," the conference call

contained "[w]ords that nobody wants to hear at a quarterly results event for a world-renowned

oil company with a $220.6 billion business plan to complete: 'corruption,' 'bribe,' 'federal

police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment' and

'painful.'"  As the *Washington Post* also noted, Foster's representations that no one within the

Company "ha[d] any idea of the scale of the corruption problem" in March raised more questions

than it answered:  "So nobody knew anything.  If not, why not?  There are billions of dollars

involved in Operation Carwash.  Two top executives were jailed."

238.    Following this revelation, Morgan Stanley analysts noted that the Company's

representations "raise[] new concerns and impl[y] potentially material adjustments to the

financials."  Morgan Stanley further stated that the most immediate outcome of the probe is

likely to result in a "sizable asset write-off" of $2 billion to $8 billion and the lowering of

dividends for voting shares.  While Moody's had maintained its rating the previous Friday,

November 14, on this news, Moody's lowered Petrobras's baseline credit rating to below

investment grade, and said the bribery probe contributed to a negative outlook on the entire

country.  On November 18, a UBS analyst opined that Petrobras faces a $10 billion impairment

on assets resulting from the ongoing corruption scandal, writing, "[w]e have ***become more***

***negative on Petrobras over the past two weeks*** and cut our 2014-16 [earnings-per-share]

estimates substantially, reflecting weaker BRL . . . vs. co's high leverage and a $10 billion impairment assumption, mostly on refinery projects."

239.    However, the November 17 conference call left analysts and investors with more questions than answers, because the Company did not provide a range or scope of the potential writedowns.  Some analysts expressed skepticism that the impact of the scandal on Petrobras's financial condition would be significant.  In an analyst report titled "PBR Conference Call—What Happens Next?" analysts from Itau BBA noted that:

> The adjustments will be based on the testimony of the former executives and companies questioned and considered by the Federal Police to be proof of bribery. We do not expect Petrobras to mark-to-market the cost of the [Abreu] refinery, at least for the time being. Proving the overpricing in this case is likely to be a more difficult task, particularly because the original contracts have been amended numerous times. ***The impact might therefore not be too significant for the time being***, at least not as considerable as the USD 16 billion estimated capex overrun for [Abreu]. Additional adjustments might be required as the investigations evolve.

240.    The Itau BBA analysts concluded that "[t]he impact of a possible write-off, assuming a reduction in the asset value, is therefore minimal."

241.    HSBC analysts stated in a November 21, 2014 report that "[i]t is hard to quantify the impact as of now [because] we have low visibility on the penalties that might by imposed by the Brazilian court and the company management."

242.    Investors looked forward to the Company's December 12 earnings release for clarity as to the impact of the corruption on the Company.  On December 11, 2014, *Forbes* noted that:

> Petrobras is expected to announce its unaudited financial results for the third quarter on December 12, after a delay of more than a month, primarily because of ongoing investigations into the alleged bribery and corruption scandal that has hit the company. We expect a focus on the potential impact of the ongoing probe to

overshadow improvements in the company's key business drivers such as net upstream production and downstream margins.

243.    However, on December 12, 2014, the Company announced that it would delay *for the second time* the release of its third quarter 2014 financial statements as a result of new developments in the widening corruption probe, including the December 11 indictments of executives at the country's largest engineering firms for their participation in the kickback scheme.  While Petrobras had announced December 12 as its deadline for the release of these financial statements, it said in a statement that it actually had until January 15, 2015 to present the unaudited results without breaching any debt covenants.  If breached, the covenants could put some of the Company's debt into technical default, forcing early repayment.  *Bloomberg* reported that the real reason for delay was due to "disagreement" among Petrobras's Board members, who "differ[ed] on the size of writedowns stemming from graft-related costs."

244.    On the same day, former Petrobras executive Velosa appeared on a popular televised weekly news show in Brazil called *Fantástico* where she explained in great detail the significant efforts she made to alert Foster, Costa and others to the corruption as far back as 2009.  As discussed in detail in ¶¶ 147-63 above, Velosa detailed how in 2008, while working under Costa, she discovered numerous irregularities and misappropriation of resources in connection with the constriction of Abreu while working on an analysis of the costs associated with the refinery's construction.

245.    Following Velosa's December 12 interview, Petrobras took immediate steps to discredit her.  Late on December 12, 2014, Petrobras posted a response on *Facts and Data*, stating that the Company "took all measures to elucidate the facts in [Velosa's] reports" and questioned why Velosa waited five years to bring this information to light, insinuating that this

was an act of retaliation and nothing more.  Then, late on December 15, 2014, Petrobras sent a formal denial of Velosa's account to the Brazilian CPI.

246.   On December 15, 2014, just weeks after Cerveró appeared before the CPI and denied having received any bribes or knowing about the alleged corruption, Brazilian criminal authorities announced Cerveró's formal indictment for acts of corruption and money laundering. Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his implementation of the suspicious Pasadena acquisition, as well as an additional $53 million in bribes in connection with a deal to supply offshore drilling vessels by Samsung Heavy Industries.

247.   With Cerveró's arrest, investors learned that the corruption at Petrobras was more rampant and broader in scope than had previously been disclosed.  Due to his former position as International Director, Cerveró's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope.

248.   As the market absorbed Petrobras's failure to publish its third quarter results, Velosa's allegations, and the news of Cerveró's indictment, the Company's common ADSs fell 11.96%, from a close of $7.11 per share on December 12, 2014 to a close of $6.26 per share on December 15, 2014, the next trading day.  Likewise, the preferred ADSs fell 13.66%, from a close of $7.57 per share on December 12, 2014 to a close of $6.66 per share on December 15, 2014.

249.   On Sunday, January 4, 2015, several news sources disclosed significant new information concerning the scope of the fraud and its impact on the Company's financial results. First, *O Globo* published a report disclosing new evidence that bribes were funneled through the construction of the Gasene pipeline—a project that Foster oversaw during her tenure as the CEO