of Petrobras's Gas and Energy Division—through "paper companies" that were set up to build

the R$6.3 billion undertaking.   Specifically, *O Globo* revealed that a previously confidential

TCU audit had uncovered overpricing in contracts for the Gasene pipeline exceeding *1800%*,

prompting calls for the newly-formed CPI to investigate whether the use of "paper companies"

and a special purpose entity to fund the pipeline's construction was intended to circumvent

competitive bidding requirements.   Indeed, just weeks later, on March 10, 2015, Barusco

confirmed in testimony before the CPI that, like the other "institutionalized" bribes at Petrobras,

contracts associated with the Gasene pipeline involved kickbacks of 3% divided among

Petrobras executives and the PT.   Second, a report published in *Folha S. Paulo* on January 4,

2015 revealed that an internal Company audit completed in November 2014 concluded that

Petrobras would have to record R$1 billion in losses on equipment purchased in connection with

projects associated with Comperj that were acquired before the plans for the project had been

finalized, and which could no longer be used.   Further, *Folha* reported, the internal audit

identified other "irregularities" in connection with a R$3.8 billion contract for Comperj that was

awarded without competitive bidding to Cartel members Odebrecht, UTC and Toyo.   In both

cases, the internal audit concluded, the Comperj contracts had been influenced by "pressures"

from Duque and Costa.

250.   In response to these disclosures, Petrobras common and preferred ADSs fell

approximately 8%, with Petrobras common ADS falling from $7.06 per share on January 2, 2015

to $6.57 per ADS on January 5, 2015, and Petrobras preferred ADSs dropping from $7.58 to

$6.95 over that same time – reaching their lowest level in over a decade.

251.   Analysts and commentators immediately identified these revelations—including

evidence of bribery in connection with one of the most significant projects that Foster oversaw

during her tenure as chief of the Gas and Energy Division—as significant new information concerning the fraud.  For example, Brazil's leading financial news site *InfoMoney* published a report prior to market open on Monday, January 5, 2015, stating that the revelations in *O Globo* and *Folha de S. Paulo* concerning the Gasene pipeline and Comperj overbilling were "shaking the news" that morning, and reported later that day that Petrobras shares had fallen "[i]n the midst of very busy news and various clarifications during the weekend," including those related to the *O Globo* report.  Similarly, *Valor Economico* reported that Petrobras common shares declined to their lowest level since 2004 following "new allegations" and the "bad news" in *O Globo* and *Folha*, and the Associated Press reported that while oil prices had also declined, Petrobras investors were in fact "react[ing] to the sequence of news about corruption and mismanagement," including the new facts revealed in *O Globo*.  As *Reuters* reported, Petrobras shares had plunged in the face of "an avalanche of bad news."

252.    Then, on January 6, 2015, Petrobras disclosed that the unpaid leave of Transpetro CEO Machado would be extended until January 21, 2015, following a confidential meeting of the Board of Directors on January 5, 2015.  Further, according to a report in *Estadao*, Petrobras shares continued to decline on January 6, 2015 because they were "affected by the news that the National Agency of Petroleum, Natural Gas and Biofuels (ANP) applied R $18.7 million fine to Petrobras for irregularities in two platforms."  In response to these disclosures, the Company's common ADS fell to $6.02 per share, while Petrobras preferred ADS declined to close at $6.14 per share on January 6, 2015.

253.    Finally, after the markets closed on January 27, 2015, Petrobras released its unaudited third-quarter financial statements.  The Company's external auditor, PwC, did not sign

off on Petrobras's third quarter financial statements, and its reported results did not contain any writedowns of Petrobras's PP&E.

254.    Nevertheless, in its January 27, 2015 earnings release, which it filed with the SEC on Form 6-K on January 28, 2015, Petrobras revealed the staggering scope of the corruption scheme.  In Note 3 to the release, in a heading titled "Reasons to correct the carrying amount of specified property, plant and equipment," the Company acknowledged that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."  Petrobras further disclosed that *R$188.4 billion (US$73 billion)* of the Company's assets, "or approximately 1/3 of the company's total fixed assets," relate to "contracts signed between Petrobras and the [Cartel] companies . . . from 2004 to April 2012," and are thus impacted by the corruption charges.

255.    The Company also admitted that it improperly capitalized as assets the inflated contract amounts confessed to by Costa, resulting in the material overstatement of its PP&E:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation.

> No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts. The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.

> *Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized.*

256.    In the January 27, 2015 earnings release, Petrobras repeatedly admitted that it needed to "correct" the carrying value of its PP&E.  The Company likewise acknowledged in Note 2 that the failure to correct the carrying value of PP&E meant that its financial statements contained material errors and did not comply with IFRS:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of the current date, ***except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of issue of these financial statements, as set out in note 3***.

> These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), ***except for the errors mentioned above and further discussed in note 3***.

257.    While Petrobras acknowledged that the corruption scandal would result in significant financial adjustments to the Company's balance sheet and income statement, it did not record an asset writedown.  However, as the Company disclosed, its internal review of certain assets impacted by the fraud indicated a range of potential writedowns between $1.5 billion and $34 billion.

258.    Similarly, in a January 27, 2015 letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that the "facts and proofs obtained in the 'Operation [Car Wash]' . . .  have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." Foster also admitted that an internal review of assets impacted by the fraud uncovered R$88.6 billion reais (US$34 billion) of overvalued assets and R$27.2 billion reais (US$10 billion) of undervalued

assets. As Reuters reported: "If confirmed by auditors, that would lead to a 61.4 billion [reais (US\$22 billion)] writedown, an amount equal to more than half the company's current 120 billion-real (\$43.3 billion) market value."

259. Additionally, in her letter to shareholders, Foster stated that the Company was working with PwC to adjust its financial statements *and* to "enhance [its] internal controls." The Company's earnings release identified several measures it was implementing in order to strengthen its internal controls.

260. Petrobras's startling admissions concerning the material errors in its financial results and the vast scope of the fraud, coupled with its internal control weaknesses and its continued lack of transparency regarding the quantification of the writedown, unsettled the market, immediately causing the Company's ADSs to plunge on January 28, 2015. Specifically, the common ADSs fell 11.95%, from a close of \$7.45 per share on January 27, 2015 to a close of \$6.56 per share on January 28, 2015. Likewise, the preferred ADSs fell 11.7%, from a close of \$7.86 per share on January 27, 2015 to a close of \$6.94 per share on January 28, 2015. The announcement kicked off a damaging week during which Petrobras lost nearly \$9 billion in market capitalization.

261. In response to this disclosure, analysts noted the Company's inability to produce audited financials and its failure to take a writedown. Morgan Stanley wrote, "[a]fter great expectation about the publication of PBR's write-off amount, no consensus was reached internally on the value and 3Q14 came out without a charge. We think this was the worst outcome and expect the stock to be under pressure . . . the worst outcome is the continuation of the uncertainty [and there is] . . . no visibility as to when audited financials will be reported." Similarly, Itau BBA, in a report entitled, "No News Is . . . Bad News!" explained that the

Company's decision to not record a writedown would likely result in "a pretty negative market reaction to this decision of excluding the write-offs, as we read it as a sign of lack of an agreement between the company and its board, which may, at the limit, jeopardize the attempt to get an audited balance on schedule (by the end of June at the latest)."

262.    Brazilian analysts at Votorantim Corretora noted that Petrobras's "Financial Figures [Were] Less Important than Lack of Information," "believ[ing] that investor sentiment will drive the shares much more than the financial figures" and that "the market has been eager to ascertain the impact of the impairments arising from the [Operation Car Wash] investigation on the company's balance sheet.   Nonetheless, the extent of the damage to the company's financial figures remains unknown . . . . So, investors remain in the dark, and this will severely harm the shares."

263.    The media also noted the market's negative and surprised reaction to this disclosure, with the *Wall Street Journal* commenting that, "'[w]hen it didn't [announce a write-down], ***the credibility went down the drain and nothing else matters***.   We need to see, as investors, a credible statement with the numbers.'"   On January 30, 2015, *Reuters* noted that the Company's decision not to provide a "monetary estimate for how much the company's assets were overvalued as a result of the corruption scheme" was "a surprise decision."

264.    Also following the release of the Company's third-quarter earnings, both Moody's (on January 29) and Fitch (on February 3) downgraded the Company to the lowest level of investment grade.   Both credit rating agencies cited as a main reason the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the liquidity pressures that follow as investors are left in the dark.

265.     Petrobras's wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs.  The disclosures of previously misrepresented and concealed facts about Petrobras's involvement in a decade-long bribery scheme and its impact on the Company's financial statements, set forth in ¶¶ 227-64 above, caused the price of Petrobras's securities to decline markedly, wiping out billions of dollars in shareholder wealth.

266.     It was entirely foreseeable to Petrobras that concealing from the public, *inter alia*, its involvement in a bid-rigging and bribery scheme that vastly inflated the value of Petrobras's construction contracts and its improper capitalization of overpayments and bribes would artificially inflate the price of Petrobras's securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Petrobras's misconduct, would cause the price of Petrobras securities to decline as the inflation caused by Petrobras's earlier misrepresentations and omissions was removed from the price of Petrobras's securities.  Accordingly, the conduct of Petrobras, as alleged herein, proximately caused foreseeable losses for Plaintiffs, who purchased Petrobras securities during the Relevant Period.

## VII.   RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE COMPANY

267.     Following the Company's January 27, 2015 disclosures, events continue to unfold (on an almost daily basis) that confirm the immense scope of the underlying fraud, the continued political abuses and corruption plaguing the Company, and the fallout for investors.

268.     On February 4, 2015, Foster, Barbassa and four other executives (constituting nearly all of the Executive Directorate), left the Company due to the corruption scandal.  At first, these departures were well received by the market, as investors hoped that Petrobras's management would be independent from political pressures.  But this positive reaction was short-lived.  On February 6, President Rousseff signaled that she would maintain tight control

over the Company by appointing a confidante, banker Aldemir Bendine, as the new CEO of Petrobras. Investors reversed course. According to Reuters, investors became concerned that "the government appointed [Bendine] to limit the political fallout from a writedown rather than clean out dead-wood in the company's accounts."

269.    On February 13, 2015, *Bloomberg* reported that Brazil's Federal Attorney General was granting leniency to at least eight contractors implicated in the bribery scheme "to prevent a slowdown in infrastructure work that could derail efforts to revive the economy." According to the article, by admitting guilt and repaying graft money, companies would avoid being declared unfit to bid for public contracts or take loans from public banks.

270.    On February 20, 2015, the Brazilian federal prosecutor's office filed lawsuits against six members of the cartel (Camargo Corrêa SA, the Brazilian unit of Japan's Sanko Co Mendes Junior Engenharia SA, OAS SA, Galvão Engenharia SA, and Engevix Engenharia SA) seeking R$4.47 billion (US$1.55 billion) in damages in connection with contract-fixing, bribery and political kickbacks at Petrobras.

271.    Following dozens of indictments and arrests of Petrobras and Cartel executives over the last couple of months, on February 24, Brazil's Attorney General, filed criminal charges against Cerveró. These charges accuse Cerveró of money laundering and criminal conspiracy for scheming with a lobbyist and the head of an Uruguay-based company to hide bribes, in part through the purchase of a R$7.5 million (US$2.6 million) apartment.

272.    On the same day, Moody's Investors Services slashed the debt rating of Petrobras to Ba2, or junk status, and signaled that more downgrades may come in the future. The *Wall Street Journal* reported that the size and timing of the downgrade not only "surprised" analysts

"and sent the country's leaders into a defensive crouch," but was "an unequivocal blow" to the administration of President Rousseff.

273.   On March 3, 2015, Brazil's head of MPF called on Brazil's Supreme Court to open an expansive new phase of the Petrobras investigation, looking into the actions of 54 people, the majority of whom are said to be high-ranking political figures.

274.   On March 5, 2015, it was reported that Congress, as part of its corruption probe into Petrobras, called Barusco to testify.  Barusco testified that he used several bank accounts in Switzerland to launder the $100 million in bribes he received as part of the Petrobras graft ring. Based on the amount he received, Barusco estimated that Brazil's ruling Workers' Party received as much as $200 million in bribes.  He said he started receiving bribes from some of the country's top construction firms 18 years ago, as early as 1997, but by 2003 and 2004, the bribes became more "institutionalized."

275.   On March 11, Brazil's Office of the Comptroller General, the CGU, said it opened a case (beyond the eight core Cartel members) against ten additional construction firms with ties to Petrobras.

276.   That same day, Braskem S.A. ("Braskem"), Latin America's largest petrochemical's producer, whose shares trade on the NYSE, suffered its biggest intraday drop in 20 years, plunging as much as 21% following the release of testimony from Costa and Youssef confirming that Braskem made "under-the-table payments" to Petrobras in exchange for contracts.  Costa testified that the bribes, which amount to at least $5 million annually from 2006 to 2012, were first discussed with Braskem executives and then ratified by former CEO Jose Carlos Grubisich.  Barbassa was a board member of Braskem until he resigned on February 6, 2015.

277.    On March 16, Renato Duque was arrested by Federal Police for the second time as part of the investigation into Petrobras and formally charged with the crime of money laundering.

278.    On March 17, Brazilian prosecutors formally charged the treasurer of the ruling Workers' Party (PT), Joao Vaccari Neto, with corruption and bribery in connection with the graft scheme at Petrobras.

279.    On March 18, 2015, the Attorney General of Switzerland announced that Switzerland had frozen *$400 million* in assets linked to the Petrobras scandal.

280.    As of the filing of this Complaint, Petrobras has still not released its audited third-quarter 2014 financial statements, originally slated for release on November 1, 2014.  According to media reports, the Company is seeking advice from the SEC on how to quantify its required asset writedown.

## VIII.   MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE EXCHANGE ACT CLAIMS

### A.    Petrobras's Materially False and Misleading Statements Concerning Its Financial Condition and Compliance with GAAP and IFRS

281.    Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period.  In particular, the PP&E, total assets, expenses and net income figures that Petrobras reported to the market during the Relevant Period, which are set forth in detail in ¶¶ 283-84 below, were materially false and misleading when made for the following reasons:

a)    Petrobras admitted in January 2015 that:

- The "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes,

95

indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." (¶ 181)

- "[C]ontracts entered into between January 1, 2004 and April 30, 2012 (the period during which the scheme operated, as stated in the depositions described above) with the suppliers and contractors named in the [Costa, Youssef, Camargo and Mendonça Neto] depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

- "[A]mounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. *However, those costs should not have been capitalized*."

- "[I]t is necessary to correct the amounts related to the misconduct that were capitalized" and, in particular, to "deduct from [PP&E] any amount that could be *linked to bribery of any sort*."

- While the Company did not correct its misstated PP&E figure (or its misstated total assets, expenses and net income figures), it provided two possible methodologies for quantifying the required writedown. This analysis indicated a potential writedown between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) with respect to contracts Petrobras signed with the Cartel companies between January 1, 2004 and April 30, 2012.

b)    Costa has admitted that the value of Petrobras's construction contracts were overstated by up to 3% due to the bribes, and by additional amounts of up to 20% due to the Cartel's overpricing of Petrobras contracts.

c)    The Company's January 27, 2015 estimates of a PP&E misstatement of between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) were vastly understated because they only accounted for the contracts entered into with known Cartel members before April 30, 2012. As alleged above (¶¶ 129, 133, 184, 191), the fraudulent scheme was not limited to Cartel members and did not stop on April 30, 2012. As a result, the range provided by the Company downplayed the overstatement.

d)    As described above at ¶¶ 171-78, Petrobras's improper capitalization of these bribes and inflated costs throughout the Relevant Period violated both IFRS and GAAP.

e)      As set forth above at ¶ 208, accountants hired by Petrobras found that while the Company spent over $18.5 billion on projects related to Abreu, the refinery is only worth $7 billion and while the Company spent $13.5 billion building Comperj, the refinery should be written down to zero.

282.      By wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the amount of **PP&E** and **total assets** in each of its quarterly and annual financial statements for the period beginning January 1, 2004 (the point at which the Company itself has acknowledged improper bribes and bid-rigging began to occur) through the present.  In addition, Petrobras misreported **net income** in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the Company's PP&E and total assets.  Moreover, Petrobras misreported net income and the Company's total costs and expenses in each of those periods during which a bribe was paid and was improperly capitalized instead of having been expensed immediately.

283.      Specifically, the Company reported the following figures throughout the Relevant Period, which were materially false and misleading when made.  Unless otherwise indicated, all figures are taken directly from Forms 6-K or 20-F filed with the SEC and are presented in $ millions:

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 3/24/10 press release filed on Form 6-K | $136,167 | $200,270 | $15,504 | | 4Q and FY 2009 |
| 3/26/10 Form 6-K (the "March 26, 2010 Form 6-K") | $136,167 | $200,270 | $15,504 | $70,000 | 4Q and FY 2009 |
| 5/20/2010 Form 20-F (the "2009 Form 20-F") | $136,167 | $200,270 | $15,504 | $70,000 | 4Q and FY 2009 |
| 5/27/2010 press release filed on Form 6-K | $140,574 | $204,215 | $4,366 | | 1Q2010 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 5/28/2010 Form 6-K (the "May 28, 2010 Form 6-K") | $140,574 | $204,215 | $4,366 | $21,350 | 1Q 2010 |
| 8/24/2010 press release filed on Form 6-K | $147,083 | $210,564 | $8,563 | | 2Q 2010 |
| 8/25/2010 Form 6-K (the "August 25, 2010 Form 6-K") | $147,083 | $210,564 | $8,563 | $44,758 | 2Q 2010 |
| 11/23/2010 press release filed on Form 6-K | $206,278 | $298,136 | $13,288 | | 3Q 2010 |
| 11/24/2010 Form 6-K (the "November 24, 2010 Form 6-K" | $206,278 | $298,136 | $13,288 | $69,854 | 3Q 2010 |
| 3/15/2011 press release filed on Form 6-K with SEC | $218,567 | $308,683 | $19,475 | | 4Q and FY 2010 |
| 3/17/2011 Form 6-K (the "March 17, 2011 Form 6-K") | $218,567 | $308,683 | $19,475 | $95,894 | 4Q and FY 2010 |
| 5/24/2011 press release filed on Form 6-K | $230,370 | $330,551 | $6,524 | | 1Q 2011 |
| 5/26/2011 Form 20-F (the "2010 Form 20-F") | $218,567 | $308,683 | $19,184 | $95,894 | 4Q and FY 2010 |
| 5/26/2011 Form 6-K (the "May 26, 2011 Form 6-K") | $230,370 | $330,551 | $6,524 | $25,219 | 1Q 2011 |
| 8/24/2011 press release filed on Form 6-K | $247,276 | $350,661 | $13,576 | | 2Q 2011 |
| 8/25/2011 Form 6-K (the "August 25, 2011 Form 6-K") | $247,276 | $350,661 | $13,576 | $56,382 | 2Q 2011 |
| 11/22/2011 press release filed on Form 6-K | $220,306 | $308,956 | $16,833 | | 3Q 2011 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 11/22/2011 Form 6-K (the November 22, 2011 Form 6-K") | $220,306 | $308,956 | $16,833 | $87,921 | 3Q 2011 |
| 2/28/2012 press release filed on Form 6-K | $182,465 | $319,410 | $20,121 | | 4Q and FY 2011 |
| 2/29/2012 Form 6-K (the "February 29, 2012 Form 6-K") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 4/2/2012 Form 20-F (the "2011 Form 20-F") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 5/15/2012 press release filed on Form 6-K | $194,099 | $337,971 | $5,212 | | 1Q 2012 |
| 5/17/2012 Form 6-K (the May 17, 2012 Form 6-K") | $194,099 | $337,971 | $5,212 | $30,751 | 1Q 2012 |
| 8/3/2012 press release filed on Form 6-K | $184,997 | $310,704 | $4,527 | | 2Q 2012 |
| 8/10/2012 Form 6-K (the August 10, 2012 Form 6-K") | $184,997 | $310,704 | $4,527 | $62,721 | 2Q 2012 |
| 10/26/2012 press release filed on Form 6-K | $191,395 | $318,467 | $7,271 | | 3Q 2012 |
| 10/30/2012 Form 6-K (the "October 30, 2012 Form 6-K") | $191,395 | $318,467 | $7,271 | $94,855 | 3Q 2012 |
| 2/4/2013 press release filed on Form 6-K | $204,901 | $331,645 | $11,034 | | 4Q and FY 2012 |
| 2/6/2013 Form 6-K (the "February 6, 2013 Form 6-K") | $204,901 | $331,645 | $11,034 | $127,727 | 4Q and FY 2012 |
| 4/29/2013 Form 20-F (the "2012 Form 20-F") | $204,901 | $331,645 | $11,034 | $127.727 | 4Q and FY 2012 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 4/26/2013 Press Release filed on Form 6-K | $214,457 | $345,274 | $3,854 | | 1Q 2013 |
| 4/30/2013 Form 6-K (the "April 30, 2013 Form 6-K") | $214,457 | $345,274 | $3,854 | $31,410 | 1Q 2013 |
| 8/9/2013 press release filed on Form 6-K | $203,716 | $338,068 | $6,850 | | 2Q 2013 |
| 8/13/2013 Form 6-K (the "August 13, 2013 Form 6-K") | $203,716 | $338,068 | $6,850 | $61,613 | 2Q 2013 |
| 10/25/2013 press release filed on Form 6-K | $208,362 | $340,106 | $8,334 | | 3Q 2013 |
| 10/28/2013 Form 6-K filed | $208,362 | $340,106 | $8,334 | $93,167 | 3Q 2013 |
| 2/25/2014 press release filed on Form 6-K | $227,901 | $321,423 | $11,094 | | 4Q and FY 2013 |
| 2/26/2014 Form 6-K (the "February 26, 2014 Form 6-K") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 4/30/2014 Form 20-F (the "2013 Form 20-F") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 5/9/2014 press release filed on Form 6-K | $240,793 | $354,403 | $2,280 | | 1Q 2014 |
| 5/12/2014 Form 6-K (the "May 12, 2014 Form 6-K") | $240,793 | $354,403 | $2,280 | $31,433 | 1Q 2014 |
| 8/8/2014 press release filed on Form 6-K | $253,955 | $363,392 | $4,505 | | 2Q 2014 |
| 8/11/2014 Form 6-K (the "August 11, 2014 Form 6-K") | $253,955 | $363,392 | $4,505 | $64,514 | 2Q 2014 |

Each of the foregoing financial figures was materially false and misleading when made for the reasons set forth in ¶¶ 281-82 above.

284.    In addition to its quarterly and annual SEC filings, the Company also published its financial statements in the prospectus supplements that it filed with the SEC in advance of its U.S. securities offerings.    During the Relevant Period, Petrobras's prospectus supplements disclosed the following amounts for PP&E, total assets and net income (in $ millions):

| Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income |
|---|---|---|---|
| 9/28/10 Prospectus Supplement filed on Form 424(b)(2) (the "September 2010 Prospectus Supplement") | $136,167 as of 12/31/09; $84,719 as of 12/31/08; $84,282 as of 12/31/07; $58,897 as of 12/31/06; $45,920 billion as of 12/31/05; $147,083 as of 6/30/10 | $200,270 as of 12/31/09; $125,695 as of 12/31/08; $129,715 as of 12/31/07; $98,680 as of 12/31/06; $78,638 as of 12/31/05; $210,564 as of 6/30/10 | $15,504 as of 12/31/09; $18,879 as of 12/31/08; $13,138 as of 12/31/07; $12,826 as of 12/31/06; $10,344 as of 12/31/05; $8,563 as of 6/30/10; $6,627 as of 6/30/09 |
| 2/3/2012 Prospectus Supplement filed on Form 424(b)(2) (the "February 2012 Prospectus Supplement") | $218,567 as of 12/31/10, $136,167 as of 12/31/09, $84,719 as of 12/31/08, $220,306 as of 9/30/11; $206,278 as of 9/30/10 | $308,683 as of 12/31/10; $200,270 as of 12/31/09; $125,695 as of 12/31/08; $308,956 as of 9/31/11; $298,136 as of 9/30/2010 | $19,184 as of 12/31/10, $15,504 as of 12/31/09, $18,879 as of 12/31/08, $17,031 as of 9/30/11, and $13,288 as of 9/30/10 |
| 5/15/2013 Prospectus Supplement filed on Form 424(b)(2) (the "May 2013 Prospectus Supplement") | $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $214,457 as of 3/31/13 | $334,654 as of 12/31/12; $319,914 as of 12/31/11; $310,194 as of 12/31/10; $345,274 as of 3/31/13 | $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $3,854 as of 3/31/13; $5,212 as of 3/31/12 |
| 3/11/2014 Prospectus Supplement filed on Form 424(b)(2) (the "March 2014 Prospectus | $227,901 as of 12/31/13; $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; | $321,423 as of 12/31/13; $327,396 as of 12/31/12; $316,414 as of 12/31/11; $310,194 as of 12/31/10; $199,442 as | $11,094 as of 12/31/13; $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $15,308 as |

101

| Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income |
|---|---|---|---|
| Supplement") | $128,754 as of 12/31/09 | of 12/31/09 | of 12/31/09 |

Each of the foregoing financial figures was materially false and misleading when made for the reasons set forth in ¶¶ 281-82 above.

285.    In addition, the May 28, 2010 Form 6-K represented that Petrobras's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made the same representations in the March 26, 2010 Form 6-K; August 25, 2010 Form 6-K; November 24, 2010 Form 6-K; March 17, 2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K.  Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

286.    Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with U.S. GAAP.  Specifically, as discussed above at ¶¶ 171-78, 281, the Company's financial statements violated, among other GAAP provisions, FASCON 6 and ASC 360.

287.    Following Petrobras's transition to IFRS reporting, the Company represented that Petrobras's financial statements were "presented" and/or "prepared" "*in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)*" in its May 17, 2012 Form 6-K, August 10, 2012; October 30, 2012 Form 6-K; April 30, 2013

Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; May 12, 2014 Form 6-K; and August 11, 2014 Form 6-K. Similarly, the Company's 2011 Form 20-F; 2012 Form 20-F; 2013 Form 20-F; February 29, 2012 Form 6-K; February 6, 2013 Form 6-K; and February 26, 2014 Form 6-K represented that Petrobras's financial statements were "presented" and/or "prepared" "*in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)*."

288.     These representations were false and misleading when made, because the Company's financial statements were not prepared in accordance with IFRS. Specifically, as discussed above at ¶¶ 171-78, 281, the Company's financial statements violated, among other IFRS provisions, IFRS CF 4.52 and IAS 16.

289.     The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by Gabrielli and Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "*fairly presents, in all material respects, the financial condition and results of operations of the Company.*" The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Foster and Barbassa. These certifications were materially false and misleading when made for the reasons set forth in ¶¶ 281-82 above.

290.     The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E:

> *Property, plant and equipment are measured at the cost to acquire or construct*, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

This statement was materially false and misleading for the reasons set forth in ¶¶ 281-82 above.

291.     Petrobras repeatedly stressed to investors that Petrobras's financial statements had been subjected to scrutiny by the Company's management and outside auditors and the Company was subject to the requirements of the SEC.  For example, during the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Foster reassured analysts:

> We have qualified people. We know how to work. We know how to operate. We have invested along our history billions dollars in our development and we know what we are doing. ***Our results are absolutely true and legitimate***.

292.     This statement was false and misleading because the Company's financial results were not "true and legitimate" and instead the Company's financial results were inflated by massive bribes and bid-rigging, as set forth above in ¶¶ 281-82.

293.     On May 9, 2014, in response to an interview question asking Foster to identify "the most important aspects of the company's governance," Foster stated that Petrobras "compl[ies] with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United States, the Latibex and Bolsa y Mercado Españoles, Spain and the National Securities Commission (CNV) and the Buenos Aires Stock Exchange, Argentina."

294.     Foster's statement attesting to Petrobras's compliance with the SEC's and NYSE's rules, including the SEC's requirement that all financial statements be accurately reported, were false and misleading for the reasons set forth above in ¶¶ 281-82.

295.     Similarly, in a September 6, 2011 post on *Facts and Data*, Petrobras represented that its "activities are fully guided by principles of ethics and transparency" and further stated:

> It is important to note that Petrobras has analyzed their accounts permanently and continuously, by internal and external audits, through the Comptroller General (CGU) and the Court of Audit (TCU).  In addition, ***the Company meets the requirements of agencies such as the Securities and Exchange Commission (CVM), Securities and Exchange Commission (SEC), the US, and the Sarbanes-Oxley Act, with its audited financial statements and approved in all instances***.

296.    These statements were false and misleading because, as set forth above at ¶¶ 281-82, the Company did not meet the requirements of the SEC or the Sarbanes-Oxley Act because its financial statements were inaccurately reported, as the Company later admitted.   These statements were also false and misleading because the Company omitted to disclose that its "audited financial statements" were materially misstated and did not comply with GAAP or IFRS (as applicable) at all times during the Relevant Period.

297.    Similarly, on December 29, 2012, Petrobras posted the following on *Facts and Data*:

> All the activities from Petrobras are monitored by the Shareholders, which are Government representatives and private shareholders. *The accounts of Petrobras are analyzed permanently and continuously by internal and external audits*, through the Government Accountability Office (CGU) and Federal Accounts Court (TCU). *The Company meets the requirements of agencies like the Brazilian Securities and Exchange Commission (CVM), Securities and Exchange Commission (SEC), of the United States and the Sarbanes-Oxley Act, and its financial statements are audited and approved in all courts.*

298.    This statement was false and misleading for the reasons set forth above at ¶¶ 281-82.

**B.    Petrobras's Materially Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects**

**1.    Pasadena, Texas Refinery**

299.    During the Relevant Period, Petrobras and its executives denied the existence of any irregularities or improprieties related to the Company's purchase of the Pasadena Refinery, even as the cost of the acquisition ballooned from $360 million for the Company's 50% stake in the refinery, to a final cost of $1.18 billion.   As discussed above in ¶ 195, Petrobras's statements regarding the cost of the Pasadena refinery were materially false and misleading or omitted material information because Petrobras's decision to purchase Pasadena was influenced by the

payment of bribes.   Among other things, Petrobras failed to disclose the following facts

regarding the kickback and contract-fixing scheme:

    a)      Costa testified that he received a $1.5 million bribe from Fernando Soares, which
            Costa believed originated from the Pasadena refinery owner, Astra, in exchange
            for not hindering the Pasadena acquisition (¶ 195); and

    b)      Costa further testified that a group headed by Cerveró received between $20-30
            million in bribes related to the purchase of the Pasadena refinery (¶ 195).

    300.    Petrobras made the following materially false and misleading statements

regarding the Pasadena refinery:

    301.    On August 7, 2013, the Company published on *Facts and Data* Gabrielli's

testimony to a Brazilian Senate committee that, "[a]s the former President, the acquisition [of the

Pasadena Refinery] was a normal operation, based on market conditions."

    302.    This statement was materially false and misleading because the acquisition of the

Pasadena refinery was not done pursuant to "market conditions"; instead, it was pursued and

approved in large measure because of tens of millions of dollars paid to Petrobras executives by

Astra, as described above in ¶ 299.

    303.    On May 23, 2014, the Company insisted on *Facts and Data* that:

    We have strict legal procedures for payments, including for the purchase of
    Pasadena.

    The payments made for any reason and in any country follow strict and clear
    procedures and relevant legislation.  Additionally, we have a structured Internal
    Audit group, which has unrestricted access to any unit of the Petrobras System to
    verify the compliance of procedures and transactions made.

    304.    This statement was materially false and misleading because the Company did not

follow "strict legal procedures" or "strict and clear procedures" for its purchase of the Pasadena

refinery (or any other purchase).   Instead, the acquisition of the Pasadena refinery was tainted

and motivated by tens of millions of dollars paid to Petrobras executives by Astra, as described above in ¶ 299.

## 2.   Abreu Refinery

305.   As discussed above, throughout the Relevant Period, Petrobras and its executives repeatedly and vehemently denied that the Company was engaged in bribes, fraud, overpricing or wrongdoing of any kind in connection with the Abreu refinery.   Each of these denials was materially false and misleading or omitted material information given the following facts (among others) regarding the kickback and contract-fixing scheme:

a)   The bribery scheme inflated the value of all of its contracts with the members of the Cartel, which included the outside contractors responsible for the construction of the Abreu refinery (¶¶ 103-44, 199-205);

b)   Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, including Abreu contracts, inflating each contact by up to 20% and including a 3% bribe payment (¶¶ 108, 123-24, 200);

c)   Barusco similarly stated in his sworn testimony that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the ABREU E LIMA REFINERY . . ." (¶¶ 201-03);

d)   Barusco testified that Duque received bribes in connection with projects at Abreu (¶ 140);

e)   Fonseca testified that he paid bribes on projects as large as R$2 billion to R$3 billion, including for construction contracts at Abreu (¶ 128); and

f)   Velosa uncovered significant irregularities in bidding and pricing for construction contracts at Abreu (¶¶ 151).

306.   Petrobras's materially false and misleading statements regarding the Abreu refinery included the following:

307.   On November 9, 2010, in response to TCU allegations that the Repar and Abreu refinery contracts were overpriced by R$1.4 billion and R$1.3 billion, respectively, Petrobras

posted a statement on *Facts and Data* stating: "***Petrobras denies that there were irregularities in the construction works of the Presidente Getúlio Vargas (Repar) and Abreu e Lima (Rnest) refineries***."

308.   This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated many of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 305.

309.   On August 5, 2012, in response to an article titled "Abreu e Lima Refinery costs three times more than the international similar one," Petrobras stated that it "***does not recognize any of the signs of irregularities identified by the Court (TCU)*** . . . . These so-called irregularities found by the Court (TCU) are based in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works." The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."

310.   Five days later, on August 10, 2012, Petrobras repeated these sentiments:

**Question:** What is the Petrobras' position regarding these new questions in several contracts of the works on Abreu e Lima Refinery?

Answer: Petrobras doesn't acknowledge any of the evidences of irregularities presented by the [TCU] during its audit regarding the contracts of Abreu e Lima Refinery, considering these irregularities found by [the TCU] are based essentially in methodological differences between [the TCU] and Petrobras regarding the analysis of the costs of the works.

311.   These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 305.

312.    On January 7, 2013, in response to questions concerning potential overpricing, Petrobras stated:

> ***Petrobras reaffirms that there are no irregularities in the construction of the Abreu e Lima Refinery in Pernambuco***.  The report[ ] broadcasted on *Fantástico* improperly compares the values of the basic design of the refinery, which was prepared seven years ago, with what is now being built.  The initial project has suffered several modifications, due to changes in the scenario.  The Company further reaffirms that there are no irregularities in the construction works of the Petrochemical Complex of Rio de Janeiro.  Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

313.    This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 305.

314.    On May 19, 2014, Petrobras made the following statement on its *Facts and Data* website concerning the Abreu refinery:

> ***Petrobras restates that there is no "overcharging of R$69.9 million" in the contract with the consortium Abreu e Lima***. Since 2008, the company has been telling the TCU that there are methodological divergences in accounting for items that are specific to the oil industry. The court itself has revised the values, after the clarification, for R$19 million. The company is still communicating with the TCU to demonstrate that there is no overpricing or overbilling in the works.

The Company issued virtually identical statements on *Facts and Data* again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23, 2014, and July 14, 2014.

315.    These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 305.

316.    On July 23, 2014, Petrobras stated: "Regarding the matter 'TCU points to irregularities,' Petrobras reaffirms that *there is no overbilling in its works*." It went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras reaffirms that there is *no overbilling or overpricing*."

317.    This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 305.

### 3.    Comperj Refinery

318.    Like the Abreu e Lima refinery, Petrobras made a series of materially false and misleading statements and omissions concerning its construction of the Comperj refinery in which it either omitted or flatly denied the existence of overpricing or other irregularities in the Comperj contracts.  Each of these statements was materially false and misleading or omitted material information given the following facts regarding the kickback and contract-fixing scheme:

a)    The bribery scheme inflated the value of its contracts with the members of the Cartel, which included significant outside contractors responsible for the construction of the Comperj refinery, and materially and falsely inflated the value of the Comperj assets reported by the Company (¶¶ 103-44, 206-08);

b)    Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, which included many Comperj contracts, inflating each contract by up to 20% and including a 3% bribe payment (¶¶ 108, 123-24);

c)    Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . PETROCHEMICAL COMPLEX OF RIO DE JANEIRO – COMPERJ[.]"(¶ 202);

d) Barusco identified three Comperj projects valued at over R$4.2 billion (approx. US$2.4 billion) that were used to funnel bribes to Petrobras executives (¶ 207).

319. Petrobras's materially false and misleading statements regarding the Comperj refinery included the following:

320. On October 8, 2010, the Company issued a statement in response to an October 8, 2010 *Folha.com* report titled "TCU says it found overbilling in works of Petrobras in Rio." Petrobras stated:

> **Response:** Petrobras reaffirms that ***there are no irregularities on the contracts of the Petrochemical Complex of Rio de Janeiro (Comperj).*** In the hiring model by overall price, what matters is that the final overall price is the one that is more economical and advantageous to Petrobras. It is not the item to item detailing, as the TCU intends.
>
> ***There is no overbilling.*** Petrobras reaffirms that there are technical disagreements between the methodology adopted by the company and by the TCU. The criteria used by the Court are insufficient and they are not applicable to works such as the Comperj, which is far more complex and with unique specificities. Petrobras cooperated with the TCU on all requests and there was no obstruction on any occasion.

321. These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 318.

322. Similarly, on January 7, 2013, in response to questions from *Jornal Nacional* concerning potential cost overruns at Comperj, Petrobras stated on *Facts and Data*:

> The Company further reaffirms that there are ***no irregularities*** in the construction works of the Petrochemical Complex of Rio de Janeiro. Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

323.   This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 318.

### 4.   SBM Contracts

324.   During the Relevant Period, Petrobras issued statements in which it falsely denied allegations that the Company had paid bribes to SBM in connection with construction contracts. Petrobras's denials of overpricing in the SBM contracts were directly contradicted by the Company's subsequent admission that there is "overwhelming evidence" that SBM had paid Petrobras officials, including Barusco's admission that he received $22 million in bribes based on Petrobras's contracts with SBM between 1997 or 1998 and October 2010.

325.   Petrobras's materially false and misleading statements regarding SBM included the following:

326.   On March 31, 2014, the Company announced the "Completion of Internal Verification," in connection with the SBM bribery allegations, stating:

> Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBM Offshore, concluded that, based on work performed and limited to its regulatory scope, *no facts or documents were found that prove the payment of bribes to employees of Petrobras.*

327.   Similarly, on April 1, 2014, Petrobras announced in a press release that the Company's own internal investigation into the alleged SBM bribes "concluded that there are no facts or documents that evidence the payment of bribes to Petrobras employees."

328.    In its April 30, 2014 Form 20-F, Petrobras reconfirmed that: "On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

329.    The statements set forth in ¶¶ 326-28 were materially false and misleading and omitted to disclose the material fact that the Company and its executives had engaged in a long-running scheme to accept bribes from SBM, as described above at ¶¶ 103-44, 209-12, 324.

330.    On April 4, 2014, Petrobras posted the following letter that it wrote to a Brazilian state agency concerning SBM Offshore and Pasadena, in which it denied any wrongdoing and defended its short-lived internal investigation into bribery by SBM:

> Petrobras strongly rejects the terms used by the reporter . . . The reporter committed improprieties and injurious falsehoods by deeming as "work of fiction" the work of senior company managers in the internal investigation relating to accusations made by the press over alleged bribes by the Dutch company SBM to Petrobras employees.
>
> By evaluating the period of duration of the works (February 13 to March 29 of 2014) and stating that it could have been summarized into one day of analysis, the reporter casts doubt on the internal investigation methodology conducted by Petrobras executives, having no grounds for doing so. If the period were a single day, then it would be hurried and fragile, as the journalist suggests.
>
> Historically, Petrobras has routinely looked into any and all accusations it receives in any unit, via the General Ombudsman or due to facts reported internally or externally to the company. At the same time, it has cooperated with external oversight bodies such as the CGU, TCU, and Federal Public Prosecutor. In the case of Pasadena, likewise, Petrobras created a special commission to investigate, within 45 days, all of the facts related to its acquisition process.
>
> The company's main corporate environment is related to employees that joined the company by public entrance exam, have internationally renowned technical excellence, and adhere to ethical standards in their internal and external relations. ***These employees, when faced with evidence of improper conduct, do not hesitate to take punitive actions of all kinds. To ignore that evidence is to ignore the public track record of a 60-year-old company, which does not have as a standard practice to get rid of complaints, but rather to clarify the real facts***

*internally and externally, and to provide appropriate answers to the appropriate agencies*.

It is unacceptable that this work, so believable, is compared to a "three real bill" without proper investigation or clarification of the facts. It is unacceptable for a piece of journalistic work to mention fraud, when there has been no proper information gathering.

The company's [executive] directors, led by the Executive Directorate, have the appropriate autonomy to investigate any and all irregularities, as they always have. Also in this case, the reporter, in doubting that autonomy, does so without objective evidence, which good journalism requires.

331.     The Company's response defending its investigation was false and materially misleading, because it failed to disclose the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above at ¶¶ 103-44, 209-12, 324.

332.     On June 11, 2014, Foster testified to the CPI concerning the alleged improprieties in its contracts with SBM, stating that "*no irregularities were discovered*" in the Company's dealings with SBM.

333.     Foster's statement was materially false and misleading because it concealed the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above at ¶¶ 103-44, 209-12, 324.

###     5.     Transpetro Contracts

334.     As with the allegations pertaining to the SBM contracts, Petrobras denied that the Company paid bribes in connection with Transpetro contracts during the Relevant Period.

335.     On February 27, 2011, in response to questions from *O Globo* newspaper regarding a piece the newspaper was writing about Transpetro contracts awarded without any bidding process—which claimed that the National Confederation of Waterway and Aerial Workers ("Conttmaf") had filed a complaint with the TCU—Petrobras stated: "The complaints

of the alleged overbilling against the administration of Transpetro that were made public by

Conttmaf are unfounded."

336.    The foregoing statement was materially false and misleading when made for the

reasons set forth in ¶¶ 103-44 above, and, given that Machado, Transpetro's CEO, was fully

involved with and complicit in the bribery scheme, as evidenced by:

    a)    PwC's refusal to accept financial statements signed by Machado in late October 2014 due to his involvement in the scheme (¶ 214); and

    b)    Costa's testimony that he received a bribe of R$500,000 from Machado in connection with Transpetro contracts (¶ 213).

      **6.**    **Repar Refinery**

337.    On October 9, 2011, in response to an article published in *Época* magazine

regarding the Repar refinery titled "Money Leaving Through The Pipe," Petrobras stated on

*Facts and Data*: "The Company reaffirms that ***there is no overbilling, overpricing or any other***

***irregularity*** in the construction works of the Presidente Getúlio Vargas Refinery (Repar)." The

following day, on October 10, 2011, the Company issued another statement responding to the

same *Época* magazine article, stating:

> Petrobras disclaims information on the alleged irregularities in works at Presidente Getúlio Vargas Refinery (Repar), published in the magazine *Época* in the article "Dinheiro saindo pelo duto" (Money leaving through the pipe).

> The Company reaffirms that there is no overbilling, overpricing or any other irregularity in the construction works of the refinery. What can be observed in the cases pointed out by the [TCU] are formulations and interpretations that differ from those adopted by the Company.

338.    Each of the foregoing statements regarding the Repar refinery was materially

false and misleading when made for the following reasons:

    a)    The bribery scheme inflated the value of its contracts with the members of the Cartel, and materially and falsely inflated the value of the Repar assets reported by the Company (¶¶ 103-44);

b) Costa testified that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, which included Repar contracts (¶¶ 108, 123-24);

c) Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and *REPAR*" (¶ 202);

d) Mendonça Neto testified that Toyo Setal paid bribes to Costa in connection with certain contracts at Repar (¶ 126); and

e) Camargo testified that he paid R$12 million to Costa and Duque in connection with a construction project at the Repar refinery. (¶ 127)

**C.** **Petrobras's Materially False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption**

339. Throughout the Relevant Period, Petrobras made statements attesting to the Company's purported commitment to strong corporate governance, transparency, and compliance with applicable disclosure regulations, while affirmatively denying the existence of corruption and fraud. For example, Petrobras falsely stated on December 29, 2012 on *Facts and Data* that "all the activities from Petrobras and its employees are totally guided by ethics and transparency principles. *Petrobras System rejects any corruption practices and uses strict management methods* to assure the protection of its shareholders' interests." Similarly, on November 8, 2011, Petrobras stated on its *Facts and Data* website: "Petrobras clarifies that there is no overbilling, overpricing, or any other irregularity in its works."

340. These statements were materially false and misleading for the following reasons:

a) The Company has admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." (¶ 181)

b) The Company has further confirmed that its prior denials were false by stating that it needed to "correct the carrying amount of specified property, plant and equipment" and further admitting that "[t]he information currently available to the

Company indicates that the contracts entered into between January 1, 2004 and April 30, 2012 . . . with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." (¶ 254)

c)    Costa testified that 3% of every contract with the "Cartel" companies was returned to certain Petrobras executives and Brazilian politicians as a bribe. Costa also confirmed that the illegal overpricing and bribery scheme impacted all contracts with the Cartel. (¶¶ 108, 123-24)

d)    Barusco, as part of his cooperation agreement with the Brazilian Federal Police, admitted to accepting over $100 million in illegal bribes in connection with the scheme and stated that the payment of these bribes started as early as 1997 or 1998. Barusco admitted that between 1997 or 1998 and October 2010, he received approximately $22 million in bribes resulting from the contract between Petrobras and SBM. Barusco also stated that a 0.9% bribe was added to each Sete Brasil contract for the construction of rigs. With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT. Barusco further confirmed that "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into. Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company. (¶¶ 103-44, 186-214, 380, 397-403)

e)    Costa, Duque, Cerveró, Machado and Barusco, among others, were aware of and complicit in the Cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras. Mendonça Neto confirmed that the Cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid-rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes. Mendonça Neto further stated that the bribes were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque). (*Id.*)

f)    Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices. (¶¶ 147-63)

g)    Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "***they wouldn't get the work if they didn't pay***." (¶ 129)

h)   Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it. (¶127)

i)   Barusco stated that "the payment of bribes" was "'endemic' and institutionalized." (¶ 143)

341.   Petrobras also made similar false statements in multiple underwriting agreements with U.S. and international banks.   For example, on September 29, 2010, Petrobras filed with the SEC a Form 6-K, which was signed by Barbassa and attached as Exhibit 1.1 an Underwriting and Agency Agreement between the Company and several underwriters (the "September 29, 2010 Underwriting Agreement").  The September 29, 2010 Underwriting Agreement stated:

> Neither the Company [Petrobras] nor any of its Subsidiaries, nor any director or executive officer of the Company or any of its Subsidiaries, nor, to the best knowledge of the Company, any agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any applicable provision of the Foreign Corrupt Practices Act of 1977 ["FCPA"]; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

342.   This statement was false and misleading because, in reality and as discussed above at ¶ 340, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

343.   On January 27, 2011, Petrobras filed with the SEC a Form 6-K, that attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters (the "January 27, 2011 Underwriting Agreement").  The January 27, 2011 Underwriting Agreement stated:

> Neither of the Companies [Petrobras and its wholly-owned subsidiary] nor any of their subsidiaries, nor any director or executive officer of the Companies or any of their subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or

any of their subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

344.    Petrobras repeated this same representation in the following documents:

     a) a December 9, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

     b) a December 12, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

     c) a February 6, 2012 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

345.    Each of these statements was false and misleading because, in reality and as discussed above at ¶ 340, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

346.    On September 26, 2012, Petrobras filed with the SEC a Form 6-K which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters (the "September 26, 2012 Underwriting Agreement"). The September 26, 2012 Underwriting Agreement stated:

Neither of the Companies [Petrobras and its wholly-owned subsidiary] nor any of Petrobras' subsidiaries, nor any director or executive officer of the Companies or any of Petrobras' subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices

Act of 1977 or the UK Bribery Act 2010; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

347.    Petrobras repeated this same representation in the following documents:

   a) a May 15, 2013 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

   b) a January 9, 2014 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

348.    Each of these statements was false and misleading because, in reality and as discussed above at ¶ 340, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

349.    On March 11, 2014, Petrobras filed with the SEC a Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters (the "March 11, 2014 Underwriting Agreement").   The March 11, 2014 Underwriting Agreement stated:

   Neither of the Companies [Petrobras and its wholly-owned subsidiary] nor any of Petrobras' subsidiaries, nor any director or executive officer of the Companies or any of Petrobras' subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - *Nova Lei Anticorrupção Brasileira* of 2013 (New Brazilian Anti-Corruption Law); or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

350.    This statement was false and misleading because, in reality and as discussed above at ¶ 340, the Company's executives passed along millions of dollars in "direct [and]

indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

351.   Further emphasizing the Company's purported commitment to ethical practices, Petrobras issued a release on May 28, 2013 containing the "Code of Ethics of the Petrobras Group," the purpose of which was to "clearly define the ethics principles that guide the actions and conduct of the Petrobras Group, institutionally and in relation to its employees.  In doing so, the Code makes the ethical meaning of the Group's Mission, Vision, and Strategic Plan explicit." Petrobras specifically identified its affirmative disavowal of "corruption and bribery":

> The Petrobras Group Code of Business Conduct
>
> In its relationship with the Society, the Government and the State, the Petrobras Group commits itself to:
>
> *       *       *
>
> 8.8  Refusing any corruption and bribery and bribery practices and keeping formal control and disciplinary procedures for any possible violation of this principle;
>
> 8.9  Refusing to support and contribute with political parties or political campaigns of candidates to elective positions.

352.   This statement was false and misleading because, in reality and as discussed above at ¶ 340, the Company's executives passed along millions of dollars in bribes to Brazilian politicians and Petrobras employees.

> **D.      Petrobras's Materially False and Misleading Statements About Competitive Bidding**

353.   During the Relevant Period, Petrobras made multiple statements reassuring investors that Petrobras engaged in competitive, arms' length bidding, and that, as a result, there was no improper overbilling or overpricing in its projects.  Each of these statements regarding Petrobras's bidding process was materially false and misleading because, as discussed above in ¶¶ 103-22, the bidding process was not conducted at arm's length in accordance with applicable

laws and regulations but rather was rigged to award contracts to the Cartel companies at inflated prices in exchange for kickbacks to Petrobras executives.

354.   Petrobras's materially false and misleading statements regarding Petrobras's bidding and project costs included the following:

355.   On July 11, 2011, Petrobras stated, in response to an article published in the newspaper *O Estado de S. Paulo* asserting that Petrobras had received complaints about its bidding processes, "Petrobras rejects accusations of fraud and denies having received denouncements regarding the bidding."

356.   The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 103-22.

357.   On August 15, 2011, Petrobras represented on *Facts and Data*:

Petrobras contracts are carried out in accordance with Decree 2745 of 24 August 1998.  From this Decree Petrobras was relieved to fulfill the Law 8666/93, which regulates hiring in the public sector, and began to conduct their hiring according to the rules of the Bidding Simplified procedure established by Decree 2745.  It is important to clarify that *the companies participating in the bidding process at Petrobras have to prove legal, technical, economic and financial qualification and tax compliance*.

358.   The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 103-22.

359.   On January 22, 2012, Petrobras rejected the notion that it engaged in anything other than a competitive bidding process, stating:

[W]e must highlight that bidding is mandatory for any procurement for works, supply of goods or services to Petrobras. However, there are cases provided for by law, in which the bid or is waived or is even unenforceable by an absolute impossibility of competition (examples: the supplier is holder of patent or copyright on the product or service requested, or has exclusive commercial representation of foreign manufacturer).

But even if the legislation eliminates the formal bid, ***the practice of Petrobras is to always seek the competition*** and quote at least three (03) price proposals in order to ensure competition between suppliers.

360.   The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 103-22.

361.   On November 13, 2013, Petrobras published a "Clarification" on its *Facts and Data* website responding to allegations in an *O Estado de S. Paulo* article regarding the Company's contracts with Odebrecht.  In this posting, the Company discussed its bidding process, stating:  "The bidding, contracting and performance of services processes of Petrobras are constantly being assessed by its Internal Audit and its recommendations are diligently reviewed, aiming at protecting the interests of the Company."

362.   This statement was false and misleading because it failed to disclose the material fact that Odebrecht—a Cartel member—was involved in the bid-rigging scheme that inflated the Company's contracts with Odebrecht by up to 20%, as discussed more fully above at ¶¶ 103-22. Accordingly, the Company's bidding processes with Odebrecht did not "aim[] to protect[] the interests of the Company" but instead protected the interests of Odebrecht, Petrobras executives, and government officials at the expense of Petrobras investors.

E.    **Petrobras's Materially False and Misleading Denials of Fraud,
      Bribery and Corruption as Investigations Commence**

363.    Between March and August 2014, as Operation Car Wash began to unfold,
Petrobras, Foster and Costa vehemently denied any participation in or knowledge of the bribery
scheme, affirming repeatedly that there were "no facts or documents that evidence the payment
of bribes to Petrobras employees," that Costa's "involvement in money laundering and
remittance abroad is zero," that "you will not find anything illegal at Petrobras, because there is
nothing illegal about Petrobras," that "there is no indication of irregularities" at Abreu and "there
is no overpricing or overbilling in the project of the Abreu e Lima refinery."

364.    Each of these statements, which are set forth fully below, was materially false and
misleading when made for the following reasons:

a)    The Company eventually admitted that "facts and proofs obtained in the
'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such
as cartelization of suppliers and former employees taking bribes, indicating that
the payments to such suppliers were improperly recognized as part of the cost of
our fixed assets." (¶ 181)

b)    The Company further confirmed that these denials were false by stating that it
needed to "correct the carrying amount of specified property, plant and
equipment" and further admitting that "[t]he information currently available to the
Company indicates that the contracts entered into between January 1, 2004 and
April 30, 2012 . . . with the suppliers and contractors named in the depositions
may have included amounts related to the misconduct by suppliers and
contractors, political agents, Petrobras personnel and other people." (¶254)

c)    Costa testified that 3% of every contract with the "Cartel" companies was
returned to certain Petrobras executives and Brazilian politicians as a bribe.  Costa
also confirmed that the illegal overpricing and bribery scheme impacted all
contracts with the Cartel.  (¶¶ 108, 123-24)

d)    Barusco, as part of his cooperation agreement with the Brazilian Federal Police,
admitted to accepting over $100 million in illegal bribes in connection with the
scheme and stated that the payment of these bribes started as early as 1997 or
1998.  Barusco stated that between 1997 or 1998 and October 2010, he received
approximately $22 million in bribes resulting from the contract between Petrobras
and SBM.  Barusco also stated that a 0.9% bribe was added to each Sete Brasil

contract for the construction of rigs. With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT. Barusco further confirmed that "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into. Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company. (¶¶ 103-44, 186-214, 380, 397-403)

e)  Costa, Duque, Cerveró, Machado and Barusco, among others, were aware of and complicit in the Cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras. Mendonça Neto confirmed that the Cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid-rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes. Mendonça Neto further stated that the bribes were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque). (*Id.*)

f)  Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices. (¶¶ 147-63)

g)  Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "***they wouldn't get the work if they didn't pay***." (¶ 129)

h)  Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it. (¶ 127)

i)  Barusco stated that "the payment of bribes" was "'endemic' and institutionalized." (¶ 143)

365.  In its April 30, 2014 Form 20-F, Petrobras firmly denied any noncompliance with applicable laws or regulations and represented that:

- Petrobras had five active internal investigation commissions in place to evaluate "aspects of the Pasadena refinery acquisition;" evaluate contracts with several "service providers;" and evaluate contracts with specific service providers involved in the Abreu and Comperj refineries; and

- While none of those five commissions had completed their work, "[b]ased on the information that is currently available, *we do not believe that the findings of any of these internal commissions would have a material effect on our financial statements.*"

366.    The Company's statement that it did not believe that "the findings of any of these internal commissions would have a material effect on [its] financial statements" was materially false and misleading because, for the reasons set forth above in ¶ 364, Petrobras had no reasonable basis to make such a statement.

367.    On May 12, 2014, Petrobras held a conference call for analysts and investors to discuss the Company's first quarter 2014 financial results.   During the First Quarter 2014 Conference Call, Foster refuted the accusations of bribery and corruption at the Company, stating in pertinent part:

> Finally, this is not a slide, but it's my final comment to you. [This] [r]efers to the processes of investigation we've set up in the last few months. We have answered different questions. We have been inquired not only at the House of Representatives but also at the Senate. We have answered questions about facts which are extremely unfavorable for our Company, and we have been working hard to investigate many of these episodes, such as the SBM Offshore situation.
>
> We have our own internal investigation committee. They conducted investigations during 45 days. And regarding Petrobras action, regarding our operations, *there are no facts or documents that would document the payment of bribery to any employees of Petrobras.* The final report by the investigation committee was offered to the national authorities, as not only executive and legislative but also judicial authorities.

368.    Foster's statements that the Company "ha[s] been working hard to investigate many of these episodes, such as the SBM Offshore situation" and that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras" were materially false and misleading because they omitted the material facts set forth above in ¶ 364.

369.    On July 12, 2014, Petrobras responded to a *Los Angeles Times* article titled "Petrobras shares fall, analysts point to poor management by Brazil." The article discussed,

among other things, how the Company had become "ensnared in political scandals," including charges of having "drastically overpaid" for the Pasadena Refinery and the open criminal investigation into the allegations that Petrobras employees accepted $139 million in bribes from SBM for steering oil platform and drilling contracts to the Dutch company.  In responding to this article on *Facts and Data*, on July 12, Petrobras refuted the allegations, reaffirming that Petrobras "has not found any facts or documents evidencing the payment of bribes to employees of Petrobras."

370.   The Company's statement that there was no "evidenc[e] [of] the payment of bribes to employees of Petrobras" by SBM was materially false and misleading for the reasons set forth above in ¶ 364.

### F.   Petrobras's Materially False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls

371.   Throughout the Relevant Period, Gabrielli, Foster and Barbassa certified the effectiveness of the Company's internal controls and procedures.  Specifically, each of the Company's Forms 20-F included a certification signed by Barbassa, as well as Gabrielli (for the 2009 Form 20-F and the 2010 Form 20-F) and Foster (for the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F), stating that:

> 4.   The Company's other certifying officer and I . . . have:
>
> \*       \*       \*
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> \*       \*       \*

> 5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):
>
> > (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
> >
> > (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

372.     Additionally, the February 29, 2012 Form 6-K, the 2010 Form 20-F and the 2011 Form 20-F contained the following statement:

> [M]anagement assessed the effectiveness of [the] Company's internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on that assessment, management has concluded that as of December 31 [of the reporting year,] [the] Company's internal control over financial reporting is effective.

373.     The 2012 Form 20-F, the 2013 Form 20-F and the March 7, 2014 Form 6-K filed with the SEC contained the following representation:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control—Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31 [of the reporting year].

374.     Each of the statements set forth above in ¶¶ 371-73 was materially false and misleading for the following reasons:  As described in detail herein, Petrobras's internal controls were grossly ineffective and were routinely overridden during the Relevant Period.  Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-

rigging on construction contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives. In the wake of the testimony from Costa and others involved in the scheme, Foster expressly admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls." The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that . . . were overbilled," yet no action was taken by the Company to discontinue the fraudulent scheme.

## IX.  SUMMARY OF SCIENTER ALLEGATIONS

375.  Petrobras knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein. Throughout the Relevant Period, Petrobras's former executives, including former CEOs Foster and Gabrielli, former CFO Barbassa, and former Executive Directorate members Costa, Duque and Cerveró were active, culpable, and primary participants in the fraudulent scheme. These executives were also responsible for issuing the materially false and misleading statements and omissions of material fact alleged herein based upon: (i) their actual issuance of and/or control over Petrobras's materially false and misleading statements, and (ii) their knowledge or reckless disregard of the fraudulent and criminal conduct described herein. These senior executives made or had control over the statements alleged in Section VIII herein and knew or recklessly disregarded that each of these statements was materially false and misleading and/or omitted material facts at the time it was made.

376.  As discussed more fully above, Petrobras's knowledge and/or reckless disregard of the falsity of the Company's statements is evidenced by, *inter alia*, (i) the fact that several of

Petrobras's most senior officers, including Costa and Barusco, have admitted that the Company was engaged in a scheme that involved the overpricing of contracts through bid-rigging and the payment of bribes, and have further admitted to personally receiving millions of dollars in bribes; (ii) Costa's and Barusco's plea agreements, including their agreement to repay $127 million in bribes that they accepted prior to and during the Relevant Period; (iii) the evidence produced through criminal proceedings against Gabrielli, Costa, Duque and Cerveró demonstrating their involvement in the kickback and bid-rigging scheme at Petrobras and the fact that they pocketed millions of dollars in illegal bribes; and (iv) the statements of Velosa, who informed Foster of the bid-rigging and bribery activity on multiple occasions before being removed from her position.

377. Petrobras's Executive Directorate (or Executive Board) was composed of the CEO and six senior-most officers of the Company and the heads of the Divisions of Finance, Gas and Energy, Downstream (or Supply), Services (or Engineering, Technology and Materials), International, and Exploration and Production. Prior to and during the Relevant Period, the Executive Directorate was populated by individuals who either were the masterminds of or active participants in the bid-rigging and bribery scheme or, at the very least, knew of the scheme and its impact on the Company's financial statements, including but not limited to the following individuals:

| Paulo Roberto Costa | Director of Downstream/Supply and a member of Petrobras's Executive Directorate from May 14, 2004 to April 2012. Arrested, indicted and pled guilty to bribery and corruption in connection with Operation Car Wash. |
| Renato Duque | Chief Services (or Engineering, Technology and Materials) Officer and member of Petrobras's Executive Directorate from 2003 until April 2012. Arrested and indicted in connection with Operation Car Wash. |
| Pedro Barusco | Duque's right-hand man and former Executive Manager of Engineering, was arrested and indicted and has pled guilty to |

| | bribery and corruption. Barusco provided testimony demonstrating Duque's and numerous other Petrobras executives' involvement in bribery scheme. |
|---|---|
| Nestor Cerveró | Former director of the International Division and member of Petrobras's Executive Directorate from 2003 until 2008. Arrested and indicted in connection with Operation Car Wash. |
| Maria das Graças Silva Foster | Director of Gas and Energy from 2007 to February 12, 2012; CEO from February 13, 2012 until February 4, 2015 and member of Petrobras's Executive Directorate from 2007 through February 4, 2015, when she was forced to resign. |
| Almir Guilherme Barbassa | CFO and member of the Executive Directorate from 2005 through February 4, 2015, when he was forced to resign. |
| Jose Sergio Gabrielli de Azevedo | CEO and member of Petrobras's Executive Directorate from 2005 until February 13, 2012. Indicted in connection with Operation Car Wash in December 2014. |

378.   These Executive Directorate members reviewed and approved nearly every single contract entered into by Petrobras that had been procured and inflated by the bribes and bid-rigging. As Foster stated in a February 6, 2013 Form 6-K, the Executive Directorate met "twice weekly to focus on the physical and financial monitoring of the principal projects in [Petrobras's] investment plan."

379.   In addition, the members of the Executive Directorate were directly involved in the preparation of Petrobras's materially false and misleading financial statements during the Relevant Period. In fact, Petrobras's by-laws mandate that the Audit Board is responsible for "analyz[ing], at least quarterly, the interim balance-sheet and further financial statements periodically **prepared by the Board of Executive Officers.**"

380.   Barusco stated in his plea agreement that illegal bribes were "embedded" within the construction contracts signed by Petrobras during the Relevant Period, and that the contracts "were approved by the Executive Board of PETROBRAS" during the Relevant Period. Velosa

likewise stated that the Executive Directorate "had access to [the] irregularities in the executive board meetings."

381.   The December 11 Prosecutor's Complaint also provides information that explains how the fraud was evident to all members of the Executive Directorate because nearly every contract with Cartel members was "close to the maximum amount ('ceiling') estimated by [Petrobras], and sometimes they even exceeded that."  That Petrobras continued to contract for services and goods that consistently exceeded the Company's own estimates for those services and goods by up to 20% was a red flag that would have alerted members of the Executive Directorate that the Company's reported assets were overstated due to inflated contract prices. Of course, however, the members of the Executive Directorate were already aware of the fraud given that they personally benefitted from it, as described herein.

382.   Given the numerous red flags identified herein indicating that Petrobras's construction contract values were materially overstated prior to and throughout the Relevant Period, and the fact that multiple members of the Executive Directorate had direct knowledge of or access to facts concerning the bribery scheme, Petrobras and the Executive Directorate knew or recklessly disregarded that the Company's capitalization of these costs caused its financial statements—and, in particular, its PP&E, assets and net income—to be materially overstated throughout the Relevant Period.

   A.   **Petrobras's Scienter Is Established Through the Admissions of Senior Officers**

383.   Costa's and Barusco's criminal guilty pleas and related testimony given in connection with those guilty pleas establish the Company's scienter.  Indeed, such testimony confirms that the fraud at Petrobras was a criminal conspiracy that was both "endemic" and "institutionalized," as Barusco testified, involved senior Petrobras executives, and was

perpetrated to secure the business of Cartel members and curry the continued favor of politicians at whose discretion Petrobras's key executives served.

### 1.   Costa

384.   Costa was the head of the Supply Division and served on the Executive Directorate until his departure from the Company in 2012.  Costa was directly responsible for Petrobras's financial statements and personally signed many of Petrobras's inflated contracts during the Relevant Period.  Costa has admitted to the criminal conspiracy underlying the fraud alleged herein.  Those admissions provided one of the primary bases for the filing of the December 11 Prosecutor's Complaint against Costa and others.

385.   As set forth in the December 11 Prosecutor's Complaint, Costa, as a member of the Executive Directorate for much of the Relevant Period, worked together with Duque, Barusco and other "top level civil servants at Petrobras" to "rig[] the competitive bidding processes regarding the major works contracted by PETROBRAS between 2004 and 2014, largely increasing the profits of those companies in [the amount of] hundreds of million [reais]." Those amounts were then falsely reported as *assets*, rather than expenses, on Petrobras's financial statements.

386.   Costa's admissions made clear that the Cartel's illegal inflation and bribery scheme "had the support of PETROBRAS directors and equivalent civil servants" including Costa and Duque, "who made sure the intent of the criminal group was attained."

387.   As discussed above in ¶¶ 103-44, 200, Costa has admitted that after assuming the position of Chief Downstream Officer in 2004, he was aware that Petrobras had built a figure of approximately 3% into *every one* of its contracts with the "Cartel" companies to be paid out as bribes to Petrobras officers and directors and, ultimately, Brazilian government officials.  Costa, who personally signed many of these inflated contracts, further admitted to his direct

133

involvement in the overpricing of contracts and payment of bribes throughout the Relevant Period.

388.    In particular, Costa testified to Brazilian prosecutors that he worked directly with Alberto Youssef, José Janene and the presidents and/or directors of the construction companies in order to execute this fraudulent scheme:

> So, I would sign the contract, some time would pass, then after the contract was signed, the first billing event Petrobras generates for services is 30 days . . . the service is executed, Petrobras does the calculation and pays 30 days later. So normally there is a gap of 60 days between the execution deadline and final payment deadline. Normally after these 60 days it was possible to make those payments. So Deputy José Janene - at the time former Deputy because in 2008 he was no longer a Deputy, he maintained contact with these companies, also with people not just at senior management and presidency level, but also operational personnel, and those amounts were then passed on to him and then on to Alberto Youssef. Within the companies, there were people who operationalized that, I had no contact with those people, I was not in contact with them, I didn't know those people. So what happened? Let's say, Alberto or Janene made that contact and the money then went for political distribution through them.

389.    Costa specifically detailed how every division of Petrobras was involved in the taking and dissemination of the illegal bribes, explaining how Foster's Gas and Energy Division funneled bribes directly to the PT (Labor Party):

> **FEDERAL JUDGE:**  And the Petrobras directors, did they also receive a part of those amounts?
>
> **PAULO ROBERTO:**  Look, in respect of the services department, everyone knew that they had a percentage of those contracts in the supply area; of the 3 per cent, 2 per cent was for the Labor Party (PT), through (indiscernible) of the service.   Other departments such as gas and energy and exploration and production, were also PT, so there was PT in the exploration department, PT in the gas and energy department and PT in the service department. So the comment in the company is that in this case the 3 per cent went direct to the PT, the PP did not participate in that because they were departments nominated for both execution of services and for business, PP with PT. So what happened within the company was that the total amount would be fully for the PT.

390.    Costa further admitted that he personally received tens of millions of dollars in bribes as part of this fraudulent scheme that affected nearly every construction contract at Petrobras:

> **FEDERAL JUDGE:**   Right, but the question I specifically asked was if the directors, for example, if you received any part of those amounts?
>
> **PAULO ROBERTO:**   Yes. So, in average amounts, what would happen? Of the one per cent for the PP, on average, obviously after (indiscernible) contract, could be a little more or a little less, 60 per cent went to the party, 20 per cent was for expenses, sometimes for invoices, issue costs etc., they are all average amounts, the amounts could be altered, and the remaining 20 per cent was allocated - 70 per cent to me and 30 per cent either to Janene or Alberto Youssef.
>
> **FEDERAL JUDGE:**   And how did you receive your part?
>
> **PAULO ROBERTO:**   I received it in cash, normally at my home or the shopping mall or in the office after I opened my consultancy company.
>
> **FEDERAL JUDGE:**   Who delivered these amounts to you?
>
> **PAULO ROBERTO:**   Normally Alberto Youssef or Janene.

391.    Costa testified that he continued to receive bribes even after he left the Company in April 2012:

> **FEDERAL JUDGE:**   But did you continue to receive amounts from this, let's say, scheme?
>
> **PAULO ROBERTO:**   Yes, I had some outstanding amounts to receive after my leaving Petrobras, from April 2012, there were some outstanding amounts, and some contracts were signed with my consultancy company, which I set up in August 2012, the contracts were signed in 2013 and I received some amounts from contracts, let's say, in respect of provision of services with these companies, yes. The answer is yes.

392.    Costa also admitted that—in addition to the 3% bribe paid to Petrobras executives and politicians for each contract—he knew that the Cartel was rigging bids for Petrobras contracts, and that this bid-rigging secretly inflated the Company's contract costs. Specifically, Costa stated: "*[I]t was clear to me that there was, quote-unquote, a prior 'agreement' between the [contractors] in respect of the works . . . that cartelization, obviously, results in an*

***excessive delta price***." Costa further acknowledged that these companies entered into a "prior agreement to define the price proposal that they would submit" to Petrobras, and that embedded within that inflated price was a 3% "political adjustment," i.e., bribe.

393.    Costa also testified that he kept a "daybook" that detailed the payment of bribes to Brazilian politicians:

> **FEDERAL JUDGE:** These politicians, for example, these public officials, that they received their portion, how you know about this?
>
> **PAULO ROBERTO:** We had regular meetings with this political group, you know? And then we regularly talked. "Oh, we got this, we got that," etc. In my daybook, that was seized in my residence, there is a table that was specific -, detailed with the Public Prosecutor's Office, and the table shows several amounts of politicians from various political parties that were ... relating to the 2010 election. I copied this table at the office of Alberto, at a meeting that I had there with him.

394.    Costa also admitted that significant acts in furtherance of Petrobras's criminal scheme and assets involved in the underlying fraud took place or are located in the United States. For example, Costa told investigators that he accepted a $1.5 million bribe from business lobbyist Fernando Soares "'to keep from interfering' with the potential acquisition of a refinery in Pasadena, US, during a board meeting to approve the deal."   Costas stated that these bribes influenced Petrobras's decision to go forward with the Pasadena investment in the face of internal doubts about the viability of the refinery. As *Agencia Brasil* reported:

> Costa told investigators he was contacted by [lobbyist] Fernando Soares with a bribe offer and accepted it. The payment was made offshore, and the money is believed to have been provided by Astra Oil, which owned the refinery. Also according to Costa, rumor had it at Petrobras that the company's former international boss, Nestor Cerveró (who is now jailed), along with politicians and Soares, split bribe money ranging somewhere in between $20 million and $30 million, probably paid by Astra.

395.    In his plea bargain agreement, Costa further confirmed that the International Division headed by Cerveró also had a "need for transfers to political groups." There, he said,

Soares had the role of "ensuring part of the kickback payments was channeled" to their political and Petrobras recipients.

396.     In addition to admitting to his direct involvement in the fraudulent scheme, Costa has agreed to repay approximately $27 million in bribes that he received throughout his tenure as the Chief Downstream Officer.

### 2.     Barusco

397.     Barusco, Services Director and Duque's right-hand man, has admitted to the receipt of nearly $100 million in bribes.  In his plea deal, Barusco admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the company Petróleo Brasileiro S/A," and agreed to "giv[e] back nearly everything of what he improperly received as a result from bribes."

398.     In a November 20, 2014 "Term of Cooperation," Barusco stated that "the payment of bribes within PETROBRAS was something *'endemic' and institutionalized*; that when [Barusco] became Executive Manager of the [Services] Department, the payment of bribes by the construction companies already existed and he understood that it was 'a part of the relation.'"

399.     Barusco explained how "a project for the COMPERJ utilities was devised" by a Cartel member and that the bidding for that project was done with Costa (and not Duque and Barusco) such that that particular "bribe would 'naturally' be paid to [Costa]."

400.     Barusco also acknowledged his awareness that the Cartel members were rigging the bids they submitted to Petrobras.  According to Barusco, the price proposals Petrobras received from Cartel companies were always "signed near the maximum amount of the internal budget for Petrobras," and "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company."

137

401.     Barusco testified to at least one instance, in connection with the construction of the Abreu refinery, where he was approached by a director of Odebrecht "who presented a list . . . containing the list of companies that should be invited to bid on the biggest packages of the works in RNEST." According to Barusco, Odebrecht "had already agreed . . . with PAULO ROBERTO COSTA, who was, at the time, Director of Suppl[y], the list of companies that were going to take part" in bidding.  Barusco stated that "on a later date [he] verified that the companies invited for the RNEST bids were the ones mentioned in the list delivered by" Odebrecht.  Barusco also stated that there was "organized pressure" to "close the values of the [RNEST] contracts at the top echelon of the PETROBRAS budget."

402.     Barusco further detailed how the bribery increased in magnitude as the Company grew and engaged in many new projects.  He admitted that "the payment of bribes and their amounts intensified" during his tenure at the Company due to "the increase of the billing of Petrobras, the increase of prices that were charged by the [Cartel] companies and the high demand of the company." For example, he explained how "in 2003 the [Services] Department managed and made around US$3 billion per year and, when [Barusco] left the company in 2011, around US$3 billion per month was being invested." As a result, the bribes increased "proportional[ly]" because such an increase "is mathematical"; there was a direct correlation between Petrobras's increased capital expenditures and new projects and the increase in bribes paid to Petrobras executives and politicians.

403.     In total, Barusco has admitted to the receipt of $97 million in bribes from over "60 (sixty) contracts signed between companies or consortia of companies and PETROBRAS." Moreover, Barusco estimated that Services Director and Executive Directorate member Duque, for whom he collected, accounted and managed the bribes, received a higher percentage of the

illegal bribes—approximately $140 million—in exchange for Petrobras's approval of the contracts.

> **B.    Foster Knew About or Recklessly Disregarded the Bid-Rigging and Kickback Scheme Prior to and During the Relevant Period**

404.    Petrobras's scienter is further evidenced by the scienter of Foster. At all relevant times, in her position as Chief Gas and Energy Officer and then CEO of Petrobras, Foster was one of a handful of individuals who served on the Company's Executive Directorate. In this role, Foster was responsible for approving contracts that included the illegal bribes that were built into a significant number of the construction and other contracts executed by Petrobras during the Relevant Period.

405.    Barusco testified that bribes were paid in connection with contracts in the Gas and Energy Division while Foster was in charge of that Division, stating that "whenever the contracts involved the Board of Gas and Energy, whose Chairman was initially ILDO SAUER *and then MARIA DAS GRACAS FOSTER*, the percentage of the bribe usually ranged from 1% to 2%."

406.    In addition, prior to assuming the role of CEO—where she signed SOX certifications in connection with the Company's SEC filings attesting to the accuracy of Petrobras's financial statements—Foster was directly informed of the contract "irregularities" evidencing the bribery scheme alleged herein on numerous occasions. As set forth above, Velosa, an Executive Manager at Petrobras during the Relevant Period who reported to Costa and was "close" to Foster, stated that after realizing in 2008 "that there was something wrong" in the Downstream business, she began "reporting these problems to [her] superiors," including Foster. Specifically, Velosa stated in a *Fantástico* interview that beginning in 2008, she began seeing "[i]rregularities regarding the payment of services that were never rendered, contracts that apparently were overbilled, negotiations that were made where a commission was requested for

the people in charge of the negotiation and a series of problems that hurt the company's ethical and procedural code." According to Velosa, she immediately brought these irregularities to the attention of Foster in 2008:

> I met with [Foster] personally when she was the director of the gas and energy sector. At that time, we discussed the subject. She received documentation about the denunciation in the communications sector. After that, we . . . *She had access to those irregularities in the executive board meetings*.

407.   In April 2009, Velosa prepared a memorandum identifying the irregularities and the issues her team had uncovered in its audit of various projects, which she intended to circulate to senior management. Velosa wrote to Foster on April 3, 2009, when Foster was still the Chief Gas and Energy Officer, and asked for her help to complete the memorandum: "I would like to have your opinion on a final text that I need to forward. Can I leave it for you to read? You know about the matter. Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary." Foster did not reply.

408.   Later that day, Velosa published and circulated to the Board of Directors her "Internal Document of the Petrobras System" which concluded that "administrative irregularities" existed in the communications unit of the Downstream department. Specifically, Velosa referred to an audit she led to thwart a scheme that diverted million of reais from Petrobras to Workers' Party (PT) members from Bahia—the same political group of then Petrobras CEO Gabrielli.

409.   Velosa continued to warn Foster of Petrobras's improper practices throughout the Relevant Period. For example, in October 2011, Velosa sent an email to Foster stating that "what happened in the ABAST (the downstream department) in the area of communications and works was absolute nonsense." Velosa said that "the immense pride she felt towards the company turned into shame" because, among other things, bidding at the Company was

occurring "with no apparent efficiency." She further stated: "I write this even knowing that there

is the possibility that you will go to [Costa's] office, and that he could then ask me what I was

doing in your office." Velosa went on to state that she was bringing the wrongdoing at Petrobras

to light "to comply with the rules and with the ethical code of Petrobras." Velosa even offered to

provide Foster with documents substantiating her claims of wrongdoing at the Company: "I

would like to present to you part of the documentation that I already have. Part of it, I know you

are already aware of." Velosa concluded the email by stating: "I would like to hear from you

before taking the next step. I don't want to send you anything without a positive sign from you."

Shortly thereafter, Velosa was "reassigned" to a new position in Singapore, only to be relieved of

her duties upon her arrival.

410.    Asked during the *Fantástico* interview whether Foster (who became CEO several

months after receiving this October 2011 email from Velosa) understood the accusations that

Velosa was making against the Company, Velosa stated:

> What I can say is this. If I say that there are irregularities in the communication
> sector and problems with bidding, if that's not clear enough then I, as a manager
> can say this: I would look for an explanation, especially from a person that I have
> a lot of access to. Because she always did, we always had a lot of access. I knew
> [Foster] when she was manager of technology, in the gas sector; I was the
> manager of the contract management sector. We were close. So she would be
> very comfortable to come to me and say: "Venina, what is going on?"

411.    Thus, through Velosa, Foster had access to information and documentation

demonstrating that Petrobras's financial statements and Foster's own public representations were

false or misleading. Velosa's conversations and emails with Foster, including her offer to

provide Foster with incriminating documents to substantiate the corruption, were blazing red

flags indicative of fraud that Foster, as CEO, had a duty to monitor, yet knowingly or recklessly

disregarded in making and/or approving the false and misleading statements alleged herein. At

minimum, even assuming that Foster did not review the documents made available by Velosa, she (and therefore Petrobras) was willfully blind.

412.     Petrobras's treatment of Velosa following her allegations of misconduct is powerful evidence of its scienter.  During her *Globo* interview, Velosa stated that "[d]uring the whole communication process, [she] was very harassed . . . [and] very pressured."  Velosa explained that: "*[t]he whole time, the president's assistants, the assistants of the directors, they were in my office saying: 'There's a lot of people involved.  You can't treat it like this*.'"  Velosa stated that when she began preparing her memorandum identifying her concerns, there "was a great pressure to prevent that from happening."  Velosa told her superiors, however: "Look, I'm going to do this.  Now, who should I send this to?  Shall I send this to the auditing department?  Shall I notify legal?  Shall I notify the director?"

413.     The fact that Velosa was threatened and ultimately exiled to Singapore after she reported this wrongdoing to Foster and the Board of Directors demonstrates clear culpability and provides additional evidence of Petrobras's scienter.  Velosa noted that in one instance she had a gun pointed to her head, and at other times her daughters were threatened.   Velosa told *Globo*:

> After I determined that the question of the communication area, during that whole process, we received several threats by phone.  My daughters, at the time, were about five and seven years old.  They were quite young.  There were other difficult moments besides that one.  The choice [Petrobras] made in 2009 was really to send me as far away as possible, where I would have as little contact as possible with the company.  Apparently, I was being rewarded going to Singapore but, actually, what really happened was, when I got to Singapore, it was to . . . I introduced myself at the office.  I was [told] that I couldn't work, that I shouldn't have any contact with the business, and that I should really take a course and dedicate myself to the course.

*          *          *

> I had a family, yes.  I had an apartment, I had a husband, two daughters, my mother.  My family.  What they did, simply, was to send me away from my country, from the country that I loved, from my co-workers.  I went to Singapore, I didn't see my mother become ill.  My mother went blind, my mother had a heart

142

transplant.  I couldn't be beside her.  My husband couldn't work anymore.  He had to come back.  During the whole time, I was pressured into doing things outside of the company's ethical code.  The only thing left was my name.  and when I saw that they put my name associated with things I didn't do, I called my daughters and said "Look, girls, either I react and try to . . . clear my name, or I am going to let this happen, we will have some peace now and then the tractor will hit us afterwards.  What are we going to do?"  My daughters said:  "Let's react."

*     *     *

And I am also very afraid, yes.  I can't say that I am not, because when you denounce, instead of getting answers to the denunciations, you . . . simply see the company . . . trying to say that:  "You are not competent.  You did a bunch of wrong things." . . . It's a machine that rolls you over.  And it is coming through.  Am I afraid?  I am afraid, but I won't stop.

414.    Faced with the revelation of facts concerning her involvement in the corruption at Petrobras, Foster expressly denied the allegations, stating on May 12, 2014 that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras"—a claim flatly belied by the documents and emails Velosa later made public.  Indeed, as additional facts came to light, Foster attempted to resign as CEO, stating "*I need to be investigated*, we all need to be investigated," and only remained in her post until February 2015 because President Dilma Rousseff refused to accept her resignation.  Since the allegations of fraud at Petrobras surfaced, Foster has attempted to transfer ownership of certain assets to her children in an effort to avoid having them seized by prosecutors, similarly demonstrating her culpability for the fraud alleged herein.

C.    **Additional Members of the Executive Directorate Have Been Implicated in the Fraudulent Scheme**

415.    In addition to the two guilty pleas by Costa and Barusco, three other Petrobras executives—Gabrielli, the former CEO, and two other former members of the Executive Directorate, Duque and Cerveró—have been charged with corruption and bribery in connection with Operation Car Wash.  Details of the evidence released to date against these criminally-

143

charged executives provide additional compelling inferences of scienter, all directly attributable to Petrobras.

### 1. Gabrielli

416. Gabrielli served as the CEO of Petrobras from July 2005 until February 2012. During that time, Gabrielli signed SOX certifications attesting to the accuracy of Petrobras's financial statements. Gabrielli also served on Petrobras's Executive Directorate during his tenure as CEO.

417. In December 2014, Gabrielli was indicted for fraud. Prosecutors have alleged that Petrobras and Gabrielli conspired with Andrade Guitierrez, a construction and engineering company, to overcharge Petrobras by approximately $11 million in connection with a project to expand Petrobras's Rio de Janeiro research park and data processing center. In connection with this criminal action, prosecutors asked the Brazilian courts to freeze Gabrielli's assets, a request that was granted on January 29, 2015. In the same order, the court also allowed prosecutors to access Gabrielli's tax, banking and phone records, as well as those of former Petrobras executives Duque and Barusco.

418. Gabrielli's role in the fraud has also been directly confirmed by other co-conspirators. For example, in a February 25, 2015 article in Brazilian publication *Veja*, Ricardo Pessoa, the jailed president of accused Cartel member UTC, gave an interview during which he described the endemic and institutionalized practice of bribery and contract inflation at Petrobras. Specifically, Pessoa described how the scheme of corruption in Petrobras began, to his knowledge, in 2003 after President Lula came to power when the contractors were contacted by government emissaries who explained the new rules "by which everyone came out a winner." According to Pessoa, Gabrielli knew about the bribes and contract inflation as "the scheme of corruption always relied on the knowledge of the ex-president of Petrobras José Sergio

Gabrielli" and that the bribes "directly financed the campaign" of the then-Defense Minister Jacques Wagner, one of Gabrielli's political sponsors who helped him secure the CEO spot.

### 2.   Duque

419.   The indictment and evidence against Duque, Petrobras's former Services Director and member of Petrobras's Executive Directorate who was responsible for the Company's financial statements during his tenure, also demonstrate the Company's scienter.   Duque was arrested on November 14, 2014 for his role in the bribery and money laundering scheme, and has remained in jail since that time.

420.   Barusco's plea agreement with Brazilian prosecutors confirms that Duque was directly involved in the corruption at Petrobras, and was the recipient of millions of dollars in bribes in connection with the execution of construction contracts:

> [T]hat from 2005 to 2010, approximately, [Barusco] and RENATO DUQUE received bribes from over 60 (sixty) contracts signed between companies or consortia of companies and PETROBRAS;
>
> *      *      *
>
> [T]hat the informant cannot tell how much has RENATO DUQUE received from bribes throughout the years he held the position of Services Director of PETROBRAS; that in the division of bribes between the informant and RENATO DUQUE, however, DUQUE generally kept the largest part, that is to say, 60%, and the informant would get 40%, however when there was the participation of an operator, RENATO DUQUE would get 40%, the informant would get 30% and the operator would get 30%.

421.   Barusco stated that "between 2003 and until the end of 2011" Duque received "approximately US$40 million dollars" in bribes.

422.   In addition, Barusco stated that between 2004 and 2011, he attended meetings with Duque and Vaccari where the three discussed "the contracts, the progress of projects and biddings," and "the payment of bribes."   Barusco also noted that "RENATO DUQUE was also

worried that he might get caught," and identified a spreadsheet "specifying the combinations and divisions of bribes for himself and RENATO DUQUE."

423.    Barusco further stated that he tracked bribes paid to himself and Duque through a spreadsheet which listed code names for each recipient, and that Duque's code name in this spreadsheet was "MW," short for "My Way."

424.    Mendonça Neto, a director of Toyo Setal, testified that he discussed the payment of bribes directly with Duque, and paid bribes to Duque "either as deposits in an account abroad or in cash here in Brazil." Julio Camargo, another Toyo Setal executive, testified that he paid R$12 million in bribes to Costa and Duque in connection with the construction of a coking unit at the Repar refinery.

### 3.    Cerveró

425.    Cerveró, the former Director of Petrobras's International Division and member of the Executive Directorate, was charged with accepting $53 million in bribes, and was subsequently arrested on January 14, 2015. Cerveró profited from bribes from international companies located largely outside of Brazil and the Cartel.

426.    Cerveró's indictment, dated February 20, 2015, formally accused Cerveró of requesting $40 million in bribes from Samsung Heavy Industries Co. in exchange for awarding Samsung contracts for drilling ships for Petrobras, and of receiving other bribes in exchange for Petrobras contracts.

427.    Prior to having his assets frozen by the Brazilian federal government, Cerveró transferred three apartments he owned and other assets to his family members in order to prevent them from being seized by prosecutors.

146

428.   Costa has confirmed Cerveró's and Duque's involvement in the kickback scheme, testifying that both Duque and Cerveró personally received bribes in connection with the execution of construction contracts:

> **FEDERAL JUDGE:** This person, you mentioned in passing, but to be clear. Were you on the Executive Board of Directors of Supply?
>
> **PAULO ROBERTO:** Correct.
>
> **FEDERAL JUDGE:** This, let's say, this cartelization and this payment of 3% also existed in the other divisions?
>
> **PAULO ROBERTO**: Yes. Correct.
>
> **FEDERAL JUDGE:** Do you know whether other directors, like you, also received amounts?
>
> **PAULO ROBERTO**: Yes, within the Service[s] [Division] there was the director Duque, who was appointed at the time by the Minister of Civil Affairs, José Dirceu, right? And he had this connection with João Vaccari within the PT [Partido Trabalhista (Worker's Party)] process. Within the International Board of Executive Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the PMDB [Partido do Movimento Democrático Brasileiro (Brazilian Democratic Movement Party)].
>
> **FEDERAL JUDGE:** But do you know, for example, whether Mr. Nestor Cerveró and Mr. Renato Duque also personally received amounts?
>
> **PAULO ROBERTO:**  Well, this was talked about within the company and it was clear that yes they did. Yes, the answer is yes.
>
> **FEDERAL JUDGE:** So these 3% existed in all ... these three divisions, at least?
>
> **PAULO ROBERTO:** Correct.

D.     <u>**Additional Evidence of Scienter**</u>

1.     **The Magnitude and Scope of the Scheme**

429.   The extraordinary scope of the illegal bribery scheme further demonstrates Petrobras's scienter.  Petrobras has admitted that the bribery scheme impacted at least one-third of the Company's fixed assets reflected on its financial statements as PP&E, amounting to over $69 billion (R$188.4 billion).  The Company has also admitted that the size of the inflation

attributable to the criminal scheme could require write-downs of approximately US$34 billion (R$88.6 billion)—an amount that would nearly wipe out the Company's profits for 2012 and 2013 combined.

430.   Further, the fact that so many high-level executives were direct participants in the scheme also establishes the Company's scienter.   As reported by the *Wall Street Journal*, Barusco testified before a congressional hearing in Brazil on March 10, 2015 that he first began receiving bribes in 1997, that the bribery scheme became "more widespread and institutionalized by 2003 or 2004," and that it continued to expand in scope after that.   Based on the amount of bribes he received, Barusco estimated that Vaccari, the treasurer of the PT, received at least $200 million in bribes.

431.   The Company's scienter is also established through other documentary and testimonial evidence demonstrating the widespread and well-known nature of the fraud.   For example, Alberto Youssef testified that it was widely known that contractors "wouldn't get the work [from Petrobras] if they didn't pay [the bribes]."   Mendonça Neto similarly testified that the payment of bribes was "very much mandatory" in order to do business with Petrobras. Similarly, Fonseca, the CEO of Galvão Engenharia testified that he was told in no uncertain terms by Petrobras executives, including Costa, that his company would have to pay bribes in order to win contracts from Petrobras.   According to Fonseca, "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by Janene in Sao Paulo."   During a 2010 meeting, Janene informed Fonseca "in a very truculent way . . . that to be able to win contracts [from Petrobras], he would have to pay."   Fonseca testified that after Galvão agreed to pay bribes to the Company, Petrobras awarded Galvão contracts valued at R$2 billion to R$3 billion.

432.    Petrobras employees also actively assisted members of the Cartel to ensure that their contracts and addenda were accepted by the Company.  As reported by *Valor International* on February 11, 2015, Petrobras held periodic meetings with Cartel members at its Rio de Janeiro offices to discuss contracts to be signed between Petrobras and the Cartel companies. Among other things, the minutes of these meetings held at the Company's headquarters reflect that Petrobras workers "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal."  These contract addenda "were responsible for the price increases that led the costs of the Refinery Abreu e Lima, in Pernambuco, to reach $18.5 billion, in comparison with $2.3 billion originally estimated."

### 2.    Petrobras's Retaliatory Efforts

433.    Petrobras's scienter is further evidenced by the efforts the Company's senior executives took to silence individuals who threatened to expose the fraud.  In addition to the actions taken against Velosa and Fernando (described at ¶¶ 147-68, 406-14), Petrobras also sought to quiet the few independent members of the Company's Board of Directors that spoke out against the Company.   As set forth above at ¶¶ 169-70, independent board member Mauro Cunha refused to approve the Company's 2013 financial statements at a February 25, 2014 Board meeting because, among other reasons, "the accounting for refineries was inadequate" and he believed an impairment was required.  Following the Company's refusal to provide more detail to investors concerning his vote, Cunha filed a formal complaint with the CVM that stated, with respect to Petrobras's accounting for the refineries, that he was "not comfortable with the absence of impairment."  Just two months later, at an April 25, 2014 Board meeting, Cunha was inexplicably removed from his position on a committee investigating the Company's Pasadena acquisition and construction of Abreu.   As Cunha acknowledged, his removal from the committee was done in retaliation for his efforts to expose the fraud.  As Cunha explained to

*Bloomberg* in a February 6, 2015 article addressing the appointment of a new CEO to replace Foster, "I would like to say publicly the truth I put in the minutes of the meeting [addressing the appointment of the new CEO], but would risk retaliation as I have suffered in the past."

### 3.     Resignations and Terminations of Petrobras Executives

434.   Finally, as discussed above, scores of senior executives at Petrobras have resigned or been terminated—including the entire Executive Directorate—as a result of their participation in the fraud alleged herein.   During the week of February 2, 2015, just one week after it announced that Petrobras's corruption-related impairment charge could reach $34 billion, Petrobras announced that Foster and Barbassa were leaving the Company.   That same week, the Company also announced the departure of: (i) Machado, the head of Transpetro; (ii) José Miranda Formigli Filho, Petrobras's Exploration and Production Officer; (iii) José Carlos Cosenza, Petrobras's Downstream Officer; and (iv) José Alcides Santoro Martins, Petrobras's Gas and Energy Officer.   Similarly, *on the very same day* in April 2012, both Costa and Duque—who numerous witnesses have identified as the two central Petrobras executives involved in the fraudulent scheme—were replaced as the Directors of Supply and Services, respectively.   The suspicious timing and nature of these departures strengthens the overall inference of Petrobras's scienter.

## X.     THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES

435.   At all relevant times, the markets for Petrobras's common and preferred ADSs were efficient for the following reasons, among others:

a)   Petrobras's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient electronic stock market;

b)   As a registered and regulated issuer of securities, Petrobras filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c)  Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Company's websites, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)  Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

e)  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Petrobras's securities; and

f)  Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Petrobras securities between the time that Petrobras made the material misrepresentations and omissions and the time that the truth was revealed, during which time the prices of Petrobras's securities were artificially inflated by Petrobras's misrepresentations and omissions.

436.  As a result of the foregoing, the market for Petrobras ADSs promptly digested current information regarding Petrobras from all publicly available sources, and the prices of Petrobras securities reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Petrobras's ADSs traded at artificially inflated prices during the Relevant Period. Plaintiffs purchased Petrobras ADSs relying upon the integrity of the market price of those securities and other market information relating to Petrobras, and were damaged thereby.

## XI.   THE STATUTORY SAFE HARBOR IS INAPPLICABLE

437.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any such forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

438.    Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Petrobras is liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## XII.   CAUSES OF ACTION

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Petrobras**

439.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is asserted against Petrobras.

440.    During the Relevant Period, Petrobras used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Petrobras common and preferred ADSs; and (iii) cause Plaintiffs to purchase Petrobras common and preferred ADSs at artificially inflated prices that did not reflect their true value.  In furtherance of its unlawful scheme, plan, and course of conduct, Petrobras took the actions set forth herein.

441.    While in possession of material adverse, non-public information, Petrobras, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not

misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common and preferred ADSs in an effort to maintain artificially high market prices for Petrobras's common and preferred ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Petrobras is being sued as a primary participant in the wrongful conduct alleged herein.

442.   By virtue of their high-level positions at the Company during the Relevant Period, Petrobras's executives were authorized to make public statements, and made public statements during the Relevant Period on Petrobras's behalf.   These executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

443.   In addition to the duties of full disclosure imposed on Petrobras as a result of its making of affirmative statements and reports to the investing public, Petrobras had a duty to promptly disseminate truthful information that would be material to investors, including information with respect to the Company's operations, so that the market price of the Company's common and preferred ADSs would be based on truthful, complete, and accurate information.

444.   Petrobras acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that it failed to ascertain and disclose such facts, even though such facts were known or readily available to it.   Petrobras's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Petrobras's operations, business, performance and prospects

from the investing public and supporting the artificially inflated price of its common and preferred ADSs.

445.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Petrobras's common and preferred ADSs during the Relevant Period.  In ignorance of the fact that the market prices of Petrobras's securities were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Petrobras, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Petrobras but not disclosed in public statements by Petrobras during the Relevant Period, Plaintiffs purchased Petrobras's common and preferred ADSs during the Relevant Period at artificially inflated prices.  As the truth eventually emerged, the price of Petrobras's securities substantially declined.

446.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance, and prospects of Petrobras, which was concealed by Petrobras, Plaintiffs would not have purchased Petrobras's securities, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

447.    By virtue of the foregoing, Petrobras has violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

448.    As a direct and proximate result of Petrobras's wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common and preferred ADSs during the Relevant Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, including:

A.      Awarding compensatory damages in favor of Plaintiffs against Petrobras for all damages sustained as a result of Petrobras's wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.      Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

C.      Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D.      Awarding such other and further relief as may be just and proper.

Dated: March 23, 2015

Darren J. Check
Gregory M. Castaldo
Matthew L. Mustokoff
Richard A. Russo
Margaret E. Onasch
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone:   (610) 667-7706
Facsimile:    (610) 667-7056

Keith R. Dutill (*pro hac* motion to be filed)
Joseph T. Kelleher (*pro hac* motion to be filed)
Marissa R. Parker (*pro hac* motion to be filed)
STRADLEY RONON STEVENS
 & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
Telephone: (215) 564-8000
Facsimile: (215) 564-8120

*-and-*

Adam Petitt
100 Park Avenue, Suite 3210
New York, NY 10017
Telephone: (212) 880-6440
Facsimile: (646) 682-7180

*Counsel for Plaintiffs*

155

# APPENDIX A

| Security | ISIN | Date | Quantity | Price |
|---|---|---|---|---|
| **DFA International Core Equity Fund** | | | | |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 40,033 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 5/3/2011 | 1,618 | $32.90 |
| ADR Preferred Shares | US71654V1017 | 5/10/2011 | 792 | $31.12 |
| ADR Preferred Shares | US71654V1017 | 12/23/2011 | 8,705 | $24.05 |
| ADR Preferred Shares | US71654V1017 | 4/12/2012 | 2,571 | $23.83 |
| ADR Preferred Shares | US71654V1017 | 4/13/2012 | 2,490 | $23.69 |
| ADR Preferred Shares | US71654V1017 | 5/31/2012 | 4,750 | $18.11 |
| ADR Preferred Shares | US71654V1017 | 10/4/2012 | 4,550 | $21.88 |
| | | | | |
| **DFA International Core Equity Fund** | | | | |
| ADR Common Shares | US71654V4086 | 9/24/2010 | 31,487 | $34.49 |
| ADR Common Shares | US71654V4086 | 12/23/2011 | 6,348 | $25.57 |
| ADR Common Shares | US71654V4086 | 4/12/2012 | 1,064 | $24.90 |
| ADR Common Shares | US71654V4086 | 4/18/2012 | 1,295 | $23.94 |
| ADR Common Shares | US71654V4086 | 10/4/2012 | 4,400 | $22.67 |
| | | | | |
| **DFA International Vector Equity Fund** | | | | |
| ADR Preferred Shares | US71654V1017 | 3/14/2011 | 5,805 | $34.40 |
| ADR Preferred Shares | US71654V1017 | 3/29/2011 | 3,597 | $34.97 |
| ADR Preferred Shares | US71654V1017 | 4/28/2011 | 5,783 | $32.57 |
| ADR Preferred Shares | US71654V1017 | 6/16/2011 | 3,600 | $29.31 |
| ADR Preferred Shares | US71654V1017 | 4/20/2012 | 2,436 | $23.06 |
| ADR Preferred Shares | US71654V1017 | 4/23/2012 | 329 | $22.29 |
| ADR Preferred Shares | US71654V1017 | 5/8/2012 | 3,002 | $20.89 |
| | | | | |
| **DFA International Vector Equity Fund** | | | | |
| ADR Common Shares | US71654V4086 | 3/14/2011 | 6,384 | $39.33 |
| ADR Common Shares | US71654V4086 | 3/29/2011 | 6,434 | $40.21 |
| ADR Common Shares | US71654V4086 | 5/5/2011 | 4,400 | $34.92 |
| ADR Common Shares | US71654V4086 | 6/16/2011 | 3,000 | $32.88 |
| ADR Common Shares | US71654V4086 | 4/20/2012 | 1,324 | $24.07 |
| ADR Common Shares | US71654V4086 | 4/23/2012 | 2,128 | $23.38 |
| | | | | |
| **Dimensional Emerging Markets Value Fund** | | | | |
| ADR Preferred Shares | US71654V1017 | 4/22/2010 | 11,673 | $37.97 |
| ADR Preferred Shares | US71654V1017 | 4/23/2010 | 46,531 | $38.20 |
| ADR Preferred Shares | US71654V1017 | 4/26/2010 | 112,669 | $38.47 |
| ADR Preferred Shares | US71654V1017 | 4/27/2010 | 41,980 | $37.22 |
| ADR Preferred Shares | US71654V1017 | 4/30/2010 | 19,162 | $38.03 |
| ADR Preferred Shares | US71654V1017 | 5/3/2010 | 49,639 | $36.87 |
| ADR Preferred Shares | US71654V1017 | 5/4/2010 | 136,956 | $34.61 |

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 5/5/2010 | 196,146 | $34.00 |
| ADR Preferred Shares | US71654V1017 | 5/17/2010 | 38,444 | $33.50 |
| ADR Preferred Shares | US71654V1017 | 6/15/2010 | 71,395 | $32.04 |
| ADR Preferred Shares | US71654V1017 | 7/1/2010 | 102,079 | $29.36 |
| ADR Preferred Shares | US71654V1017 | 7/7/2010 | 186,171 | $30.93 |
| ADR Preferred Shares | US71654V1017 | 9/1/2010 | 19,800 | $30.77 |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 1,630,098 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 11/4/2010 | 114,683 | $33.12 |
| ADR Preferred Shares | US71654V1017 | 11/5/2010 | 101,290 | $33.08 |
| ADR Preferred Shares | US71654V1017 | 11/8/2010 | 70,060 | $32.87 |
| ADR Preferred Shares | US71654V1017 | 11/9/2010 | 35,367 | $33.12 |
| ADR Preferred Shares | US71654V1017 | 11/11/2010 | 246,714 | $31.79 |
| ADR Preferred Shares | US71654V1017 | 11/12/2010 | 45,886 | $31.04 |
| ADR Preferred Shares | US71654V1017 | 11/30/2010 | 155,950 | $29.33 |
| ADR Preferred Shares | US71654V1017 | 12/1/2010 | 190,450 | $29.91 |
| ADR Preferred Shares | US71654V1017 | 12/2/2010 | 205,166 | $30.55 |
| ADR Preferred Shares | US71654V1017 | 12/3/2010 | 32,500 | $31.11 |
| ADR Preferred Shares | US71654V1017 | 12/30/2010 | 428,300 | $33.54 |
| ADR Preferred Shares | US71654V1017 | 1/10/2011 | 106,226 | $32.30 |
| ADR Preferred Shares | US71654V1017 | 1/11/2011 | 104,950 | $32.90 |
| ADR Preferred Shares | US71654V1017 | 1/12/2011 | 189,119 | $33.83 |
| ADR Preferred Shares | US71654V1017 | 1/13/2011 | 180,831 | $33.87 |
| ADR Preferred Shares | US71654V1017 | 1/14/2011 | 177,177 | $33.36 |
| ADR Preferred Shares | US71654V1017 | 1/21/2011 | 137,878 | $32.91 |
| ADR Preferred Shares | US71654V1017 | 1/25/2011 | 205,947 | $32.56 |
| ADR Preferred Shares | US71654V1017 | 1/26/2011 | 295,653 | $32.59 |
| ADR Preferred Shares | US71654V1017 | 2/9/2011 | 166,277 | $32.26 |
| ADR Preferred Shares | US71654V1017 | 2/10/2011 | 102,214 | $32.27 |
| ADR Preferred Shares | US71654V1017 | 2/11/2011 | 23,382 | $32.12 |
| ADR Preferred Shares | US71654V1017 | 2/14/2011 | 101,393 | $32.56 |
| ADR Preferred Shares | US71654V1017 | 2/15/2011 | 132,107 | $33.00 |
| ADR Preferred Shares | US71654V1017 | 2/22/2011 | 25,865 | $33.99 |
| ADR Preferred Shares | US71654V1017 | 2/23/2011 | 132,120 | $34.88 |
| ADR Preferred Shares | US71654V1017 | 2/24/2011 | 21,567 | $35.45 |
| ADR Preferred Shares | US71654V1017 | 3/4/2011 | 243,215 | $35.79 |
| ADR Preferred Shares | US71654V1017 | 3/7/2011 | 23,714 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 3/10/2011 | 128,976 | $34.43 |
| ADR Preferred Shares | US71654V1017 | 3/11/2011 | 60,805 | $34.34 |
| ADR Preferred Shares | US71654V1017 | 3/14/2011 | 270,235 | $34.54 |
| ADR Preferred Shares | US71654V1017 | 3/15/2011 | 447,762 | $34.18 |
| ADR Preferred Shares | US71654V1017 | 3/16/2011 | 67,286 | $34.25 |
| ADR Preferred Shares | US71654V1017 | 3/16/2011 | 101,646 | $33.76 |
| ADR Preferred Shares | US71654V1017 | 3/17/2011 | 144,014 | $34.05 |
| ADR Preferred Shares | US71654V1017 | 3/21/2011 | 188,326 | $34.46 |
| ADR Preferred Shares | US71654V1017 | 3/22/2011 | 2,152 | $34.80 |
| ADR Preferred Shares | US71654V1017 | 3/23/2011 | 120,211 | $34.92 |
| ADR Preferred Shares | US71654V1017 | 3/24/2011 | 38,944 | $35.07 |

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 3/25/2011 | 46,456 | $35.20 |
| ADR Preferred Shares | US71654V1017 | 3/28/2011 | 164,703 | $34.89 |
| ADR Preferred Shares | US71654V1017 | 3/30/2011 | 111,237 | $35.35 |
| ADR Preferred Shares | US71654V1017 | 3/31/2011 | 106,916 | $35.54 |
| ADR Preferred Shares | US71654V1017 | 4/4/2011 | 21,440 | $36.13 |
| ADR Preferred Shares | US71654V1017 | 4/5/2011 | 69,491 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 4/6/2011 | 76,203 | $35.71 |
| ADR Preferred Shares | US71654V1017 | 4/8/2011 | 84,661 | $35.89 |
| ADR Preferred Shares | US71654V1017 | 4/11/2011 | 162,461 | $35.62 |
| ADR Preferred Shares | US71654V1017 | 4/12/2011 | 74,164 | $34.02 |
| ADR Preferred Shares | US71654V1017 | 4/13/2011 | 102,414 | $33.36 |
| ADR Preferred Shares | US71654V1017 | 4/20/2011 | 179,230 | $33.59 |
| ADR Preferred Shares | US71654V1017 | 4/21/2011 | 77,722 | $34.17 |
| ADR Preferred Shares | US71654V1017 | 4/25/2011 | 115,652 | $33.71 |
| ADR Preferred Shares | US71654V1017 | 4/26/2011 | 108,619 | $33.87 |
| ADR Preferred Shares | US71654V1017 | 4/27/2011 | 58,048 | $33.28 |
| ADR Preferred Shares | US71654V1017 | 4/29/2011 | 63,791 | $33.12 |
| ADR Preferred Shares | US71654V1017 | 5/2/2011 | 256,472 | $33.48 |
| ADR Preferred Shares | US71654V1017 | 5/3/2011 | 152,978 | $32.85 |
| ADR Preferred Shares | US71654V1017 | 5/4/2011 | 52,450 | $32.05 |
| ADR Preferred Shares | US71654V1017 | 5/9/2011 | 199,174 | $30.52 |
| ADR Preferred Shares | US71654V1017 | 5/10/2011 | 143,320 | $31.14 |
| ADR Preferred Shares | US71654V1017 | 5/11/2011 | 164,937 | $30.33 |
| ADR Preferred Shares | US71654V1017 | 5/11/2011 | 179,000 | $30.31 |
| ADR Preferred Shares | US71654V1017 | 5/18/2011 | 267,103 | $30.71 |
| ADR Preferred Shares | US71654V1017 | 5/19/2011 | 171,665 | $30.16 |
| ADR Preferred Shares | US71654V1017 | 5/20/2011 | 36,637 | $30.15 |
| ADR Preferred Shares | US71654V1017 | 5/23/2011 | 150,684 | $29.33 |
| ADR Preferred Shares | US71654V1017 | 5/24/2011 | 56,311 | $29.99 |
| ADR Preferred Shares | US71654V1017 | 9/14/2011 | 89,442 | $23.88 |
| ADR Preferred Shares | US71654V1017 | 9/15/2011 | 156,475 | $24.47 |
| ADR Preferred Shares | US71654V1017 | 9/16/2011 | 85,608 | $24.31 |
| ADR Preferred Shares | US71654V1017 | 9/20/2011 | 72,784 | $23.55 |
| ADR Preferred Shares | US71654V1017 | 9/21/2011 | 109,293 | $22.88 |
| ADR Preferred Shares | US71654V1017 | 9/23/2011 | 137,792 | $20.99 |
| ADR Preferred Shares | US71654V1017 | 9/29/2011 | 22,151 | $21.38 |
| ADR Preferred Shares | US71654V1017 | 9/30/2011 | 124,939 | $20.86 |
| ADR Preferred Shares | US71654V1017 | 10/3/2011 | 77,689 | $20.24 |
| ADR Preferred Shares | US71654V1017 | 10/4/2011 | 66,027 | $19.56 |
| ADR Preferred Shares | US71654V1017 | 10/6/2011 | 800 | $21.02 |
| ADR Preferred Shares | US71654V1017 | 10/7/2011 | 173,081 | $21.04 |
| ADR Preferred Shares | US71654V1017 | 10/10/2011 | 107,034 | $21.59 |
| ADR Preferred Shares | US71654V1017 | 10/11/2011 | 108,798 | $21.73 |
| ADR Preferred Shares | US71654V1017 | 10/12/2011 | 125,627 | $22.79 |
| ADR Preferred Shares | US71654V1017 | 10/14/2011 | 24,525 | $22.63 |
| ADR Preferred Shares | US71654V1017 | 10/17/2011 | 181,593 | $22.10 |
| ADR Preferred Shares | US71654V1017 | 12/16/2011 | 135,320 | $23.22 |

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 12/19/2011 | 83,280 | $22.97 |
| ADR Preferred Shares | US71654V1017 | 2/29/2012 | 502,313 | $28.51 |
| ADR Preferred Shares | US71654V1017 | 3/1/2012 | 24,094 | $28.77 |
| ADR Preferred Shares | US71654V1017 | 3/14/2012 | 8,700 | $27.19 |
| ADR Preferred Shares | US71654V1017 | 3/15/2012 | 37,793 | $27.23 |
| ADR Preferred Shares | US71654V1017 | 3/16/2012 | 80,360 | $26.83 |
| ADR Preferred Shares | US71654V1017 | 3/19/2012 | 44,800 | $27.11 |
| ADR Preferred Shares | US71654V1017 | 6/5/2012 | 35,294 | $18.76 |
| ADR Preferred Shares | US71654V1017 | 6/6/2012 | 258,023 | $19.05 |
| ADR Preferred Shares | US71654V1017 | 6/7/2012 | 197,223 | $19.18 |
| ADR Preferred Shares | US71654V1017 | 6/8/2012 | 381,797 | $18.55 |
| ADR Preferred Shares | US71654V1017 | 6/11/2012 | 49,296 | $18.38 |
| ADR Preferred Shares | US71654V1017 | 6/13/2012 | 19,817 | $18.10 |
| ADR Preferred Shares | US71654V1017 | 11/15/2012 | 44,151 | $18.79 |
| ADR Preferred Shares | US71654V1017 | 11/19/2012 | 79,050 | $18.63 |
| ADR Preferred Shares | US71654V1017 | 11/21/2012 | 100,989 | $18.16 |
| ADR Preferred Shares | US71654V1017 | 11/23/2012 | 30,430 | $18.15 |
| ADR Preferred Shares | US71654V1017 | 11/26/2012 | 45,913 | $17.99 |
| ADR Preferred Shares | US71654V1017 | 11/27/2012 | 165,927 | $18.04 |
| ADR Preferred Shares | US71654V1017 | 12/19/2012 | 40,101 | $19.87 |
| ADR Preferred Shares | US71654V1017 | 12/20/2012 | 224,116 | $20.09 |
| ADR Preferred Shares | US71654V1017 | 12/21/2012 | 138,323 | $19.75 |
| ADR Preferred Shares | US71654V1017 | 12/24/2012 | 2,495 | $19.55 |
| ADR Preferred Shares | US71654V1017 | 12/26/2012 | 183,438 | $20.01 |
| ADR Preferred Shares | US71654V1017 | 12/27/2012 | 143,623 | $19.03 |
| ADR Preferred Shares | US71654V1017 | 1/7/2013 | 64,023 | $19.76 |
| ADR Preferred Shares | US71654V1017 | 1/8/2013 | 83,617 | $19.17 |
| ADR Preferred Shares | US71654V1017 | 1/9/2013 | 9,808 | $19.25 |
| ADR Preferred Shares | US71654V1017 | 1/10/2013 | 139,480 | $19.32 |
| ADR Preferred Shares | US71654V1017 | 1/15/2013 | 2,190 | $19.48 |
| ADR Preferred Shares | US71654V1017 | 1/16/2013 | 23,500 | $19.27 |
| ADR Preferred Shares | US71654V1017 | 1/17/2013 | 225,662 | $19.38 |
| ADR Preferred Shares | US71654V1017 | 1/18/2013 | 228,798 | $19.23 |
| ADR Preferred Shares | US71654V1017 | 1/23/2013 | 33,914 | $19.11 |
| ADR Preferred Shares | US71654V1017 | 2/6/2013 | 442,181 | $17.71 |
| ADR Preferred Shares | US71654V1017 | 2/7/2013 | 181,032 | $17.75 |
| ADR Preferred Shares | US71654V1017 | 2/8/2013 | 136,159 | $17.71 |
| ADR Preferred Shares | US71654V1017 | 2/11/2013 | 98,621 | $17.72 |
| ADR Preferred Shares | US71654V1017 | 2/13/2013 | 93,521 | $18.27 |
| ADR Preferred Shares | US71654V1017 | 2/15/2013 | 85,096 | $17.96 |
| ADR Preferred Shares | US71654V1017 | 2/21/2013 | 66,554 | $17.54 |
| ADR Preferred Shares | US71654V1017 | 2/28/2013 | 234,655 | $16.87 |
| ADR Preferred Shares | US71654V1017 | 3/4/2013 | 257,903 | $16.88 |
| ADR Preferred Shares | US71654V1017 | 3/6/2013 | 15,021 | $17.71 |
| ADR Preferred Shares | US71654V1017 | 3/8/2013 | 87,629 | $19.02 |
| ADR Preferred Shares | US71654V1017 | 3/11/2013 | 82,742 | $18.44 |
| ADR Preferred Shares | US71654V1017 | 3/12/2013 | 52,318 | $19.08 |

| ADR Preferred Shares | US71654V1017 | 3/14/2013 | 89,999 | $19.09 |
| ADR Preferred Shares | US71654V1017 | 3/20/2013 | 88,094 | $18.92 |
| ADR Preferred Shares | US71654V1017 | 3/21/2013 | 185,525 | $18.62 |
| ADR Preferred Shares | US71654V1017 | 4/3/2013 | 118,657 | $17.56 |
| ADR Preferred Shares | US71654V1017 | 4/4/2013 | 225,107 | $17.68 |
| ADR Preferred Shares | US71654V1017 | 4/5/2013 | 1,549 | $17.55 |
| ADR Preferred Shares | US71654V1017 | 4/11/2013 | 55,579 | $18.22 |
| ADR Preferred Shares | US71654V1017 | 4/12/2013 | 16,635 | $17.88 |
| ADR Preferred Shares | US71654V1017 | 6/21/2013 | 158,454 | $14.77 |
| ADR Preferred Shares | US71654V1017 | 6/24/2013 | 72,853 | $14.19 |
| ADR Preferred Shares | US71654V1017 | 6/25/2013 | 84,564 | $14.48 |
| ADR Preferred Shares | US71654V1017 | 6/26/2013 | 30,899 | $14.83 |
| ADR Preferred Shares | US71654V1017 | 7/1/2013 | 53,615 | $14.41 |
| ADR Preferred Shares | US71654V1017 | 7/2/2013 | 184,050 | $14.22 |
| ADR Preferred Shares | US71654V1017 | 7/5/2013 | 217,206 | $13.44 |
| ADR Preferred Shares | US71654V1017 | 7/8/2013 | 60,890 | $13.49 |
| ADR Preferred Shares | US71654V1017 | 7/23/2013 | 100,000 | $14.93 |
| ADR Preferred Shares | US71654V1017 | 8/5/2013 | 104,877 | $14.53 |
| ADR Preferred Shares | US71654V1017 | 8/6/2013 | 43,848 | $14.27 |
| ADR Preferred Shares | US71654V1017 | 8/8/2013 | 11,809 | $14.24 |
| ADR Preferred Shares | US71654V1017 | 8/13/2013 | 87,233 | $14.24 |
| ADR Preferred Shares | US71654V1017 | 8/14/2013 | 29,243 | $14.36 |
| ADR Preferred Shares | US71654V1017 | 9/11/2013 | 75,000 | $16.03 |

**Dimensional Emerging Markets Value Fund**

| ADR Common Shares | US71654V4086 | 4/22/2010 | 11,463 | $42.73 |
| ADR Common Shares | US71654V4086 | 4/23/2010 | 69,078 | $43.03 |
| ADR Common Shares | US71654V4086 | 4/26/2010 | 102,544 | $43.29 |
| ADR Common Shares | US71654V4086 | 4/27/2010 | 59,204 | $42.04 |
| ADR Common Shares | US71654V4086 | 4/28/2010 | 16,111 | $41.23 |
| ADR Common Shares | US71654V4086 | 6/7/2010 | 1,500 | $36.12 |
| ADR Common Shares | US71654V4086 | 9/1/2010 | 102,501 | $34.85 |
| ADR Common Shares | US71654V4086 | 9/2/2010 | 135,671 | $35.60 |
| ADR Common Shares | US71654V4086 | 9/24/2010 | 513,125 | $34.49 |
| ADR Common Shares | US71654V4086 | 9/30/2010 | 761,740 | $36.22 |
| ADR Common Shares | US71654V4086 | 10/1/2010 | 176,660 | $36.42 |
| ADR Common Shares | US71654V4086 | 10/28/2010 | 360,800 | $33.83 |
| ADR Common Shares | US71654V4086 | 11/4/2010 | 247,033 | $36.17 |
| ADR Common Shares | US71654V4086 | 11/5/2010 | 45,567 | $36.27 |
| ADR Common Shares | US71654V4086 | 11/11/2010 | 182,199 | $35.09 |
| ADR Common Shares | US71654V4086 | 11/30/2010 | 263,300 | $32.54 |
| ADR Common Shares | US71654V4086 | 12/2/2010 | 313,200 | $33.80 |
| ADR Common Shares | US71654V4086 | 12/30/2010 | 181,000 | $37.25 |
| ADR Common Shares | US71654V4086 | 1/10/2011 | 150,596 | $36.15 |
| ADR Common Shares | US71654V4086 | 1/11/2011 | 211,178 | $36.90 |
| ADR Common Shares | US71654V4086 | 1/12/2011 | 211,922 | $38.18 |

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 1/14/2011 | 293,741 | $37.32 |
| ADR Common Shares | US71654V4086 | 1/21/2011 | 109,959 | $36.37 |
| ADR Common Shares | US71654V4086 | 1/25/2011 | 347,892 | $35.98 |
| ADR Common Shares | US71654V4086 | 1/26/2011 | 106,408 | $35.88 |
| ADR Common Shares | US71654V4086 | 2/9/2011 | 39,710 | $35.88 |
| ADR Common Shares | US71654V4086 | 2/22/2011 | 80,700 | $38.88 |
| ADR Common Shares | US71654V4086 | 2/23/2011 | 58,259 | $40.13 |
| ADR Common Shares | US71654V4086 | 2/24/2011 | 88,612 | $40.51 |
| ADR Common Shares | US71654V4086 | 3/4/2011 | 374,000 | $41.16 |
| ADR Common Shares | US71654V4086 | 3/11/2011 | 11,724 | $39.20 |
| ADR Common Shares | US71654V4086 | 3/14/2011 | 300,906 | $39.49 |
| ADR Common Shares | US71654V4086 | 3/15/2011 | 435,213 | $39.13 |
| ADR Common Shares | US71654V4086 | 3/16/2011 | 16,987 | $39.67 |
| ADR Common Shares | US71654V4086 | 3/16/2011 | 169,891 | $38.70 |
| ADR Common Shares | US71654V4086 | 3/17/2011 | 156,907 | $39.08 |
| ADR Common Shares | US71654V4086 | 3/21/2011 | 244,432 | $39.55 |
| ADR Common Shares | US71654V4086 | 3/23/2011 | 2,270 | $40.09 |
| ADR Common Shares | US71654V4086 | 3/30/2011 | 143,864 | $40.43 |
| ADR Common Shares | US71654V4086 | 3/31/2011 | 174,926 | $40.53 |
| ADR Common Shares | US71654V4086 | 4/1/2011 | 57,410 | $41.37 |
| ADR Common Shares | US71654V4086 | 4/4/2011 | 81,406 | $41.38 |
| ADR Common Shares | US71654V4086 | 4/5/2011 | 48,794 | $40.89 |
| ADR Common Shares | US71654V4086 | 4/20/2011 | 348,099 | $37.60 |
| ADR Common Shares | US71654V4086 | 4/21/2011 | 141,002 | $38.19 |
| ADR Common Shares | US71654V4086 | 4/25/2011 | 10,699 | $37.73 |
| ADR Common Shares | US71654V4086 | 4/29/2011 | 84,460 | $37.10 |
| ADR Common Shares | US71654V4086 | 5/2/2011 | 175,003 | $37.43 |
| ADR Common Shares | US71654V4086 | 5/3/2011 | 152,778 | $36.68 |
| ADR Common Shares | US71654V4086 | 5/4/2011 | 63,048 | $35.76 |
| ADR Common Shares | US71654V4086 | 5/5/2011 | 18,071 | $34.92 |
| ADR Common Shares | US71654V4086 | 5/9/2011 | 188,075 | $34.49 |
| ADR Common Shares | US71654V4086 | 5/10/2011 | 327,925 | $35.18 |
| ADR Common Shares | US71654V4086 | 5/11/2011 | 159,700 | $34.34 |
| ADR Common Shares | US71654V4086 | 5/18/2011 | 384,583 | $34.38 |
| ADR Common Shares | US71654V4086 | 5/19/2011 | 220,017 | $33.83 |
| ADR Common Shares | US71654V4086 | 9/14/2011 | 201,662 | $26.01 |
| ADR Common Shares | US71654V4086 | 9/16/2011 | 221,358 | $26.60 |
| ADR Common Shares | US71654V4086 | 9/19/2011 | 298,287 | $25.67 |
| ADR Common Shares | US71654V4086 | 9/23/2011 | 56,082 | $22.95 |
| ADR Common Shares | US71654V4086 | 9/28/2011 | 83,511 | $23.71 |
| ADR Common Shares | US71654V4086 | 10/14/2011 | 21,142 | $24.38 |
| ADR Common Shares | US71654V4086 | 10/17/2011 | 1,408 | $24.17 |
| ADR Common Shares | US71654V4086 | 12/16/2011 | 175,750 | $24.74 |
| ADR Common Shares | US71654V4086 | 2/29/2012 | 261,500 | $29.87 |
| ADR Common Shares | US71654V4086 | 3/1/2012 | 61,500 | $30.03 |
| ADR Common Shares | US71654V4086 | 3/14/2012 | 171,492 | $28.43 |
| ADR Common Shares | US71654V4086 | 3/15/2012 | 283,899 | $28.11 |

| ADR Common Shares | US71654V4086 | 3/16/2012 | 100 | $27.76 |
| ADR Common Shares | US71654V4086 | 3/19/2012 | 125,059 | $28.12 |
| ADR Common Shares | US71654V4086 | 4/5/2012 | 47,888 | $25.13 |
| ADR Common Shares | US71654V4086 | 4/9/2012 | 145,558 | $24.81 |
| ADR Common Shares | US71654V4086 | 4/10/2012 | 259,905 | $24.34 |
| ADR Common Shares | US71654V4086 | 4/11/2012 | 258,526 | $24.39 |
| ADR Common Shares | US71654V4086 | 4/12/2012 | 6,151 | $24.94 |
| ADR Common Shares | US71654V4086 | 4/13/2012 | 7,423 | $24.64 |
| ADR Common Shares | US71654V4086 | 4/16/2012 | 1,184 | $24.31 |
| ADR Common Shares | US71654V4086 | 5/11/2012 | 282,097 | $21.12 |
| ADR Common Shares | US71654V4086 | 5/14/2012 | 94,242 | $20.10 |
| ADR Common Shares | US71654V4086 | 5/15/2012 | 335,207 | $19.70 |
| ADR Common Shares | US71654V4086 | 5/16/2012 | 358,854 | $20.08 |
| ADR Common Shares | US71654V4086 | 6/5/2012 | 254,374 | $19.54 |
| ADR Common Shares | US71654V4086 | 6/6/2012 | 435,520 | $19.86 |
| ADR Common Shares | US71654V4086 | 6/7/2012 | 201,106 | $20.18 |
| ADR Common Shares | US71654V4086 | 6/8/2012 | 9,900 | $19.54 |
| ADR Common Shares | US71654V4086 | 7/11/2012 | 107,148 | $18.65 |
| ADR Common Shares | US71654V4086 | 7/12/2012 | 15,715 | $18.18 |
| ADR Common Shares | US71654V4086 | 7/13/2012 | 173,560 | $19.74 |
| ADR Common Shares | US71654V4086 | 7/16/2012 | 191,415 | $19.62 |
| ADR Common Shares | US71654V4086 | 7/17/2012 | 173,221 | $19.52 |
| ADR Common Shares | US71654V4086 | 7/20/2012 | 130,446 | $19.65 |
| ADR Common Shares | US71654V4086 | 7/24/2012 | 210,147 | $18.76 |
| ADR Common Shares | US71654V4086 | 7/25/2012 | 46,107 | $18.85 |
| ADR Common Shares | US71654V4086 | 7/26/2012 | 13,300 | $19.36 |
| ADR Common Shares | US71654V4086 | 11/27/2012 | 230,401 | $18.34 |
| ADR Common Shares | US71654V4086 | 1/7/2013 | 7,200 | $20.03 |
| ADR Common Shares | US71654V4086 | 1/8/2013 | 143,361 | $19.51 |
| ADR Common Shares | US71654V4086 | 1/9/2013 | 49,439 | $19.70 |
| ADR Common Shares | US71654V4086 | 1/16/2013 | 17,358 | $19.62 |
| ADR Common Shares | US71654V4086 | 1/17/2013 | 131,258 | $19.76 |
| ADR Common Shares | US71654V4086 | 1/18/2013 | 136,889 | $19.60 |
| ADR Common Shares | US71654V4086 | 1/23/2013 | 110,466 | $19.46 |
| ADR Common Shares | US71654V4086 | 1/24/2013 | 102,470 | $19.57 |
| ADR Common Shares | US71654V4086 | 1/31/2013 | 5,116 | $18.31 |
| ADR Common Shares | US71654V4086 | 2/6/2013 | 179,911 | $16.46 |
| ADR Common Shares | US71654V4086 | 2/7/2013 | 286,881 | $16.37 |
| ADR Common Shares | US71654V4086 | 2/8/2013 | 519,066 | $16.13 |
| ADR Common Shares | US71654V4086 | 2/11/2013 | 112,917 | $16.01 |
| ADR Common Shares | US71654V4086 | 2/28/2013 | 135,407 | $14.74 |
| ADR Common Shares | US71654V4086 | 3/4/2013 | 619,144 | $14.53 |
| ADR Common Shares | US71654V4086 | 6/21/2013 | 49,446 | $13.87 |
| ADR Common Shares | US71654V4086 | 7/23/2013 | 500,000 | $14.58 |
| ADR Common Shares | US71654V4086 | 8/5/2013 | 462,299 | $13.82 |
| ADR Common Shares | US71654V4086 | 8/6/2013 | 387,550 | $13.47 |
| ADR Common Shares | US71654V4086 | 8/7/2013 | 256,224 | $13.52 |

| ADR Common Shares | US71654V4086 | 9/11/2013 | 353,783 | $15.33 |
|---|---|---|---|---|

**Emerging Markets Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| ADR Preferred Shares | US71654V1017 | 4/26/2010 | 77,477 | $38.51 |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 4/27/2010 | 57,323 | $37.05 |
| ADR Preferred Shares | US71654V1017 | 5/6/2010 | 64,546 | $33.20 |
| ADR Preferred Shares | US71654V1017 | 5/13/2010 | 82,347 | $34.06 |
| ADR Preferred Shares | US71654V1017 | 5/14/2010 | 71,091 | $32.84 |
| ADR Preferred Shares | US71654V1017 | 5/19/2010 | 34,416 | $31.84 |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 439,408 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 2/2/2011 | 102,967 | $34.09 |
| ADR Preferred Shares | US71654V1017 | 2/3/2011 | 103,744 | $33.98 |
| ADR Preferred Shares | US71654V1017 | 2/8/2011 | 89,406 | $33.00 |
| ADR Preferred Shares | US71654V1017 | 2/9/2011 | 60,865 | $32.02 |
| ADR Preferred Shares | US71654V1017 | 2/10/2011 | 8,918 | $32.28 |
| ADR Preferred Shares | US71654V1017 | 3/17/2011 | 15,245 | $34.05 |
| ADR Preferred Shares | US71654V1017 | 3/18/2011 | 24,430 | $34.08 |
| ADR Preferred Shares | US71654V1017 | 3/21/2011 | 20,713 | $34.46 |
| ADR Preferred Shares | US71654V1017 | 3/28/2011 | 1,313 | $35.21 |
| ADR Preferred Shares | US71654V1017 | 3/29/2011 | 79,842 | $34.97 |
| ADR Preferred Shares | US71654V1017 | 3/30/2011 | 6,605 | $35.34 |
| ADR Preferred Shares | US71654V1017 | 3/31/2011 | 6,052 | $35.55 |
| ADR Preferred Shares | US71654V1017 | 4/4/2011 | 6,488 | $36.13 |
| ADR Preferred Shares | US71654V1017 | 4/5/2011 | 21,030 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 4/6/2011 | 38,393 | $35.82 |
| ADR Preferred Shares | US71654V1017 | 5/11/2011 | 46,164 | $30.33 |
| ADR Preferred Shares | US71654V1017 | 5/12/2011 | 14,450 | $29.71 |
| ADR Preferred Shares | US71654V1017 | 5/13/2011 | 3,221 | $29.32 |
| ADR Preferred Shares | US71654V1017 | 5/17/2011 | 2,865 | $30.37 |
| ADR Preferred Shares | US71654V1017 | 5/18/2011 | 43,642 | $30.71 |
| ADR Preferred Shares | US71654V1017 | 5/20/2011 | 10,203 | $30.15 |
| ADR Preferred Shares | US71654V1017 | 5/23/2011 | 41,970 | $29.33 |
| ADR Preferred Shares | US71654V1017 | 5/24/2011 | 56,000 | $29.99 |
| ADR Preferred Shares | US71654V1017 | 9/28/2011 | 28,102 | $21.87 |
| ADR Preferred Shares | US71654V1017 | 9/29/2011 | 2,749 | $21.38 |
| ADR Preferred Shares | US71654V1017 | 9/30/2011 | 15,508 | $20.86 |
| ADR Preferred Shares | US71654V1017 | 10/3/2011 | 9,644 | $20.24 |
| ADR Preferred Shares | US71654V1017 | 10/4/2011 | 8,197 | $19.56 |
| ADR Preferred Shares | US71654V1017 | 11/1/2011 | 667 | $24.04 |
| ADR Preferred Shares | US71654V1017 | 11/2/2011 | 3,300 | $25.08 |
| ADR Preferred Shares | US71654V1017 | 11/3/2011 | 38,238 | $25.22 |
| ADR Preferred Shares | US71654V1017 | 11/4/2011 | 49,900 | $25.37 |
| ADR Preferred Shares | US71654V1017 | 11/7/2011 | 3,155 | $26.00 |
| ADR Preferred Shares | US71654V1017 | 11/8/2011 | 19,718 | $26.31 |
| ADR Preferred Shares | US71654V1017 | 11/18/2011 | 24,343 | $24.53 |
| ADR Preferred Shares | US71654V1017 | 11/21/2011 | 10,555 | $24.01 |

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 11/22/2011 | 173,057 | $24.25 |
| ADR Preferred Shares | US71654V1017 | 11/25/2011 | 66,438 | $23.06 |
| ADR Preferred Shares | US71654V1017 | 11/28/2011 | 6,700 | $23.44 |
| ADR Preferred Shares | US71654V1017 | 12/12/2011 | 68,037 | $24.48 |
| ADR Preferred Shares | US71654V1017 | 12/14/2011 | 66,963 | $23.78 |
| ADR Preferred Shares | US71654V1017 | 12/22/2011 | 42,767 | $23.94 |
| ADR Preferred Shares | US71654V1017 | 12/23/2011 | 14,430 | $24.04 |
| ADR Preferred Shares | US71654V1017 | 12/27/2011 | 303 | $24.05 |
| ADR Preferred Shares | US71654V1017 | 2/8/2012 | 23,100 | $30.10 |
| ADR Preferred Shares | US71654V1017 | 2/10/2012 | 98,800 | $27.58 |
| ADR Preferred Shares | US71654V1017 | 2/13/2012 | 13,400 | $27.99 |
| ADR Preferred Shares | US71654V1017 | 2/23/2012 | 98,000 | $27.90 |
| ADR Preferred Shares | US71654V1017 | 2/28/2012 | 1,200 | $28.61 |
| ADR Preferred Shares | US71654V1017 | 3/20/2012 | 87,932 | $26.46 |
| ADR Preferred Shares | US71654V1017 | 3/21/2012 | 40,618 | $26.48 |
| ADR Preferred Shares | US71654V1017 | 3/26/2012 | 50,250 | $26.47 |
| ADR Preferred Shares | US71654V1017 | 5/22/2012 | 74,219 | $19.63 |
| ADR Preferred Shares | US71654V1017 | 6/5/2012 | 7,995 | $18.98 |
| ADR Preferred Shares | US71654V1017 | 9/14/2012 | 33,934 | $23.39 |
| ADR Preferred Shares | US71654V1017 | 9/17/2012 | 38,416 | $23.00 |
| ADR Preferred Shares | US71654V1017 | 9/18/2012 | 7,700 | $22.94 |
| ADR Preferred Shares | US71654V1017 | 11/6/2012 | 1,074 | $21.06 |
| ADR Preferred Shares | US71654V1017 | 11/16/2012 | 75,317 | $18.52 |
| ADR Preferred Shares | US71654V1017 | 11/19/2012 | 1,531 | $18.84 |
| ADR Preferred Shares | US71654V1017 | 11/20/2012 | 80,262 | $18.58 |
| ADR Preferred Shares | US71654V1017 | 11/21/2012 | 79,511 | $18.17 |
| ADR Preferred Shares | US71654V1017 | 11/23/2012 | 11,504 | $18.15 |
| ADR Preferred Shares | US71654V1017 | 11/26/2012 | 36,687 | $17.99 |
| ADR Preferred Shares | US71654V1017 | 11/27/2012 | 123,463 | $18.08 |
| ADR Preferred Shares | US71654V1017 | 11/28/2012 | 602 | $17.62 |
| ADR Preferred Shares | US71654V1017 | 11/29/2012 | 182,310 | $18.01 |
| ADR Preferred Shares | US71654V1017 | 11/30/2012 | 22,847 | $17.89 |
| ADR Preferred Shares | US71654V1017 | 1/28/2013 | 65,127 | $19.38 |
| ADR Preferred Shares | US71654V1017 | 5/6/2013 | 15,143 | $19.76 |
| ADR Preferred Shares | US71654V1017 | 5/8/2013 | 140,277 | $20.44 |
| ADR Preferred Shares | US71654V1017 | 5/9/2013 | 56,905 | $20.16 |
| ADR Preferred Shares | US71654V1017 | 5/10/2013 | 69,747 | $19.70 |
| ADR Preferred Shares | US71654V1017 | 5/14/2013 | 99,668 | $19.36 |
| ADR Preferred Shares | US71654V1017 | 5/17/2013 | 18,333 | $19.54 |
| ADR Preferred Shares | US71654V1017 | 5/21/2013 | 25,552 | $19.64 |
| ADR Preferred Shares | US71654V1017 | 6/21/2013 | 11,069 | $14.77 |
| ADR Preferred Shares | US71654V1017 | 6/24/2013 | 2,500 | $14.19 |
| ADR Preferred Shares | US71654V1017 | 6/25/2013 | 10,777 | $14.48 |
| ADR Preferred Shares | US71654V1017 | 8/5/2013 | 26,896 | $14.53 |
| ADR Preferred Shares | US71654V1017 | 8/6/2013 | 24,458 | $14.27 |
| ADR Preferred Shares | US71654V1017 | 8/8/2013 | 2,148 | $14.24 |
| ADR Preferred Shares | US71654V1017 | 8/13/2013 | 15,684 | $14.24 |

| ADR Preferred Shares | US71654V1017 | 8/14/2013 | 5,257 | $14.36 |
| ADR Preferred Shares | US71654V1017 | 9/5/2013 | 3,050 | $14.65 |
| ADR Preferred Shares | US71654V1017 | 9/6/2013 | 219,942 | $15.49 |
| ADR Preferred Shares | US71654V1017 | 9/9/2013 | 24,146 | $15.79 |
| ADR Preferred Shares | US71654V1017 | 9/17/2013 | 5,028 | $16.46 |
| ADR Preferred Shares | US71654V1017 | 9/18/2013 | 39,817 | $16.42 |
| ADR Preferred Shares | US71654V1017 | 9/19/2013 | 2,300 | $17.24 |
| ADR Preferred Shares | US71654V1017 | 9/20/2013 | 55,518 | $17.32 |

**Emerging Markets Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| ADR Common Shares | US71654V4086 | 5/6/2010 | 121,120 | $37.98 |
| ADR Common Shares | US71654V4086 | 5/14/2010 | 26,347 | $36.99 |
| ADR Common Shares | US71654V4086 | 5/19/2010 | 9,496 | $35.64 |
| ADR Common Shares | US71654V4086 | 5/21/2010 | 60,118 | $34.13 |
| ADR Common Shares | US71654V4086 | 5/25/2010 | 60,119 | $32.18 |
| ADR Common Shares | US71654V4086 | 9/24/2010 | 427,527 | $34.49 |
| ADR Common Shares | US71654V4086 | 3/17/2011 | 70,831 | $39.08 |
| ADR Common Shares | US71654V4086 | 3/18/2011 | 58,226 | $39.12 |
| ADR Common Shares | US71654V4086 | 3/21/2011 | 52,654 | $39.55 |
| ADR Common Shares | US71654V4086 | 3/28/2011 | 90 | $40.50 |
| ADR Common Shares | US71654V4086 | 3/29/2011 | 76,293 | $40.19 |
| ADR Common Shares | US71654V4086 | 3/30/2011 | 3,513 | $40.50 |
| ADR Common Shares | US71654V4086 | 3/31/2011 | 9,208 | $40.58 |
| ADR Common Shares | US71654V4086 | 4/4/2011 | 12,996 | $41.38 |
| ADR Common Shares | US71654V4086 | 4/5/2011 | 7,790 | $40.89 |
| ADR Common Shares | US71654V4086 | 4/6/2011 | 29,129 | $40.89 |
| ADR Common Shares | US71654V4086 | 5/11/2011 | 10,200 | $34.51 |
| ADR Common Shares | US71654V4086 | 5/18/2011 | 52,922 | $34.38 |
| ADR Common Shares | US71654V4086 | 5/20/2011 | 30,278 | $34.00 |
| ADR Common Shares | US71654V4086 | 5/24/2011 | 2,400 | $33.97 |
| ADR Common Shares | US71654V4086 | 5/26/2011 | 21,800 | $33.62 |
| ADR Common Shares | US71654V4086 | 8/16/2011 | 1,616 | $29.00 |
| ADR Common Shares | US71654V4086 | 8/17/2011 | 6 | $29.35 |
| ADR Common Shares | US71654V4086 | 9/28/2011 | 14,356 | $23.89 |
| ADR Common Shares | US71654V4086 | 9/29/2011 | 38,444 | $23.26 |
| ADR Common Shares | US71654V4086 | 10/28/2011 | 14,300 | $26.84 |
| ADR Common Shares | US71654V4086 | 10/31/2011 | 4,400 | $27.13 |
| ADR Common Shares | US71654V4086 | 11/1/2011 | 7,150 | $25.61 |
| ADR Common Shares | US71654V4086 | 11/2/2011 | 4,200 | $26.74 |
| ADR Common Shares | US71654V4086 | 11/3/2011 | 2,600 | $26.90 |
| ADR Common Shares | US71654V4086 | 11/4/2011 | 96,357 | $27.05 |
| ADR Common Shares | US71654V4086 | 11/7/2011 | 7,222 | $27.84 |
| ADR Common Shares | US71654V4086 | 11/8/2011 | 5,771 | $28.35 |
| ADR Common Shares | US71654V4086 | 11/18/2011 | 46,450 | $26.55 |
| ADR Common Shares | US71654V4086 | 11/21/2011 | 29,084 | $25.76 |
| ADR Common Shares | US71654V4086 | 11/22/2011 | 89,016 | $26.11 |

| ADR Common Shares | US71654V4086 | 12/12/2011 | 64,450 | $26.18 |
| ADR Common Shares | US71654V4086 | 12/22/2011 | 27,981 | $25.47 |
| ADR Common Shares | US71654V4086 | 12/23/2011 | 58,841 | $25.57 |
| ADR Common Shares | US71654V4086 | 12/27/2011 | 778 | $25.56 |
| ADR Common Shares | US71654V4086 | 2/8/2012 | 13,501 | $32.43 |
| ADR Common Shares | US71654V4086 | 2/10/2012 | 77,349 | $29.54 |
| ADR Common Shares | US71654V4086 | 2/23/2012 | 55,600 | $29.42 |
| ADR Common Shares | US71654V4086 | 3/20/2012 | 90,350 | $27.24 |
| ADR Common Shares | US71654V4086 | 3/26/2012 | 40,250 | $27.39 |
| ADR Common Shares | US71654V4086 | 4/4/2012 | 13,900 | $25.35 |
| ADR Common Shares | US71654V4086 | 5/22/2012 | 69,850 | $20.45 |
| ADR Common Shares | US71654V4086 | 9/17/2012 | 76,266 | $23.83 |
| ADR Common Shares | US71654V4086 | 9/18/2012 | 7,184 | $23.77 |
| ADR Common Shares | US71654V4086 | 11/5/2012 | 18,150 | $21.40 |
| ADR Common Shares | US71654V4086 | 11/9/2012 | 6,975 | $20.91 |
| ADR Common Shares | US71654V4086 | 11/12/2012 | 80,823 | $20.51 |
| ADR Common Shares | US71654V4086 | 11/13/2012 | 39,752 | $20.25 |
| ADR Common Shares | US71654V4086 | 11/16/2012 | 79,841 | $18.95 |
| ADR Common Shares | US71654V4086 | 11/19/2012 | 32,601 | $19.30 |
| ADR Common Shares | US71654V4086 | 11/20/2012 | 34,462 | $19.03 |
| ADR Common Shares | US71654V4086 | 11/29/2012 | 26,058 | $18.38 |
| ADR Common Shares | US71654V4086 | 11/30/2012 | 11,144 | $18.19 |
| ADR Common Shares | US71654V4086 | 1/9/2013 | 3,566 | $19.70 |
| ADR Common Shares | US71654V4086 | 1/28/2013 | 128,938 | $19.63 |
| ADR Common Shares | US71654V4086 | 1/29/2013 | 3,378 | $19.20 |
| ADR Common Shares | US71654V4086 | 5/22/2013 | 44,278 | $18.71 |
| ADR Common Shares | US71654V4086 | 5/23/2013 | 215,720 | $18.09 |
| ADR Common Shares | US71654V4086 | 5/24/2013 | 140,650 | $18.07 |
| ADR Common Shares | US71654V4086 | 5/29/2013 | 14,960 | $17.88 |
| ADR Common Shares | US71654V4086 | 5/31/2013 | 12,800 | $17.94 |
| ADR Common Shares | US71654V4086 | 7/30/2013 | 9,749 | $13.81 |
| ADR Common Shares | US71654V4086 | 8/5/2013 | 43,001 | $13.82 |
| ADR Common Shares | US71654V4086 | 8/6/2013 | 8,120 | $13.47 |
| ADR Common Shares | US71654V4086 | 8/7/2013 | 5,370 | $13.52 |
| ADR Common Shares | US71654V4086 | 9/5/2013 | 21,615 | $14.47 |
| ADR Common Shares | US71654V4086 | 9/6/2013 | 156,999 | $14.63 |
| ADR Common Shares | US71654V4086 | 9/17/2013 | 83,770 | $15.55 |

**The Emerging Markets Series, a series of The DFA Investment Trust Company**

| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 170,441 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 11/9/2011 | 28,200 | $25.17 |
| ADR Preferred Shares | US71654V1017 | 4/4/2012 | 22,032 | $24.20 |
| ADR Preferred Shares | US71654V1017 | 4/16/2012 | 20,398 | $23.43 |
| ADR Preferred Shares | US71654V1017 | 4/18/2012 | 38,670 | $23.06 |
| ADR Preferred Shares | US71654V1017 | 4/26/2012 | 31,100 | $22.33 |
| ADR Preferred Shares | US71654V1017 | 5/1/2012 | 12,450 | $22.22 |

| ADR Preferred Shares | US71654V1017 | 5/25/2012 | 19,000 | $18.72 |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 6/4/2012 | 4,200 | $18.67 |
| ADR Preferred Shares | US71654V1017 | 9/26/2012 | 27,096 | $22.20 |
| ADR Preferred Shares | US71654V1017 | 9/27/2012 | 17,304 | $22.52 |
| ADR Preferred Shares | US71654V1017 | 10/24/2012 | 12,100 | $21.36 |
| ADR Preferred Shares | US71654V1017 | 11/6/2012 | 2,126 | $21.06 |
| ADR Preferred Shares | US71654V1017 | 11/9/2012 | 2,400 | $20.17 |
| ADR Preferred Shares | US71654V1017 | 11/15/2012 | 7,049 | $18.79 |
| ADR Preferred Shares | US71654V1017 | 5/6/2013 | 1,257 | $19.76 |
| ADR Preferred Shares | US71654V1017 | 5/8/2013 | 45,176 | $20.44 |
| ADR Preferred Shares | US71654V1017 | 5/9/2013 | 18,287 | $20.14 |
| ADR Preferred Shares | US71654V1017 | 5/10/2013 | 27,969 | $19.70 |
| ADR Preferred Shares | US71654V1017 | 5/13/2013 | 8,623 | $19.44 |
| ADR Preferred Shares | US71654V1017 | 5/14/2013 | 23,696 | $19.36 |
| ADR Preferred Shares | US71654V1017 | 5/17/2013 | 4,411 | $19.54 |
| ADR Preferred Shares | US71654V1017 | 5/21/2013 | 6,058 | $19.64 |
| ADR Preferred Shares | US71654V1017 | 5/22/2013 | 21,800 | $19.65 |
| ADR Preferred Shares | US71654V1017 | 5/23/2013 | 35,538 | $19.26 |
| ADR Preferred Shares | US71654V1017 | 5/28/2013 | 2,055 | $19.62 |
| ADR Preferred Shares | US71654V1017 | 5/31/2013 | 19,561 | $18.78 |
| ADR Preferred Shares | US71654V1017 | 6/10/2013 | 48,049 | $17.67 |

**The Emerging Markets Series, a series of The DFA Investment Trust Company**

| ADR Common Shares | US71654V4086 | 9/24/2010 | 140,643 | $34.49 |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 12/20/2011 | 49,955 | $25.16 |
| ADR Common Shares | US71654V4086 | 12/21/2011 | 64,800 | $24.80 |
| ADR Common Shares | US71654V4086 | 12/22/2011 | 595 | $25.49 |
| ADR Common Shares | US71654V4086 | 4/4/2012 | 39,431 | $25.38 |
| ADR Common Shares | US71654V4086 | 4/16/2012 | 34,559 | $24.31 |
| ADR Common Shares | US71654V4086 | 4/18/2012 | 26,660 | $23.95 |
| ADR Common Shares | US71654V4086 | 4/26/2012 | 400 | $23.36 |
| ADR Common Shares | US71654V4086 | 5/1/2012 | 13,650 | $23.53 |
| ADR Common Shares | US71654V4086 | 5/25/2012 | 16,550 | $19.47 |
| ADR Common Shares | US71654V4086 | 9/26/2012 | 14,600 | $22.97 |
| ADR Common Shares | US71654V4086 | 9/27/2012 | 33,100 | $23.28 |
| ADR Common Shares | US71654V4086 | 10/24/2012 | 14,250 | $22.09 |
| ADR Common Shares | US71654V4086 | 11/6/2012 | 14,905 | $21.74 |
| ADR Common Shares | US71654V4086 | 11/7/2012 | 25,495 | $21.33 |
| ADR Common Shares | US71654V4086 | 5/22/2013 | 102,099 | $18.71 |
| ADR Common Shares | US71654V4086 | 5/23/2013 | 12,554 | $18.09 |
| ADR Common Shares | US71654V4086 | 5/24/2013 | 1,866 | $18.07 |
| ADR Common Shares | US71654V4086 | 6/10/2013 | 8,098 | $16.54 |
| ADR Common Shares | US71654V4086 | 6/11/2013 | 1,394 | $16.12 |

**Emerging Markets Social Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 68,560 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 2/10/2011 | 16,600 | $32.27 |
| ADR Preferred Shares | US71654V1017 | 2/11/2011 | 3,797 | $32.12 |
| ADR Preferred Shares | US71654V1017 | 2/25/2011 | 12,049 | $34.75 |
| ADR Preferred Shares | US71654V1017 | 3/3/2011 | 11,209 | $35.63 |
| ADR Preferred Shares | US71654V1017 | 3/29/2011 | 15,270 | $34.98 |
| ADR Preferred Shares | US71654V1017 | 3/30/2011 | 1,489 | $35.36 |
| ADR Preferred Shares | US71654V1017 | 3/31/2011 | 2,192 | $35.54 |
| ADR Preferred Shares | US71654V1017 | 4/4/2011 | 12,986 | $36.14 |
| ADR Preferred Shares | US71654V1017 | 4/5/2011 | 10,532 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 4/6/2011 | 22,651 | $35.67 |
| ADR Preferred Shares | US71654V1017 | 4/26/2011 | 864 | $33.93 |
| ADR Preferred Shares | US71654V1017 | 5/2/2011 | 759 | $33.48 |
| ADR Preferred Shares | US71654V1017 | 6/6/2011 | 46,525 | $29.77 |
| ADR Preferred Shares | US71654V1017 | 6/7/2011 | 7,075 | $29.72 |
| ADR Preferred Shares | US71654V1017 | 3/5/2012 | 14,900 | $28.80 |
| ADR Preferred Shares | US71654V1017 | 4/10/2012 | 3,650 | $23.55 |
| ADR Preferred Shares | US71654V1017 | 4/13/2012 | 300 | $23.69 |
| ADR Preferred Shares | US71654V1017 | 5/3/2012 | 4,850 | $22.76 |
| ADR Preferred Shares | US71654V1017 | 5/23/2012 | 5,023 | $18.81 |
| ADR Preferred Shares | US71654V1017 | 5/24/2012 | 11,300 | $18.37 |
| ADR Preferred Shares | US71654V1017 | 6/6/2012 | 114 | $19.04 |
| ADR Preferred Shares | US71654V1017 | 6/20/2012 | 20,900 | $19.68 |
| ADR Preferred Shares | US71654V1017 | 6/22/2012 | 15,750 | $18.75 |
| ADR Preferred Shares | US71654V1017 | 2/27/2013 | 18,645 | $17.06 |
| ADR Preferred Shares | US71654V1017 | 5/8/2013 | 8,095 | $20.44 |
| ADR Preferred Shares | US71654V1017 | 5/9/2013 | 11,887 | $20.14 |
| ADR Preferred Shares | US71654V1017 | 5/23/2013 | 1,034 | $19.25 |
| ADR Preferred Shares | US71654V1017 | 5/31/2013 | 1,520 | $18.83 |
| ADR Preferred Shares | US71654V1017 | 6/4/2013 | 2,339 | $18.95 |
| ADR Preferred Shares | US71654V1017 | 12/24/2014 | 13,500 | $7.96 |

**Emerging Markets Social Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 9/24/2010 | 66,706 | $34.49 |
| ADR Common Shares | US71654V4086 | 3/8/2011 | 3,000 | $40.54 |
| ADR Common Shares | US71654V4086 | 3/29/2011 | 19,173 | $40.19 |
| ADR Common Shares | US71654V4086 | 3/30/2011 | 2,269 | $40.41 |
| ADR Common Shares | US71654V4086 | 3/31/2011 | 3,619 | $40.52 |
| ADR Common Shares | US71654V4086 | 4/1/2011 | 32,200 | $41.37 |
| ADR Common Shares | US71654V4086 | 6/6/2011 | 35,800 | $32.98 |
| ADR Common Shares | US71654V4086 | 3/5/2012 | 14,426 | $30.18 |
| ADR Common Shares | US71654V4086 | 4/18/2012 | 6,750 | $23.95 |
| ADR Common Shares | US71654V4086 | 5/3/2012 | 400 | $23.78 |
| ADR Common Shares | US71654V4086 | 5/23/2012 | 7,150 | $19.61 |
| ADR Common Shares | US71654V4086 | 6/20/2012 | 22,300 | $20.47 |

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 6/22/2012 | 8,250 | $19.53 |
| ADR Common Shares | US71654V4086 | 1/9/2013 | 9,923 | $19.70 |
| ADR Common Shares | US71654V4086 | 5/29/2013 | 1,100 | $17.88 |
| ADR Common Shares | US71654V4086 | 5/31/2013 | 3,477 | $17.94 |
| ADR Common Shares | US71654V4086 | 6/3/2013 | 1,357 | $17.78 |
| ADR Common Shares | US71654V4086 | 6/4/2013 | 14,868 | $17.84 |
| ADR Common Shares | US71654V4086 | 12/24/2014 | 83,700 | $7.55 |

**Dimensional Emerging Markets Trust**

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 32,842 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 6/2/2011 | 23,882 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 8/30/2011 | 1,364 | $25.90 |
| ADR Preferred Shares | US71654V1017 | 8/31/2011 | 15,000 | $26.45 |
| ADR Preferred Shares | US71654V1017 | 9/1/2011 | 700 | $26.52 |
| ADR Preferred Shares | US71654V1017 | 10/14/2011 | 282 | $22.63 |
| ADR Preferred Shares | US71654V1017 | 10/17/2011 | 2,000 | $22.10 |
| ADR Preferred Shares | US71654V1017 | 11/8/2011 | 2,800 | $26.31 |
| ADR Preferred Shares | US71654V1017 | 4/18/2012 | 6,140 | $22.98 |
| ADR Preferred Shares | US71654V1017 | 4/19/2012 | 3,400 | $23.12 |
| ADR Preferred Shares | US71654V1017 | 4/20/2012 | 10,164 | $23.06 |
| ADR Preferred Shares | US71654V1017 | 4/23/2012 | 1,371 | $22.29 |
| ADR Preferred Shares | US71654V1017 | 7/11/2012 | 500 | $18.11 |
| ADR Preferred Shares | US71654V1017 | 7/12/2012 | 3,500 | $17.67 |

**Dimensional Emerging Markets Trust**

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 9/24/2010 | 29,621 | $34.49 |
| ADR Common Shares | US71654V4086 | 1/28/2011 | 12,820 | $35.73 |
| ADR Common Shares | US71654V4086 | 5/9/2011 | 5,121 | $34.49 |
| ADR Common Shares | US71654V4086 | 5/10/2011 | 2,485 | $35.24 |
| ADR Common Shares | US71654V4086 | 5/16/2011 | 2,857 | $33.77 |
| ADR Common Shares | US71654V4086 | 6/2/2011 | 27,250 | $33.97 |
| ADR Common Shares | US71654V4086 | 8/30/2011 | 31,600 | $28.47 |
| ADR Common Shares | US71654V4086 | 10/17/2011 | 11,000 | $24.17 |
| ADR Common Shares | US71654V4086 | 11/7/2011 | 1,278 | $27.84 |
| ADR Common Shares | US71654V4086 | 11/8/2011 | 1,022 | $28.35 |
| ADR Common Shares | US71654V4086 | 4/18/2012 | 6,964 | $23.94 |
| ADR Common Shares | US71654V4086 | 4/19/2012 | 2,009 | $24.14 |
| ADR Common Shares | US71654V4086 | 4/20/2012 | 1,451 | $24.07 |
| ADR Common Shares | US71654V4086 | 4/23/2012 | 2,619 | $23.38 |
| ADR Common Shares | US71654V4086 | 6/18/2013 | 14,888 | $15.30 |
| ADR Common Shares | US71654V4086 | 6/19/2013 | 17,112 | $15.29 |

**Emerging Markets Value Fund, a sub-fund of Dimensional Funds plc**

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 4/14/2010 | 51,091 | $39.37 |
| ADR Preferred Shares | US71654V1017 | 4/15/2010 | 23,909 | $38.95 |

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 4/23/2010 | 68,163 | $38.36 |
| ADR Preferred Shares | US71654V1017 | 4/26/2010 | 32,667 | $38.51 |
| ADR Preferred Shares | US71654V1017 | 4/27/2010 | 23,450 | $37.05 |
| ADR Preferred Shares | US71654V1017 | 5/6/2010 | 91,199 | $32.25 |
| ADR Preferred Shares | US71654V1017 | 5/7/2010 | 28,801 | $32.01 |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 95,888 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 1/4/2011 | 80,000 | $32.53 |
| ADR Preferred Shares | US71654V1017 | 1/5/2011 | 118,611 | $33.14 |
| ADR Preferred Shares | US71654V1017 | 1/7/2011 | 2,100 | $33.28 |
| ADR Preferred Shares | US71654V1017 | 1/10/2011 | 37,274 | $32.30 |
| ADR Preferred Shares | US71654V1017 | 1/11/2011 | 15,607 | $32.90 |
| ADR Preferred Shares | US71654V1017 | 1/20/2011 | 15,281 | $32.75 |
| ADR Preferred Shares | US71654V1017 | 1/28/2011 | 39,738 | $32.32 |
| ADR Preferred Shares | US71654V1017 | 2/9/2011 | 91,908 | $32.14 |
| ADR Preferred Shares | US71654V1017 | 2/16/2011 | 31,000 | $33.04 |
| ADR Preferred Shares | US71654V1017 | 2/18/2011 | 38,087 | $33.44 |
| ADR Preferred Shares | US71654V1017 | 2/22/2011 | 11,720 | $34.03 |
| ADR Preferred Shares | US71654V1017 | 3/1/2011 | 96,383 | $34.78 |
| ADR Preferred Shares | US71654V1017 | 4/4/2011 | 102,930 | $36.14 |
| ADR Preferred Shares | US71654V1017 | 4/5/2011 | 83,474 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 4/12/2011 | 174,387 | $34.02 |
| ADR Preferred Shares | US71654V1017 | 4/13/2011 | 139,782 | $33.40 |
| ADR Preferred Shares | US71654V1017 | 4/18/2011 | 60,515 | $32.62 |
| ADR Preferred Shares | US71654V1017 | 4/19/2011 | 22,114 | $33.06 |
| ADR Preferred Shares | US71654V1017 | 4/20/2011 | 5,910 | $33.59 |
| ADR Preferred Shares | US71654V1017 | 4/26/2011 | 7,318 | $33.87 |
| ADR Preferred Shares | US71654V1017 | 4/27/2011 | 41,969 | $33.27 |
| ADR Preferred Shares | US71654V1017 | 4/28/2011 | 15,531 | $32.60 |
| ADR Preferred Shares | US71654V1017 | 5/3/2011 | 100,532 | $32.85 |
| ADR Preferred Shares | US71654V1017 | 5/4/2011 | 34,468 | $32.05 |
| ADR Preferred Shares | US71654V1017 | 5/5/2011 | 99,997 | $31.14 |
| ADR Preferred Shares | US71654V1017 | 5/13/2011 | 105,000 | $29.28 |
| ADR Preferred Shares | US71654V1017 | 7/1/2011 | 58,127 | $30.96 |
| ADR Preferred Shares | US71654V1017 | 7/5/2011 | 1,873 | $30.97 |
| ADR Preferred Shares | US71654V1017 | 7/8/2011 | 16,034 | $30.46 |
| ADR Preferred Shares | US71654V1017 | 7/11/2011 | 23,966 | $29.69 |
| ADR Preferred Shares | US71654V1017 | 12/16/2011 | 32,600 | $23.17 |
| ADR Preferred Shares | US71654V1017 | 3/26/2012 | 55,880 | $26.40 |
| ADR Preferred Shares | US71654V1017 | 3/27/2012 | 38,180 | $26.50 |
| ADR Preferred Shares | US71654V1017 | 3/28/2012 | 59,000 | $25.76 |
| ADR Preferred Shares | US71654V1017 | 3/29/2012 | 41,700 | $25.16 |
| ADR Preferred Shares | US71654V1017 | 4/2/2012 | 14,200 | $25.38 |
| ADR Preferred Shares | US71654V1017 | 4/16/2012 | 13,052 | $23.43 |
| ADR Preferred Shares | US71654V1017 | 4/17/2012 | 24,748 | $23.33 |
| ADR Preferred Shares | US71654V1017 | 4/24/2012 | 56,350 | $22.57 |
| ADR Preferred Shares | US71654V1017 | 4/25/2012 | 91,525 | $22.62 |
| ADR Preferred Shares | US71654V1017 | 5/11/2012 | 26,550 | $20.39 |

| ADR Preferred Shares | US71654V1017 | 5/23/2012 | 25,211 | $18.81 |
| ADR Preferred Shares | US71654V1017 | 5/29/2012 | 14,884 | $19.08 |
| ADR Preferred Shares | US71654V1017 | 5/30/2012 | 15,000 | $18.39 |
| ADR Preferred Shares | US71654V1017 | 5/31/2012 | 13,737 | $18.11 |
| ADR Preferred Shares | US71654V1017 | 9/4/2012 | 62,553 | $20.10 |
| ADR Preferred Shares | US71654V1017 | 9/5/2012 | 24,778 | $20.02 |
| ADR Preferred Shares | US71654V1017 | 9/21/2012 | 27,800 | $22.72 |
| ADR Preferred Shares | US71654V1017 | 9/24/2012 | 6,200 | $22.39 |
| ADR Preferred Shares | US71654V1017 | 12/4/2012 | 193,409 | $18.04 |
| ADR Preferred Shares | US71654V1017 | 12/5/2012 | 48,400 | $17.97 |
| ADR Preferred Shares | US71654V1017 | 12/6/2012 | 21,600 | $18.11 |
| ADR Preferred Shares | US71654V1017 | 12/13/2012 | 3,900 | $18.90 |
| ADR Preferred Shares | US71654V1017 | 12/14/2012 | 17,000 | $19.09 |
| ADR Preferred Shares | US71654V1017 | 12/17/2012 | 21,000 | $18.96 |
| ADR Preferred Shares | US71654V1017 | 12/18/2012 | 10,642 | $19.04 |
| ADR Preferred Shares | US71654V1017 | 12/19/2012 | 38,815 | $19.87 |
| ADR Preferred Shares | US71654V1017 | 12/20/2012 | 231,790 | $20.11 |
| ADR Preferred Shares | US71654V1017 | 12/27/2012 | 23,626 | $19.02 |
| ADR Preferred Shares | US71654V1017 | 2/13/2013 | 110,000 | $18.26 |
| ADR Preferred Shares | US71654V1017 | 2/15/2013 | 10,131 | $17.96 |
| ADR Preferred Shares | US71654V1017 | 2/20/2013 | 47,663 | $18.08 |
| ADR Preferred Shares | US71654V1017 | 3/4/2013 | 77,014 | $16.88 |
| ADR Preferred Shares | US71654V1017 | 6/4/2013 | 30,200 | $18.85 |
| ADR Preferred Shares | US71654V1017 | 6/5/2013 | 94,058 | $18.58 |
| ADR Preferred Shares | US71654V1017 | 6/6/2013 | 119,483 | $18.23 |
| ADR Preferred Shares | US71654V1017 | 7/15/2013 | 162,818 | $13.86 |
| ADR Preferred Shares | US71654V1017 | 7/19/2013 | 124,986 | $14.38 |
| ADR Preferred Shares | US71654V1017 | 8/5/2013 | 9,520 | $14.53 |
| ADR Preferred Shares | US71654V1017 | 8/6/2013 | 118,873 | $14.27 |
| ADR Preferred Shares | US71654V1017 | 8/8/2013 | 6,536 | $14.24 |
| ADR Preferred Shares | US71654V1017 | 8/16/2013 | 60,557 | $15.15 |
| ADR Preferred Shares | US71654V1017 | 8/23/2013 | 1,400 | $15.36 |

**Emerging Markets Value Fund, a sub-fund of Dimensional Funds plc**

| ADR Common Shares | US71654V4086 | 4/14/2010 | 5,500 | $43.94 |
| ADR Common Shares | US71654V4086 | 4/23/2010 | 15,000 | $42.98 |
| ADR Common Shares | US71654V4086 | 5/6/2010 | 123,416 | $36.93 |
| ADR Common Shares | US71654V4086 | 5/7/2010 | 26,584 | $36.42 |
| ADR Common Shares | US71654V4086 | 5/19/2010 | 20,000 | $35.15 |
| ADR Common Shares | US71654V4086 | 9/24/2010 | 93,296 | $34.49 |
| ADR Common Shares | US71654V4086 | 1/4/2011 | 65,000 | $36.38 |
| ADR Common Shares | US71654V4086 | 1/5/2011 | 123,431 | $37.12 |
| ADR Common Shares | US71654V4086 | 1/7/2011 | 6,600 | $36.14 |
| ADR Common Shares | US71654V4086 | 1/10/2011 | 37,704 | $36.15 |
| ADR Common Shares | US71654V4086 | 1/11/2011 | 15,320 | $36.90 |
| ADR Common Shares | US71654V4086 | 1/20/2011 | 13,467 | $36.19 |

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 1/24/2011 | 1,909 | $36.28 |
| ADR Common Shares | US71654V4086 | 2/9/2011 | 55,961 | $35.81 |
| ADR Common Shares | US71654V4086 | 2/16/2011 | 79,895 | $37.49 |
| ADR Common Shares | US71654V4086 | 2/18/2011 | 41,340 | $37.85 |
| ADR Common Shares | US71654V4086 | 2/22/2011 | 32,507 | $38.91 |
| ADR Common Shares | US71654V4086 | 3/1/2011 | 6,390 | $39.71 |
| ADR Common Shares | US71654V4086 | 4/1/2011 | 224,200 | $41.37 |
| ADR Common Shares | US71654V4086 | 4/6/2011 | 48,800 | $40.47 |
| ADR Common Shares | US71654V4086 | 4/7/2011 | 81,331 | $40.30 |
| ADR Common Shares | US71654V4086 | 4/11/2011 | 24,069 | $40.20 |
| ADR Common Shares | US71654V4086 | 4/27/2011 | 35,000 | $37.16 |
| ADR Common Shares | US71654V4086 | 5/3/2011 | 65,319 | $36.68 |
| ADR Common Shares | US71654V4086 | 5/4/2011 | 26,955 | $35.76 |
| ADR Common Shares | US71654V4086 | 5/5/2011 | 80,000 | $34.92 |
| ADR Common Shares | US71654V4086 | 5/13/2011 | 60,000 | $33.07 |
| ADR Common Shares | US71654V4086 | 7/1/2011 | 50,000 | $34.07 |
| ADR Common Shares | US71654V4086 | 7/7/2011 | 30,000 | $33.97 |
| ADR Common Shares | US71654V4086 | 3/26/2012 | 44,858 | $27.31 |
| ADR Common Shares | US71654V4086 | 3/27/2012 | 45,791 | $27.20 |
| ADR Common Shares | US71654V4086 | 3/28/2012 | 45,926 | $26.47 |
| ADR Common Shares | US71654V4086 | 3/29/2012 | 11,474 | $26.12 |
| ADR Common Shares | US71654V4086 | 4/16/2012 | 4,120 | $24.31 |
| ADR Common Shares | US71654V4086 | 4/17/2012 | 3,180 | $24.17 |
| ADR Common Shares | US71654V4086 | 4/24/2012 | 38,390 | $23.50 |
| ADR Common Shares | US71654V4086 | 4/25/2012 | 170,010 | $23.51 |
| ADR Common Shares | US71654V4086 | 9/21/2012 | 44,250 | $23.42 |
| ADR Common Shares | US71654V4086 | 9/24/2012 | 5,150 | $23.10 |
| ADR Common Shares | US71654V4086 | 12/4/2012 | 206,065 | $18.37 |
| ADR Common Shares | US71654V4086 | 12/5/2012 | 100,350 | $18.28 |
| ADR Common Shares | US71654V4086 | 12/6/2012 | 29,800 | $18.40 |
| ADR Common Shares | US71654V4086 | 12/13/2012 | 20,200 | $19.09 |
| ADR Common Shares | US71654V4086 | 12/14/2012 | 18,400 | $19.24 |
| ADR Common Shares | US71654V4086 | 12/17/2012 | 18,400 | $19.27 |
| ADR Common Shares | US71654V4086 | 12/20/2012 | 42,366 | $20.20 |
| ADR Common Shares | US71654V4086 | 6/4/2013 | 83,302 | $17.78 |
| ADR Common Shares | US71654V4086 | 6/5/2013 | 186,449 | $17.71 |
| ADR Common Shares | US71654V4086 | 6/6/2013 | 252,535 | $17.04 |
| ADR Common Shares | US71654V4086 | 7/12/2013 | 125,270 | $13.25 |
| ADR Common Shares | US71654V4086 | 8/6/2013 | 46,854 | $13.47 |
| ADR Common Shares | US71654V4086 | 8/7/2013 | 41,728 | $13.52 |

**T.A. World ex U.S. Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| | | | | |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 3/24/2010 | 5,500 | $40.34 |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 57,053 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 3/14/2011 | 5,453 | $34.43 |
| ADR Preferred Shares | US71654V1017 | 3/23/2011 | 2,090 | $34.91 |

| ADR Preferred Shares | US71654V1017 | 3/25/2011 | 1,035 | $35.19 |
| ADR Preferred Shares | US71654V1017 | 6/16/2011 | 286 | $29.31 |
| ADR Preferred Shares | US71654V1017 | 7/1/2011 | 124 | $30.77 |
| ADR Preferred Shares | US71654V1017 | 7/28/2011 | 5,100 | $30.48 |
| ADR Preferred Shares | US71654V1017 | 12/15/2011 | 2,853 | $23.91 |
| ADR Preferred Shares | US71654V1017 | 12/19/2011 | 5,986 | $22.98 |
| ADR Preferred Shares | US71654V1017 | 12/20/2011 | 1,861 | $23.55 |

**T.A. World ex U.S. Core Equity Portfolio, a series of DFA Investment Dimensions Group Inc.**

| ADR Common Shares | US71654V4086 | 9/24/2010 | 36,385 | $34.49 |
| ADR Common Shares | US71654V4086 | 3/14/2011 | 804 | $39.34 |
| ADR Common Shares | US71654V4086 | 3/23/2011 | 996 | $40.09 |
| ADR Common Shares | US71654V4086 | 12/15/2011 | 6,098 | $25.42 |
| ADR Common Shares | US71654V4086 | 12/19/2011 | 2,352 | $24.38 |

**Emerging Markets Core Equity Fund, a sub-fund of Dimensional Funds ICVC**

| ADR Preferred Shares | US71654V1017 | 4/14/2010 | 4,816 | $39.38 |
| ADR Preferred Shares | US71654V1017 | 4/16/2010 | 4,884 | $37.91 |
| ADR Preferred Shares | US71654V1017 | 6/1/2010 | 5,500 | $32.37 |
| ADR Preferred Shares | US71654V1017 | 6/4/2010 | 4,300 | $31.69 |
| ADR Preferred Shares | US71654V1017 | 8/9/2010 | 100 | $33.06 |
| ADR Preferred Shares | US71654V1017 | 8/10/2010 | 1,500 | $32.44 |
| ADR Preferred Shares | US71654V1017 | 9/24/2010 | 3,596 | $30.59 |
| ADR Preferred Shares | US71654V1017 | 2/1/2011 | 1,800 | $33.94 |
| ADR Preferred Shares | US71654V1017 | 2/3/2011 | 7,946 | $34.00 |
| ADR Preferred Shares | US71654V1017 | 2/18/2011 | 3,231 | $33.44 |
| ADR Preferred Shares | US71654V1017 | 2/23/2011 | 2,001 | $34.79 |
| ADR Preferred Shares | US71654V1017 | 3/3/2011 | 5,397 | $35.67 |
| ADR Preferred Shares | US71654V1017 | 3/10/2011 | 10,159 | $34.50 |
| ADR Preferred Shares | US71654V1017 | 3/18/2011 | 8,341 | $34.15 |
| ADR Preferred Shares | US71654V1017 | 3/24/2011 | 2,115 | $35.05 |
| ADR Preferred Shares | US71654V1017 | 3/28/2011 | 1,209 | $35.20 |
| ADR Preferred Shares | US71654V1017 | 4/4/2011 | 2,575 | $36.14 |
| ADR Preferred Shares | US71654V1017 | 4/5/2011 | 2,089 | $35.84 |
| ADR Preferred Shares | US71654V1017 | 5/9/2011 | 962 | $30.48 |
| ADR Preferred Shares | US71654V1017 | 5/12/2011 | 41,200 | $29.76 |
| ADR Preferred Shares | US71654V1017 | 5/17/2011 | 7,400 | $30.37 |
| ADR Preferred Shares | US71654V1017 | 5/18/2011 | 9,707 | $30.71 |
| ADR Preferred Shares | US71654V1017 | 6/10/2011 | 4,848 | $30.04 |
| ADR Preferred Shares | US71654V1017 | 6/13/2011 | 18,352 | $30.02 |
| ADR Preferred Shares | US71654V1017 | 6/20/2011 | 1,700 | $29.39 |
| ADR Preferred Shares | US71654V1017 | 7/1/2011 | 2,131 | $30.96 |
| ADR Preferred Shares | US71654V1017 | 7/11/2011 | 2,008 | $29.71 |
| ADR Preferred Shares | US71654V1017 | 8/1/2011 | 248 | $30.64 |
| ADR Preferred Shares | US71654V1017 | 8/25/2011 | 7,700 | $25.25 |
| ADR Preferred Shares | US71654V1017 | 11/25/2011 | 205 | $23.14 |

| ADR Preferred Shares | US71654V1017 | 12/1/2011 | 25,577 | $25.06 |
|---|---|---|---|---|
| ADR Preferred Shares | US71654V1017 | 12/9/2011 | 400 | $25.71 |
| ADR Preferred Shares | US71654V1017 | 1/18/2012 | 7,600 | $27.55 |
| ADR Preferred Shares | US71654V1017 | 1/19/2012 | 19,400 | $27.82 |
| ADR Preferred Shares | US71654V1017 | 1/20/2012 | 10,528 | $27.44 |
| ADR Preferred Shares | US71654V1017 | 2/16/2012 | 3,209 | $26.72 |
| ADR Preferred Shares | US71654V1017 | 3/1/2012 | 2,036 | $28.83 |
| ADR Preferred Shares | US71654V1017 | 3/8/2012 | 4,400 | $27.46 |
| ADR Preferred Shares | US71654V1017 | 4/3/2012 | 43,500 | $24.99 |
| ADR Preferred Shares | US71654V1017 | 5/7/2013 | 1,400 | $20.26 |
| ADR Preferred Shares | US71654V1017 | 5/17/2013 | 4,733 | $19.54 |
| ADR Preferred Shares | US71654V1017 | 6/7/2013 | 2,044 | $17.95 |
| ADR Preferred Shares | US71654V1017 | 6/10/2013 | 906 | $17.61 |
| ADR Preferred Shares | US71654V1017 | 6/11/2013 | 5,565 | $17.09 |
| ADR Preferred Shares | US71654V1017 | 6/14/2013 | 18,658 | $17.46 |
| ADR Preferred Shares | US71654V1017 | 6/17/2013 | 2,089 | $17.21 |
| ADR Preferred Shares | US71654V1017 | 6/18/2013 | 8,263 | $16.52 |
| ADR Preferred Shares | US71654V1017 | 8/16/2013 | 1,339 | $15.10 |
| ADR Preferred Shares | US71654V1017 | 8/19/2013 | 9,177 | $14.85 |
| ADR Preferred Shares | US71654V1017 | 9/25/2013 | 11,929 | $17.02 |
| ADR Preferred Shares | US71654V1017 | 10/29/2013 | 8,349 | $17.87 |
| ADR Preferred Shares | US71654V1017 | 10/31/2013 | 7,549 | $18.60 |
| ADR Preferred Shares | US71654V1017 | 11/6/2013 | 6,522 | $17.82 |
| ADR Preferred Shares | US71654V1017 | 11/12/2013 | 17,775 | $17.13 |
| ADR Preferred Shares | US71654V1017 | 12/19/2013 | 5,694 | $14.45 |
| ADR Preferred Shares | US71654V1017 | 1/30/2014 | 14,300 | $12.30 |

**Emerging Markets Core Equity Fund, a sub-fund of Dimensional Funds ICVC**

| ADR Common Shares | US71654V4086 | 6/1/2010 | 4,520 | $36.93 |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 6/2/2010 | 9,680 | $36.33 |
| ADR Common Shares | US71654V4086 | 8/9/2010 | 1,400 | $38.09 |
| ADR Common Shares | US71654V4086 | 9/24/2010 | 3,499 | $34.49 |
| ADR Common Shares | US71654V4086 | 2/3/2011 | 5,200 | $38.16 |
| ADR Common Shares | US71654V4086 | 2/4/2011 | 15,200 | $38.31 |
| ADR Common Shares | US71654V4086 | 2/18/2011 | 1,267 | $37.85 |
| ADR Common Shares | US71654V4086 | 2/23/2011 | 599 | $40.07 |
| ADR Common Shares | US71654V4086 | 3/3/2011 | 3,934 | $40.84 |
| ADR Common Shares | US71654V4086 | 3/24/2011 | 4,600 | $40.37 |
| ADR Common Shares | US71654V4086 | 4/1/2011 | 2,106 | $41.35 |
| ADR Common Shares | US71654V4086 | 4/4/2011 | 694 | $41.42 |
| ADR Common Shares | US71654V4086 | 5/6/2011 | 7,600 | $35.03 |
| ADR Common Shares | US71654V4086 | 5/12/2011 | 18,400 | $33.53 |
| ADR Common Shares | US71654V4086 | 5/17/2011 | 5,800 | $34.01 |
| ADR Common Shares | US71654V4086 | 5/18/2011 | 11,195 | $34.38 |
| ADR Common Shares | US71654V4086 | 6/10/2011 | 8,098 | $33.07 |
| ADR Common Shares | US71654V4086 | 6/13/2011 | 3,702 | $33.30 |

| | | | | |
|---|---|---|---|---|
| ADR Common Shares | US71654V4086 | 6/20/2011 | 1,900 | $32.18 |
| ADR Common Shares | US71654V4086 | 7/1/2011 | 1,500 | $34.07 |
| ADR Common Shares | US71654V4086 | 7/7/2011 | 5,400 | $33.97 |
| ADR Common Shares | US71654V4086 | 9/26/2011 | 2,200 | $22.65 |
| ADR Common Shares | US71654V4086 | 11/3/2011 | 3,583 | $26.83 |
| ADR Common Shares | US71654V4086 | 11/25/2011 | 2,301 | $24.90 |
| ADR Common Shares | US71654V4086 | 12/1/2011 | 12,899 | $27.36 |
| ADR Common Shares | US71654V4086 | 1/18/2012 | 9,505 | $29.56 |
| ADR Common Shares | US71654V4086 | 1/19/2012 | 4,600 | $30.11 |
| ADR Common Shares | US71654V4086 | 1/20/2012 | 10,800 | $29.72 |
| ADR Common Shares | US71654V4086 | 2/16/2012 | 5,176 | $28.50 |
| ADR Common Shares | US71654V4086 | 3/1/2012 | 11,300 | $30.18 |
| ADR Common Shares | US71654V4086 | 4/3/2012 | 21,550 | $26.15 |
| ADR Common Shares | US71654V4086 | 6/7/2013 | 2,081 | $16.86 |
| ADR Common Shares | US71654V4086 | 6/10/2013 | 12,252 | $16.54 |
| ADR Common Shares | US71654V4086 | 6/11/2013 | 5,632 | $16.12 |
| ADR Common Shares | US71654V4086 | 6/14/2013 | 7,826 | $16.13 |
| ADR Common Shares | US71654V4086 | 6/17/2013 | 2,140 | $15.87 |
| ADR Common Shares | US71654V4086 | 8/16/2013 | 5,600 | $14.39 |
| ADR Common Shares | US71654V4086 | 8/19/2013 | 4,311 | $14.14 |
| ADR Common Shares | US71654V4086 | 9/20/2013 | 10,765 | $16.08 |
| ADR Common Shares | US71654V4086 | 10/29/2013 | 7,100 | $17.15 |
| ADR Common Shares | US71654V4086 | 10/31/2013 | 2,882 | $17.83 |
| ADR Common Shares | US71654V4086 | 11/6/2013 | 4,166 | $17.08 |
| ADR Common Shares | US71654V4086 | 11/12/2013 | 14,167 | $16.40 |
| ADR Common Shares | US71654V4086 | 12/19/2013 | 3,705 | $13.40 |
| ADR Common Shares | US71654V4086 | 1/30/2014 | 22,701 | $11.44 |
| ADR Common Shares | US71654V4086 | 4/29/2014 | 15,394 | $14.43 |